**In re A.H. ROBINS COMPANY, INCORPORATED, Debtor.**

Nos. 88–1755, 88–1757, 88–1766 and 88–3604.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 6, 1988.

Decided June 16, 1989.

Irving R.M. Panzer, Joseph Francis McDowell, III (Cullity, Kelley & McDowell, Manchester, N.H., Sidney L. Matthew, Tallahassee, Fla., John T. Baker, Denver, Colo., Bragg & Dubofsky, P.C., Boulder, Colo., Robert E. Manchester, Manchester Law Offices, P.A., Bradley Post, Post, Syrios & Bradshaw, Wichita, Kan., James F. Szaller, Cleveland, Ohio, Brown & Szaller, Co., LPA, on brief), for appellants.

John G. Harkins, Jr. (Deborah F. Cohen, Philadelphia, Pa., Richard B. Herzog, Gerald P. Norton, Mark Schattner, Pepper, Hamilton & Scheetz, Washington, D.C., on brief), Joseph Stuart Friedberg (Joseph S. Friedberg, Chartered, Ronald I. Meshbesher, Meshbesher, Singer & Spence, Ltd., Minneapolis, Minn., John A. Cochrane, Cochrane & Bresnahan, P.A., St. Paul, Minn., Herbert B. Newberg, Martin J. D'Urso, Herbert B. Newberg, P.C., Philadelphia, Pa., James Hovland, Krause & Rollins, Minneapolis, Minn., Douglas W. Thomson, Thomson, Hawkins & Ellis, Theodore I. Brenner, Bremner, Baber & Janus, W. Scott Street, III, A. Peter Brodell, Williams, Mullen, Christian & Dobbins, Richmond, Va., on brief), for appellees.

Before RUSSELL, WIDENER, and CHAPMAN, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

This diversity suit by seven individual claimants, suing on their own behalf and as the proposed class representatives of all injured Dalkon Shield claimants, seeks recovery against Aetna Casualty and Surety Company (Aetna) for injuries resulting from the use of an allegedly defective intrauterine device known as the Dalkon Shield. Aetna was neither the manufacturer nor the vendor of the device; it was the products liability insurance carrier of A.H. Robins Company, Inc. (Robins), the manufacturer and distributor of the device. It is the theory of the plaintiffs that Aetna's conduct, while acting in its role as insurance carrier, was such that it rendered itself liable as a joint tortfeasor with Robins for any injuries sustained by persons using the device. The plaintiffs sought class certification of the suit. During consideration whether to give final certification of the suit, the parties entered into a settlement of the action conditioned on certification. After a duly-noticed hearing, the District Court granted in separate orders final class certification of the action and approval of the settlement of the action so certified. The appeal challenges the two orders. Since the two orders from which the appeals are taken are intimately connected, the two appeals have been consolidated. We affirm both the class certification and the settlement orders.

## I.

In the early 1960's, Dr. Hugh Davis, a gynecologist on the staff of the Johns Hopkins Hospital and the Johns Hopkins Medical School, developed an intrauterine device which has been generally described as a Dalkon Shield. In conjunction with some associates, Dr. Davis, in the mid 1960's, began to manufacture and sell on a small scale the Dalkon Shield. This limited operation continued until early 1970 when A.H. Robins Co., Inc. (Robins), which was a well-recognized and successful manufacturer and marketer of pharmaceutical products, acquired the exclusive right to manufacture and market the Dalkon Shield. In his findings in connection with this purchase by Robins of exclusive rights in the manufacture and sale of the Dalkon Shield, the District Judge said:

> Prior to that time (*i.e.*, the purchase of the Dalkon Shield), Robins had never marketed any kind of a birth control product and had no gynecologist on its medical staff. Nevertheless, Robins did no further testing, readily accepted the figures of the inventor's testing, and aggressively promoted the device to the medical profession and, uniquely for such a device, to the general public.

Robins, however, did not begin the marketing of the device until early 1971. Whether as a result of the promotional efforts of Robins or not, the product received wide public acceptance, and its sale was brisk. Between 1971 and mid-1974 when sales were discontinued, some 2,200,000 Dalkon Shields were sold. These sales generated a gross revenue for Robins of $11,240,611.00 and a gross profit of $505,499.00.[1]

The product, however, had hardly been introduced into the market before what the District Court herein described as "an extraordinary volume" of complaints of injuries suffered by reason of its use began to surface. By 1973, the complaints had reached such a level that Robins felt compelled to send its first "Dear Doctor" letter to the medical profession advising the profession of a septic abortion problem arising out of the use of the device along with a suggestion for reducing the risk of such problem. The complaints from users of the device, however, continued at such a pace that by mid-1974 Robins finally withdrew the product from the market. Robins did not, though, issue any product recall until September 1980, when it addressed its second "Dear Doctor" letter to the medical profession. In this letter it recommended that the devices be removed from all continuing users, even those with no manifest problems, and it noted, as summarized by the District Court, that "long-term users of all IUD's had a higher risk of exposure to actinomyces, a virulent strain of microorganism implicated as a cause of pelvic inflammatory disease." However, there was no realistic recall of the Dalkon Shield until 1984.

The early complaints of injury from the use of the device quickly generated lawsuits against Robins in various parts of the country. Aetna Casualty and Surety Company (Aetna), as the products liability insurance carrier, was obligated to defend the suits filed against Robins in that connection. The first action to come to trial against Robins charging injuries from the use of the Dalkon Shield arose in the state court in Kansas and resulted in a verdict in February 1975 in favor of the plaintiff in the amount of $85,000, including a $75,000 punitive damage award. This verdict was widely publicized and the filing of actions against Robins quickened.[2] This multiplication of suits—such, for instance, as approximately two hundred at the same time in the Northern District of California[3] and

---

1. These figures are taken from the opinion in *In re A.H. Robins Co., Inc.*, 89 B.R. 555, 557 (E.D. Va.1988).

2. There appears to have been considerable recruiting of claimants by attorneys. In one case, the recruiting prompted a proceeding under the Ohio Code of Professional Responsibility. The attorney had successfully secured 106 claims through his advertising. For the Supreme Court decision on the practice, *see Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985).

3. *See In re Northern District of California "Dalkon Shield" IUD Products Liability Litigation*, 526 F.Supp. 887 (N.D.Cal.1981), *vacated*, 693

in the District of Maryland,[4]—posed a serious problem of manageability for the courts before which the suits were pending.

Many of the courts referred the multiplicity of suits in their district for consolidated pre-trial proceedings under the direction of the Judicial Panel on Multi–District Litigation in the hope that such action might reduce the difficulties of disposing expeditiously of the mounting Dalkon Shield case burden. *See In re A.H. Robins Co., Inc. "Dalkon Shield" IUD Products Liability Litigation,* 406 F.Supp. 540 (J.P. M.D.L.1975); 419 F.Supp. 710 (J.P.M.D.L. 1976); and 438 F.Supp. 942 (J.P.M.D.L. 1977). After the entry of a number of such orders of transfer, the Judicial Panel finally concluded that their previous orders accepting transfers had accomplished as much as could be achieved in reducing pre-trial proceedings and it began vacating later transfer orders, returning the cases for further proceedings to the respective transferor courts. *In re A.H. Robins Co., Inc. "Dalkon Shield" IUD Products Liability Litigation,* 453 F.Supp. 108 (J.P.M.D.L. 1978); and 505 F.Supp. 221 (J.P.M.D.L. 1981). While these proceedings before the Judicial Panel had aided the problems of discovery in the Dalkon Shield cases, they did nothing to relieve the clogging of court calendars by the constantly increasing stream of Dalkon Shield cases to be tried, nor did they reduce substantially the trial time of the cases. It was manifest that other measures were required if this overloading of the courts with Dalkon Shield cases was to be relieved.

District Judge Miles Lord of the Minnesota District Court, to whom had been assigned in the late 1970's and early 1980's a large number of Dalkon Shield cases, determined to try his hand at expediting the disposition of such cases as were before him. He consolidated a large number of such suits and appointed a lead counsel to handle discovery. He prodded the counsel so appointed to proceed aggressively, and he named two masters to sift through all the material discovered and to prepare a report for counsel and the court based on all material discovered and any developed in their independent investigations. The masters did conduct considerable independent investigations. Thus, they reviewed carefully the relevant records in the files of Robins and inquired into the possible involvement of Aetna with Robins in the defense planning and activity. All of this discovery, along with that developed by lead counsel, was catalogued by lead counsel appointed by the Court. The suits in litigation before Judge Lord, however, were at this point settled for $38 million and no further proceedings were had in Judge Lord's court (and that of his successor). The lead counsel in this litigation before Judge Lord withdrew from any subsequent Dalkon Shield litigation but made available to counsel in other cases the discovery developed in that case.

## II.

Other courts took another tack in an effort to manage expeditiously and fairly the mass of Dalkon Shield cases. They turned to the class action procedure provided by Rule 23, Fed.R.Civ.P. The great volume of cases which were inundating the court system and the similarity of the issues in all the cases, it was thought, provided a proper basis for class treatment both in the interests of the parties and of the courts. The first case in which this procedure was invoked was *Rosenfeld v. A.H. Robins Co., Inc.,* 63 A.D.2d 11, 407 N.Y. S.2d 196 (N.Y.App.Div.), appeal dismissed, 46 N.Y.2d 731, 413 N.Y.S.2d 374, 385 N.E. 2d 1301 (1978). In that case, the plaintiffs sought class certification under a New York statute modeled after Rule 23, and Robins, oddly enough, opposed such certification. The motion court denied certification and, on appeal, that decision was affirmed. The court, in affirming that decision, stated that:

> In view of the complicated issues of fact which must be resolved on an indi-

---

F.2d 847 (9th Cir.1982), *cert. denied,* 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983).

**4.** *Kontoulas v. A.H. Robins Co.,* 745 F.2d 312 (4th Cir.1984).

vidual basis, it is our opinion that common questions of law and fact do not predominate in this action and that the Special Terms correctly denied plaintiffs' motion for class certification.

407 N.Y.S. at 201.

The court added as the rationale for this conclusion that "[t]he difficulties involved in determining the causality of injuries of this sort cannot be overstated." *Ibid.* at 201. It also denied partial certification because the issues which would have been pertinent in such a certification were "so thoroughly intertwined with those which must be determined individually." *Ibid.* at 201. It is obvious from these comments that it was the problem of individual causality which motivated the court in its denial in this case of class certification.

The next stab at class certification arose in *In re Northern District of California "Dalkon Shield" IUD Products Liability Litigation,* 526 F.Supp. 887 (N.D.Cal.1981) *vacated,* 693 F.2d 847 (9th Cir.1982), *cert. denied,* 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983). In that case, the District Judge, confronted with a mass of Dalkon Shield cases pending for trial in his court, concluded that a class certification was an appropriate—in fact, the only—available procedure for expediting the fair disposition of such suits and preventing a waste of judicial resources in trying individually cases in which there would be an endless repetition at great length of many of the same facts. He accordingly proceeded on his own motion to certify a nationwide class action on the issue of punitive damages under Rule 23(b)(1)(B) and a statewide (California) class action on the issue of liability under Rule 23(b)(3). He supported his decision with a cogently reasoned opinion. However, on appeal, that decision was reversed. 693 F.2d 847 (9th Cir.1982).

The Court of Appeals, in reversing the District Court's certification sought to divide the certification issue into two broad classes: One deals with the class (b)(3) certification of the issue of liability for the manufacture and sale of a defective product; the second relates to the District Court's certification under the "limited fund" doctrine of the claim for punitive damages under (b)(1)(B). On the first point, the Court of Appeals said that, despite the fact that the certification under (b)(3) was "limited to the issue of liability," "Robins' overall liability, under some of the theories [of liability], cannot be proved unless each plaintiff also proves that Robins' breach of duty proximately caused her particular injury." 693 F.2d at 853, 856. It recognized that Rule 23(c)(4)(A) authorizes and encourages separating issues for certification where economies of trial may be achieved, but dismissed the use of such authority in this case because "[t]he complexity of issues peculiar to individual claims militates against grouping all plaintiffs into a class for only part of their recovery" and "[t]he few issues that might be tried on a class basis in this case, balanced against issues [such as causation and damages] that must be tried individually, indicate that the time saved by a class action may be relatively insignificant. A few verdicts followed by settlements might be equally efficacious."[5] *Ibid.* at 855, 856. It then added this somewhat contradictory sentence: "We do not preclude further consideration by the District Court of motions to certify a more limited class or subclasses under Rule 23(b)(3)," *Ibid.* at 856, seemingly suggesting that if the District Court would further break the issue down certification might be appropriate. It proceeded to add that the petitioner for class certification had failed to satisfy the "typicality" requirement of subsection (a)(3) or the "superiority" requirement of (b)(3). For this conclusion the Court of Appeals relied on the Advisory Committee's Note to (b)(3) and on *La Mar v. H & B Novelty and Loan Co.,* 489 F.2d 461 (9th Cir.1973) and *McDonnell Douglas Corp. v. U.S. District*

---

**5.** This sentence suggests that settlement was the method by which these mass torts should be solved. It indicated that a few trials might provide a basis for such settlement. At the time there had been a score of verdicts in Dalkon Shield litigation. This basis for settlement was present. But was the court suggesting a class certification for settlement purposes? The opinion is unclear. We discuss this point later on in this opinion.

*Court for the Central Division of California, et al.,* 523 F.2d 1083 (9th Cir.1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976), two cases which held that the "flexible" language of Rule 23 itself had, in the interest of manageability, to be reined in with constraining limitations, which were not expressed in the Rule.[6] The Court of Appeals appears to have found also that the (a)(4) requirement of "adequate representation" was not met. In that regard, it stated that "[n]o plaintiff has appeared in this appeal in support of class certification," "no plaintiff [had] accepted" the role of class representative, "none of the attorneys already involved [was] willing to serve as class counsel" and the District Court had been forced to appoint counsel to maintain the class action. 693 F.2d at 850–51. The appointed counsel had resigned and the replacement had not started to represent the class.[7] 693 F.2d at 850–51. However, in concluding this phase of its opinion, the Court of Appeals ambiguously said:

> We are not necessarily ruling out the class action tool as a means for expediting multi-party product liability actions in appropriate cases, but the combined difficulties overlapping each of the elements of Rule 23(a) preclude certification in this case. 693 F.2d at 851.

In reversing the certification of the punitive damages claim under (b)(1)(B), the Court of Appeals held apparently that to qualify for certification under the "limited fund" doctrine, the movant for certification must prove the fact that the fund is inadequate to pay all claims "inescapably," 693 F.2d at 851, and it found that the District Court had erred in finding to the contrary in entering an order of certification of the punitive damage claim under (b)(1)(B).[8]

6. *McDonnell Douglas* held (1) that "[n]one of these subdivisions, [of (b)(1)(A), (b)(1)(B) or (b)(2)] permits certifications of a class whose members have independent tort claims arising out of the same occurrence and whose representatives assert only liability for damages," and (2) the "'incompatible standards of conduct' of subdivision (b)(1)(A) must be interpreted to be incompatible standards of conduct required of the defendant in fulfilling judgments in separate actions" and "a judgment that defendants were liable to one plaintiff would not require action inconsistent with a judgment that they were not liable to another plaintiff" did not satisfy this standard.

Both of these rules, the first of which is stated at page 1085, 523 F.2d, and the second at page 1086, are premised in *La Mar, supra,* in which the court had said it had to depart from the "flexible" language of the Rule itself and to fashion its own set of principles that would render the Rule inapplicable to damage suits. As we shall see, the "trend of the decisions" is contrary to this limiting construction of the Rule as stated in *La Mar* and *McDonnell Douglas. See School Asbestos Litigation,* 789 F.2d 996, 1009 (3d Cir.1986). We discuss these cases in more detail later herein.

7. As we see later, several courts consider this the real basis for the court of appeal's decision. In *Agent Orange,* 100 F.R.D. 718, 726 (E.D.N.Y. 1983), Judge Weinstein said: "The Court's decision [in *In re Dalkon Shield,* 693 F.2d 847] was based largely on the fact that no plaintiff or defendant supported certification."

*In re Temple,* 851 F.2d 1269, 1273, n. 7 (11th Cir.1988), the court construed *In re Dalkon Shield* as approving class action certification of "mass torts" situations, though not of "products

liability" actions. Thus *Temple* states: "[s]ome courts have noted that mass torts caused by a single transaction, *i.e.,* a plane crash, might be proper subject of a class action. *In re Dalkon Shield,* 693 F.2d at 853," impliedly finding that a products liability case was not proper. The reason assigned by *In re Dalkon Shield* for its distinction between the mass torts and products liability suit in this regard was that in the mass torts "the cause of the common disaster is the same for each of the plaintiffs"; whereas in the products liability action, "individual issues may outnumber common issues. No single happening or accident occurs to cause similar types of physical harm or property damage." 693 F.2d at 853. This distinction, however, is not applicable to this case. The defectiveness of the Dalkon Shield is the issue of causation in every Dalkon Shield case, just as the crash of the plane is the common cause in the mass torts action construed by the Court.

8. The District Court had found a "limited fund" where recovery of punitive damages in one case carried the risk of prejudicing the rights of other claimants to recover punitive damages on two facts primarily: "(1) At the time there were 1,573 suits involving claims for compensatory damages of "well over $500 million", and (2) [t]he potential for the constructive bankruptcy of A.H. Robins, a company whose net worth is $280,394,000, raised the unconscionable possibility that large numbers of plaintiffs who are not first in line at the courthouse door will be deprived of a practical means of redress." In *In re Northern District of Cal, Dalkon Shield IUD Products Liability Litigation,* 521 F.Supp. 1188, 1191 (N.D.Cal.1981). As we note later, the idea that one seeking class certification under the

In 1984, Robins itself thereafter filed an action seeking class certification of the claim for punitive damages in all Dalkon Shield suits in the Eastern District of Virginia. *In re Dalkon Shield Punitive Damages Litigation,* 613 F.Supp. 1112 (E.D.Va. 1985). Certification was denied. The District Judge construed the decision by the Ninth Circuit Court of Appeals in *In re Northern District of California Dalkon Shield Products Liability Litigation, supra,* (693 F.2d 847), as having held that Rule 23(a) with its requirements of commonality, typicality and adequate representation were not met in the negligence and warranty claims for punitive damages against Robins and concluded that such decision barred under familiar principles of collateral estoppel this subsequent request for certification of the propriety of punitive damages awards in Dalkon Shield cases.

The final effort at maintaining a class action against Robins before the filing of the action which is the subject of this appeal occurred in early 1985. At that time counsel who later filed this action instituted in the District Court of Virginia a proposed class action against Robins. The complaint in that action included the same general allegations which had been made in earlier attempts at maintaining a class action in the Dalkon Shield litigation but added an important new averment. It alleged that at the time the action was filed, Robins was insolvent and that the value of outstanding claims, filed and unfiled, exceeded Robins' value, thereby exposing filing victims to economic prejudice at the hands of more timely filed claims. The action sought a gross judgment, the proceeds from which would be equitably distributed among Dalkon Shield claimants *under an alternative dispute resolution process.*[9] Robins opposed the suit and denied insolvency. Though a hearing was

had by the District Court on the motion for class certification, no order on that motion was issued prior to the filing by Robins of the Chapter 11 proceedings. The motion has remained dormant since.

### III.

During the period of these proceedings before the Judicial Panel and the attempts at class certification as already detailed, the flood of suits against Robins by Dalkon Shield claimants had continued unabated. By 1985 "an average in excess of seventy (70) cases per week were being filed," usually seeking "both compensatory and punitive damages."[10] Moreover, large verdicts were being returned against Robins. Illustrative of that was a case in the same court before which the first verdict in a Dalkon Shield case in mid–1975 was returned. In 1985, with the same counsel representing the plaintiff, a verdict of $9.1 million (of which $7.5 million was awarded as punitive damages) was returned against Robins. In short, beginning with an award of $85,000 in 1975, awards in the Dalkon Shield cases escalated by 1985 with verdicts such as this latest verdict to over $9 million. Such suits understandably were taking their toll on Robins' resources.

### IV.

Under these circumstances, it was but natural that some Dalkon Shield claimants and their counsel would have become apprehensive of the ability of Robins to meet the liabilities being asserted in all the pending Dalkon Shield cases. Another "deep pocket" had to be sought and a number of the claimants focused on Aetna as this other "deep pocket." Various suits were begun prior to the filing or immediately after the filing by Robins of its Chapter 11

limited fund doctrine must prove the inadequacy of the fund to be "inescapable" has been repudiated in other decisions. *See In re Bendectin Products Liability Litigation,* 749 F.2d 300, 306 (6th Cir.1984), later discussed with extensive citation of other precedents.

**9.** It is interesting that at this early stage, counsel contemplated disposing of individual issues of

causation and damages through a "dispute resolution" mechanism, the same procedure established in the Robins Plan of Reorganization and the *Breland* settlement, which we later discuss.

**10.** *In re A.H. Robins Co., Inc.,* 89 B.R. 555, 557 (E.D.Va.1988).

petition against Aetna charging liability on its part as a tortfeasor with Robins.

Typical of such suits was *Bast, et al. v. A.H. Robins Co., Inc.,* 616 F.Supp. 333 (E.D.Wis.1985). In that case, the Dalkon Shield plaintiffs sought, in the words of the Court, "to impose direct liability for their injuries upon Aetna Casualty and Surety Company, the A.H. Robins Company's insurance carrier," under a claim that Aetna had, by its actions, made itself a joint tortfeasor equally liable as Robins. They alleged virtually the same substantive claims as did the plaintiffs in the case before us, to wit, negligence, express and implied warranty, misrepresentation and fraud, all garnished with a RICO claim. The Court found the complaint flawed because the plaintiffs had failed to "aver the existence of a duty of care owed the plaintiffs by Aetna, and resultant injuries proximately caused by such breach." 616 F.Supp. at 334. It, therefore, dismissed the action.

A few weeks after *Bast* was dismissed, and about a week before Robins filed its Chapter 11 petition, a similar case came before the District Court in the other district of the same state. *Campbell, et al. v. A.H. Robins Co., Inc.,* 615 F.Supp. 496 (W.D.Wis.1985). The complaint in this action charged the same negligence, warranty, misrepresentation, conspiracy, fraud and RICO counts as had *Bast.* Aetna filed a motion to dismiss and the Court granted the motion. In dismissing the suit, the Court said that all the claims were "faulty for the simple reason that an insurer owes no duty of care to injured third parties under Wisconsin law." In the same vein, the court said that "there must be allegations of how a defendant may have breached such duties, and how the plaintiffs' injuries may have been caused by the defendant." 615 F.Supp. at 500 (citation omitted). It added too that "retrospective liability of co-conspirators does not operate to make the late-entering conspirator responsible for the already completed substantive offenses of his cohorts." *Ibid.* It dis-

missed the RICO claim as "deficient in two respects: the complaint does not allege a causal connection between the racketeering offenses attributable to Aetna and the injuries that plaintiffs suffered; and the complaint does not, and cannot, allege an injury to 'business or property' as required by 18 U.S.C. § 1964(c)." *Ibid.* (footnote omitted).

Other suits against Aetna were filed seeking to charge it as a joint tortfeasor with Robins in the Dalkon Shield litigation. So far as we can ascertain, motions for dismissal in all such actions were filed by Aetna and, such as had been heard and ruled on, had been granted. *See Bathurst v. Aetna Casualty and Surety Co.,* No. 85–C–0324 (E.D.Wis.1985) and *Dyes v. Aetna Casualty and Surety Co.,* No. C–85–3932A (N.D.Ga.1985).[11]

### V.

In addition to all these attempts at class action certification, either total or partial, and attempted suits against Aetna, there had been a running dispute between Aetna and Robins on the extent of the coverage under Aetna's policy. This difference apparently existed from the very beginning of the Dalkon Shield litigation. In 1979 Aetna had filed a declaratory action to resolve some of these disputes and differences. In October, 1984, a settlement was agreed upon in this litigation after extensive negotiations. In a compromise settlement of the dispute, Aetna agreed, among other things, to provide a small additional coverage above its claimed limits of $300 million. By mid–1985, there was argument between Robins and Aetna over the amount of remaining liability, if any, under Aetna's policy available for payment of judgments entered in the Dalkon Shield litigation.

### VI.

By this time, Robins had been frustrated in every effort to reduce the expenses of

---

11. It was represented to this Court, without contradiction, that 144 of like cases had been filed against Aetna. Motions for dismissal were made in all of them by Aetna. Forty of the motions had been heard. Four had been voluntarily dismissed, and in the remaining 36, the trial court had granted the motion to dismiss, and that dismissal had not been appealed.

defending the individual suits being filed through the use of the class action device. The costs of defense, the disruption that all the individual trials was placing on its executive force, and the expense of discharging some of the judgments were putting great financial strain on Robins. Its funds had been so depleted by the suits that its unrestricted funds had been reduced to $5 million and "financial institutions were unwilling to lend it money." It had actually experienced considerable difficulty in collateralizing as a condition of appeal the judgment in the case where the plaintiffs had recovered in early 1985 a $9.1 million judgment. Faced with its obvious financial deterioration, a deterioration which gave every indication of accelerating, Robins felt its only avenue for paying equitably and fairly all the claims was through a Chapter 11 proceeding. So on August 22, 1985, Robins filed in the Eastern District Court of Virginia its Chapter 11 petition. By the time Robins filed this petition it and/or its insurance carrier had settled 9,238 claims for approximately $530,000,000. Despite these settlements, Robins, at the time it filed for relief, still faced over five thousand pending cases in state and federal court. *In re A.H. Robins Co., Inc., supra,* 89 B.R. at 557.

## VII.

A few months after the Chapter 11 petition was filed, seven Dalkon Shield claimants, suing individually and as the class representative of all Dalkon Shield claimants, filed this action against Aetna *alone* to recover for the injuries allegedly suffered by them as a result of the use of the Dalkon Shield. The plaintiffs (hereafter often referred to as the *Breland* plaintiffs) asked at the outset of their complaint that the action be certified as a class suit on behalf of the whole class of Dalkon Shield claimants, which class they averred should be divided into two such classes identified as Class A and Class B. Class A members were those claimants who had complied with all the requirements for proof as a claimant in the Robins bankruptcy proceedings, and Class B members were those who had failed to so comply. Alleging compli-

ance with the prerequisites of Rule 23, they asked that the action against Aetna be certified as a class action against Aetna on behalf of both Classes A and B under Rule 23(b)(1)(A) and (B), without opt-out rights on the part of any member of either Class. They proffered allegations of justification for this action. They then separated their substantive claims into two categories. The first was characterized by them as their "Limited Fund Contract Claim." This claim related to Aetna's liability under its Robins policy. In 1984, after several years of haggling between Robins and Aetna, an agreement, as we have already said, was reached which changed in some particulars Aetna's obligation under its policy to the prejudice of those entitled to avail themselves of rights under it. It was the premise of the *Breland* plaintiffs that the Dalkon Shield claimants were third-party beneficiaries under the policy and as such had a common, undivided interest in the value of the policy. They sought "vitiation" of this 1984 agreement between Robins and Aetna. This was the subject of the "limited fund" claim.

The second claim of the *Breland* plaintiffs was for recovery of damages against Aetna as a joint tortfeasor for all injuries sustained by the two Dalkon Shield Classes of claimants by reason of the use of the Dalkon Shield. The plaintiffs alleged as a basis for their charge against Aetna as a joint tortfeasor that from "the time the Defendant [Aetna] agreed to insure Robins and continuing up to the present, Defendant became an active participant in all stages of the development, testing, promotion, and marketing of the product as well as being inexorably involved in the palliation of the public and the medical profession." They followed with a statement of the same claims of liability under negligence, strict liability, express and implied warranty, fraud, and conspiracy plus the standard RICO averments that were becoming routine allegations in the suits filed by Dalkon Shield claimants against Robins.

In its answer to this complaint, Aetna admitted at the outset federal jurisdiction

"over this action pursuant to 28 U.S.C. § 1334(b) and 11 U.S.C. § 105 because this action arises in and is related to *In re A.H. Robins Company, Inc. Chapter 11 Case No. 85–01307–R,*" and expressly conceded the accuracy of plaintiffs' allegations in paragraph 26 of their [the plaintiffs'] complaint, which was in these words:

> The class is severely prejudiced and adversely affected unless a single class action is permitted to be maintained in which class representatives under strict court guardianship are in a position to bind the class and Aetna in a unitary proceeding against Aetna. The equitable underpinnings for the certification of mandatory Rule 23(b)(1) class actions are satisfied under these extraordinary circumstances.

It added affirmatively in that connection "that Aetna [itself] would be severely prejudiced if forced to respond to multiple suits filed by class members. The application of incompatible standards to Aetna would impair Aetna's ability to engage in the consistent, continuing course of conduct relative to its duties and obligations as an insurer."

On the merits of the claims, Aetna denied specifically all allegations of the complaint charging liability on its part along with Robins in the Dalkon Shield cases as a joint tortfeasor, stating affirmatively that

> Aetna's action and activities complained of by plaintiffs are based on Aetna's relationship with Robins as its insurer, and not on any direct conduct or contact between Aetna and any of the plaintiffs claiming injury from use of the Dalkon Shield. No action by Aetna caused any injury to any plaintiff as a matter of fact or of law.

It said in further explication of this defense that it was "neither a manufacturer nor a seller of the Dalkon Shield and, therefore, is not subject to strict liability."

### VIII.

With the joinder of issues in the action, the plaintiffs moved promptly for class certification in accordance with the allegations of their complaint. The District Court heard such motion on October 30, 1986. In its order entered some weeks after the hearing, the court found that "the requirements for class action certification under Federal Rules of Civil Procedure 23 [had] been" met and it conditionally certified the action. However, consistent "with the Court's determination by [its] Order of November 4, 1986, to lift the stay in this action to permit Plaintiffs to proceed with discovery" and "to assure that the class will have the benefit of all such discovery," it made its certification "subject to further consideration in light of discovery developments, whether this action should continue to be maintained as a class action, and if so, in what form."

In the meantime, a number of Dalkon Shield claimants, by counsel, filed for leave to intervene at the hearing on the motion for final certification in order to oppose class certification. The District Court granted the right to intervene for the purpose of filing briefs in opposition to class certification as well as "to present oral argument before the Court prior to the disposition of the class certification motion before this Court."

While the discovery was continuing under the District Court's order for conditional certification, the Official Dalkon Shield Claimants' Committee filed a motion with the District Court for leave to file its own complaint against Aetna. That motion was granted and the Committee proceeded to file its complaint. The Committee's complaint followed substantially the *Breland* plaintiffs' complaint on its broad claim against Aetna but it injected into the controversy an entirely new issue of considerable complexity. This additional allegation was that "[a]s a result of the joint negligence of Aetna and Robins, Aetna is liable to Robins for contribution for its pro-rata share of those damages already paid by Robins to Dalkon Shield users." Aetna responded to this complaint, admitting the insurance policy issued by it to Robins and that Robins had "expended in excess of $200,000,000 pre-petition with respect to

Dalkon Shield claims"[12] but denying absolutely on a number of grounds any claim that it was a joint tortfeasor along with Robins in the Dalkon Shield case. It, too, added an affirmative claim of a right to contribution from Robins in the event it was found liable as a joint tortfeasor. This latter claim was stated in paragraph 20 of Aetna's answer to the Committee's complaint as follows:

> In the event, however, Aetna is liable to Robins for contribution or for other form of relief (all such liability being expressly denied by Aetna), then, as to any amounts which Aetna is required to pay to Dalkon Shield claimants (other than under the policies of insurance issued by Aetna to Robins) on account of injuries related to the Dalkon Shield, Robins is liable to Aetna for contribution as to all such payments to the extent based on conduct by Aetna found sufficient to give rise to a right by Robins to contribution.

This action of the Committee was consolidated with the *Breland* suit without objection and was disposed of in the orders granting certification and approving the settlement, all as subsequently discussed.

### IX.

As discovery on the certification issue proceeded, considerable inquiry on the part of counsel for the *Breland* plaintiffs into all dealings between Robins and Aetna, including the files of Robins and those of Aetna, was conducted. At the same time, discussions of a possible settlement between the plaintiffs in *Breland* and Aetna were engaged in by counsel for the parties. The parties recognized that the *Breland* case and the Robins reorganization would necessarily involve some coordination if a feasible settlement were to be achieved. Such a coordination would require as an essential step a final class certification in the *Breland* case. To expedite certification, Aetna stipulated of record that "if

*Breland* were certified, and if claims resolution in *Breland* could be coordinated with the claims resolution process which would be required in the Robins reorganization proceedings, [it] would agree not to litigate separately any of the non-common issues of individual medical causation and individual amounts of damages." This stipulation left open either for trial or for settlement the issue whether Aetna could be held liable as a joint tortfeasor with Robins; all other issues—the non-common ones of individual causation and damages—were to be resolved along with the similar claims in the Robins reorganization under a claims resolution procedure for the disposition of such claims.

A settlement figure on the common issue of Aetna's possible liability as a tortfeasor was extensively discussed. The discussion ranged somewhere "between zero and $300 million in cash." However, it became "obvious," as the *Breland* counsel wrote Aetna's counsel, "that somebody is going to buy Robins," and, though the parties to the *Breland* suit had "agreed in principle to a solution," he (the *Breland* counsel) felt that any final attempt at settlement should "wait until we see what type of proposal is seriously made by a serious suitor that has a chance of becoming a feasible plan of reorganization prior to our finally resolving our lawsuit." When American Home Products Corporation (Home Products) later entered the picture as a "serious suitor" for Robins, the negotiations in the consolidated suits of the *Breland* plaintiffs and the Claimants' Committee and the discussions of a Plan of Reorganization of Robins, based primarily on an offer of American Home, began to merge and take shape, looking to a combined settlement of all Dalkon Shield litigation.

### X.

While discussions had been proceeding between Aetna and the *Breland* plaintiffs, the parties in the bankruptcy reorganiza-

---

**12.** It would seem that Aetna had paid already the full limits of its policy ($300 million), and Robins had paid over $200 million of its own funds in settlement of judgments or compromise. This explains why Robins had to advance the appeal bond in the last Kansas suit in which a $9 million deposit of bond was required (we referred earlier to this fact).

tion of Robins had fortunately been working at the same time on a Plan of Reorganization. As a basis for any plan of reorganization it was necessary that an estimation be made of the unliquidated claims against the debtor under Section 502(c) of the Bankruptcy Code, which directs that "[t]here *shall* be estimated for purposes of allowance under this section—(1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." An estimation under this section contemplates a full adjudication.[13] The estimation of the unliquidated claims in this case was arrived at after testimony by expert witnesses, taken in a proceeding before the District Judge, where all parties were represented by counsel and had participated. The result of the hearing was an estimation made by the District Judge on the basis of the full record before him. The Dalkon Shield claims constituted substantially all the unliquidated claims involved in the estimation. The value of such unliquidated Dalkon Shield claims was fixed in the District Judge's estimation order at an "aggregate" dollar amount or value of $2.475 billion. The District Judge announced to all parties interested in the reorganization that no plan of reorganization would be considered which failed to provide this amount for the full payment of all Dalkon Shield claims.

At this point the American Home Products Corporation (American Home) made an offer that gave promise of enabling the debtor to meet this requirement of the District Judge. It proposed a merger of Robins with a subsidiary of American Home, which, with the assistance of its parent company, would as an incident of the merger provide, among other things, a sum, which, supplemented with some other antic-

---

**13.** The process of estimation under the Bankruptcy Code is accurately explained in the Note, *The Manville Bankruptcy: Treating Mass Tort Claims in Chapter 11 Proceedings*, 96 Harv.L. Rev. 1121 at 1128–29 and 1132–33 (1983):

The liquidation of contingent claims is governed by the estimation provision of the Bankruptcy Code, section 502(c). The term "estimation" is misleading insofar as it suggests a mere guess or a lack of procedure; estimation in bankruptcy can be a full adjudication. Normally, the process of estimating individual claims is carried out before the bankruptcy judge. The unusual nature of the *Manville* case, however, may permit the bankruptcy court to read section 502(c) in a way that would allow it to lift the automatic stay on outside litigation and leave the estimation of individual asbestos claims to other courts, as long as the bankruptcy court estimated Manville's total asbestos-related liability, placed a limit on that liability, and established a compensation fund for recovery by present and future asbestos claimants.

Under this reading, the bankruptcy court would estimate Manville's total liability by statistical means. It could employ epidemiological studies to determine the future incidence of asbestos-related disease, and then study the data from the 3500 claims against Manville that have already reached judgment or settlement to determine the average cost of each claim. The estimation of Manville's aggregate liability, a process entirely distinct from the estimation of individual claims, would not directly determine the recovery rights of any individual.

. . . . .

The historical background and policy of section 502(c) support a reading that would permit the bankruptcy court to estimate only the aggregate of claims. The old Bankruptcy Act permitted courts to decline to allow claims "not capable of liquidation or of reasonable estimation" or whose liquidation or estimation "would unduly delay the administration of the estate or any proceeding under this Act." The n.̣ v requirement that the court estimate all claiṃ.̣ .̣ ̇s one of many reforms in the Bankruptcy C. ̇ ̇at are intended to implement the Code's broad policy of affording the debtor the most complete relief and the freshest start feasible by disposing of all possible claims during the bankruptcy proceeding. Congress wished to eliminate the possibility that after the completion of reorganization the debtor would still be faced with the uncertainty of contingent debts that could ruin the financial stability achieved in the reorganization proceedings. *Congress' goals would be achieved equally well by assigning a dollar value to the whole of the asbestos plaintiffs' claims as by assigning a dollar value to each individual claim.* In either case, Manville would exit from the reorganization certain of all of its liabilities and able to carry on its business without the fear that pending or future asbestos-related claims would endanger its financial condition. (Italics added).

For other discussion of the estimation process under 502(c), *see* 3 Collier on Bankruptcy, ¶ 502.03, pp. 502–71 to 503–75 (15th ed. 1979) and Kaufman, *Procedures for Estimating Contingent or Unliquidated Claims in Bankruptcy*, 35 Stan.L.Rev. 153 (1982).

ipated contributions would, provide a fund of $2.475 billion for the full satisfaction of the unliquidated Dalkon Shield claims. One expected to make some contribution was Aetna. The reason for such inclusion was American Home's insistence that its contribution was contingent on a settlement by all Dalkon Shield claimants of their claims against any party. This insistence on American Home's part was a desire to assure the new company to be formed by the merger against any Dalkon shield liability. It may be that American Home felt that if Aetna were left out and Dalkon Shield claimants prevailed on its joint tortfeasor claim against Aetna, Aetna would acquire a right of contribution against Robins or its successor under the laws of a majority of the states.[14] American Home apparently demanded that the new company, Robins and American Home, be protected against that risk. It accordingly became clear to the parties in the bankruptcy, as it had to the parties in the

*Breland* case, that the negotiations for settlement of the suit of the *Breland* plaintiffs and of the Claimants' Committee had to be merged into a comprehensive procedure for the liquidation of all Dalkon Shield claims against Robins and Aetna. This made it essential that the settlement of the *Breland* case be tied to the Plan of Reorganization of Robins, and that is what the parties in the two proceedings did.

The procedure adopted to achieve this merger of the *Breland* action and the Plan of Reorganization of Robins began with the formulation of what was intended as the Final Plan of Reorganization of Robins. This Plan of Reorganization contemplated the creation of a Trust Fund to consist of $2.475 billion, to be funded primarily by payments made by American Home in connection with its acquisition by merger of Robins and by contributions of Aetna.[15] Since it was manifest that Robins' liability in the Dalkon Shield litigation was direct

**14.** In the majority of the states, especially in those states where the Uniform Contribution Among Tortfeasors Act has been adopted, the laws provide for contribution so that all tortfeasors are required to pay their fair share of the damages recovered. *See, e.g., Rabatin v. Columbus Lines, Inc.,* 790 F.2d 22, 25–26 (3d Cir.1986); *Gideon v. Johns–Manville Sales Corp.,* 761 F.2d 1129, 1140–41 (5th Cir.1985); *Greyhound Lines, Inc. v. Cobb County, Ga.,* 681 F.2d 1327 (11th Cir.1982); *Raisler v. Burlington Northern Ry. Co.,* 219 Mont. 254, 717 P.2d 535 (1985); *Rowland v. Skaggs Companies, Inc.,* 666 S.W.2d 770 (Mo.1984) (*en banc*); *Sitzes v. Anchor Motor Freight, Inc.,* 169 W.Va. 698, 289 S.E.2d 679 (1982); *Petersen v. Tolstow,* 184 N.J. Super. 84, 445 A.2d 84 (1982); *Schauer v. Joyce,* 54 N.Y.2d 1, 444 N.Y.S.2d 564, 429 N.E.2d 83 (1981); *Blackledge v. Harrington,* 291 Or. 691, 634 P.2d 243 (1981). This rule regarding contribution can apply even where the liability of the parties rests on different grounds. *Monsen v. DeGroot,* 130 Ill.App.3d 735, 86 Ill.Dec. 199, 475 N.E.2d 5 (1985), *aff'd, Hopkins v. Powers,* 113 Ill.2d 206, 100 Ill.Dec. 579, 497 N.E.2d 757 (1986); *Florida Farm Bureau Cas. Co. v. Batton,* 444 So.2d 1128 (Fla. Dist. Ct.App.1984); *Wolfe v. Ford Motor Co.,* 386 Mass. 95, 434 N.E.2d 1008 (1982). Moreover, the provision for contribution can arise whether the other tortfeasor is sued or not. *Greenemeier by Redington v. Spencer,* 694 P.2d 850 (Colo.Ct.App.1984), *aff'd,* 719 P.2d 710 (Colo.1986) (*en banc*).

A dwindling minority of jurisdictions does, however, continue to deny contribution among joint tortfeasors. *See, e.g., Gray v. City of Kan-*

*sas City, Kan.,* 603 F.Supp. 872 (D.Kan.1985); *Kennedy v. City of Sawyer,* 228 Kan. 439, 618 P.2d 788 (1980). Even of this limited number, however, some states have, by statutes recently enacted, legislated contribution. *See, e.g., Holcomb v. Holcomb,* 70 N.C.App. 471, 320 S.E.2d 12 (1984); *Jaswell Drill Corp. v. General Motors Corp.,* 129 N.H. 341, 529 A.2d 875 (1987). This legislation can further complicate actions for contribution. Ordinarily, the substantive right of contribution is determined by the law at the time of the tort and not by the time suit may be filed; in short, if right of contribution is created by statute, the right is normally prospective and does not apply to torts which occurred earlier. *Korn v. G.D. Searle & Co.,* 81 B.R. 1 (D.N.H. 1987); *Glass v. Stahl Specialty Co.,* 97 Wash.2d 880, 652 P.2d 948 (1982). We note, too, that there may be many claims which under Claims Resolution Facility procedure may elect to have a trial, the venue of which may not be in the courts of Virginia. In these cases, the appropriate law of contribution or apportionment will be determined by the rule in the state in which such cases would be tried. There would accordingly be a real risk of conflicting decisions on apportionment and contribution. Fortunately, the Settlement in this case and the Plan of Reorganization in the Robins Chapter 11 proceedings, if approved, remove this issue as a problem.

**15.** There were to be some minimal contributions by several individuals who were officers and directors of Robins. These individuals were to be included in the settlement.

while that of Aetna's liability as a possible joint tortfeasor was rather tenuous, if at all, the contribution of Robins through its merger with American Home's subsidiary and that of Aetna would vary markedly, and it did. The contribution of Aetna was to consist of a net of $75 million and of four policies of insurance, one of which was to be in the total amount of $250 million to be used "in the event there [were] not sufficient funds of the Trust (including investment income) to make further payments on claims" and the other to consist of an approved policy or policies of insurance in the amount of $100 million to pay Class B claimants whose claims were "ineligible for such recovery on a nonsubordinated basis." Aetna was to pay the premiums on all such insurance. Upon the approval of the Plan of Reorganization and the Certification and Settlement in the *Breland* suit, and the payments and transfers of insurance contracts to the Trust Fund required under the Plan and Settlement, the claims of all Dalkon Shield claimants against both Robins and Aetna were to be converted into claims solely against the Trust Fund established to pay in full their claims as proved under the procedure provided in the Plan, and Robins, Aetna and American Home and a successor company and the individuals contributing to the fund were to be released absolutely from any liability to Dalkon Shield claimants.

The Trust itself was to be operated by five trustees named in the Plan. The trustees were to create a Claims Resolution Facility which would resolve the liability due to each Dalkon Shield claimant. The issue of liability in each case would be resolved, if possible, by negotiations between the Facility acting for the Trust and the claimant and her attorney, if she had an attorney. If resolution of the claim could not be accomplished through negotiation, then the claim in every case would be resolved either by binding arbitration or by

a jury trial at the option of the claimant. Should any claimant elect to settle her claim by suit, venue of such trial "[would] be unchanged by the Chapter 11 case" and the "right to a jury trial [would] be preserved," with "[a]ll claims and defenses ... available to both sides in a trial." *See* Exhibit Vol. III, pp. 1952–53.[16] Under Aetna's stipulation, already described, this provision meant that questions of individual causation and damages in both the Robins bankruptcy and in the *Breland* case would be resolved by the above proceedings.

## XI.

Considerable testimony was taken—much of it before the District Court itself—on the propriety of certification and of the Settlement. The parties' in interest engaged in extensive cross-examination of the witnesses in the various proceedings. A full record of such proceedings is included in the Joint Appendix herein. Some of the records considered in the matter were made before the Claimants Committee's action was filed, but a great part was after that filing. In addition, the discovery developed as a result of the proceedings before Judge Lord as well as the report of the masters appointed by Judge Lord in that proceeding was made a part of the record. Moreover, the masters testified in person in connection with their investigations and reports. At the conclusion of the receipt of testimony and admission of exhibits, lengthy arguments of counsel both for and against certification and of the Settlement were heard by the District Court.

On the basis of the record and the arguments, oral and written, by the parties, the District Court made its findings and conclusions separately on both the motion for class certification and the motion to approve the Settlement. It is essential in reviewing these decisions to remember that we are reviewing two decisions, both made

---

**16.** On punitive as distinguished from compensatory damages, the Plan of Reorganization provided that

any portion of any Dalkon Shield Claim that is a Claim for punitive damages is a Disallowed Claim; provided, however, that holders

of Dalkon Shield Claims subject to the Claims Resolution Facility are entitled to receive from the Claimants Trust any sums payable in lieu of punitive damages pursuant to the Claims Resolution Facility.

Article VII, 7.02(a)(iv), Exhibit Vol. III, p. 1920.

substantially on the same factual record but dealing separately with the different issues in the two appeals. However, before we discuss the two appeals on their merits, we must address a jurisdictional issue, which, if upheld, would require the dismissal of the entire action.

## XII.

The appellants have raised a threshold claim that this action fails the jurisdictional test established for a diversity action in federal court. The jurisdictional flaw is said to be the failure of the action to meet the jurisdictional amount test under 28 U.S.C. § 1332.[17] The appellants base this contention on *Zahn v. International Paper Co.*, 414 U.S. 291, 301, 94 S.Ct. 505, 512, 38 L.Ed.2d 511 (1973), in which the Supreme Court said that "[e]ach plaintiff in a Rule 23(b)(3) class action ... must satisfy the jurisdictional amount, and any plaintiff who does not must be dismissed from the case." We address this jurisdictional issue first, as we should.

Unquestionably, all the named plaintiffs in this case meet the jurisdictional amount test for federal diversity jurisdiction. Each plaintiff alleges a claim in excess of $10,-000.[18] Such an allegation was sufficient at the time to establish jurisdiction. *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 288, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938). But it is the appellants' construction of *Zahn* that not only must the named plaintiffs in a proposed class action suit meet the jurisdictional amount but that all unnamed class claimants must likewise do so. Under this argument, it would be necessary to find on the record that the 300,000 Dalkon Shield claimants met the jurisdictional test. We do not understand, however, that the appellants as-

sert that the plaintiffs herein must establish by direct proof that the claims of the unnamed class members meet the jurisdictional amount, nor would prevalent authority sustain such contention, if made. The courts which have considered the jurisdictional amount requirement in the mass tort class action context have ruled that the court will dismiss on this ground only if it can be said "to a legal certainty" that the claims of the unnamed claimants fail the jurisdictional amount test. This was the decision of the court in the first decision to address this point in a mass tort case, the decision which is generally regarded as the guiding authority in this connection. *Payton v. Abbott Labs.*, 83 F.R.D. 382, 395 (D.Mass.1979).[19]

*Payton*, on its facts, has striking similarity with this case. It involved claims by a class of women suing for injuries caused by exposure to diethylstilbestrol (DES), manufactured and sold by the defendant pharmaceutical manufacturer. The defendant objected to class certification on the ground "that members of the plaintiff class [did] not satisfy that [the jurisdictional amount] minimum and that, in the context of this action, separating members of the class who meet the jurisdictional minimum from those who do not is impossible."[20] The Court, in deciding the issue in that case, looked first to *St. Paul Indemnity*, which had said that "[i]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal" for want of the jurisdictional amount, 303 U.S. at 289, 58 S.Ct. at 590, and, applying that principle, denied the motion of the defendant to dismiss, saying

> Plaintiffs' claimed damages are unliquidated and subject to a jury's evaluation of many subjective factors. I cannot

---

**17.** The argument disregards Aetna's contention that jurisdiction exists under Section 1334(b) and Section 105 of the Bankruptcy Code. We, however, find no need to address these alternative grounds for jurisdiction since we are of the opinion that jurisdiction properly attaches under Section 1332.

**18.** This was the jurisdictional amount when the suits were filed.

**19.** This decision was modified on a point unrelated to that which is relevant here. 100 F.R. D. 336 (D.Mass.1983).

**20.** The last portion of this sentence is a literal application of *Zahn*, which did not order the dismissal of the action in that case on jurisdictional grounds, but ordered only the dismissal of those class members who did not meet the jurisdictional amount.

now find to a legal certainty that the claim of any member of the plaintiff class is less than the jurisdictional amount. 83 F.R.D. at 395.

In *In re No. District of Cal. "Dalkon Shield" IUD Products*, 526 F.Supp. 887, 910–11 (N.D.Cal.1981), in which there was, as we have said, a class certification of Dalkon Shield claimants, the District Court apparently *sua sponte* noted that it might be argued in denial of jurisdiction as do the appellants here that "each class member, named or unnamed" may not have a claim meeting "the amount in controversy requirement." The court, however, dismissed such possible jurisdictional objection. In so doing, it relied, as did *Payton*, on *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 288, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938), with its rule requiring a finding of "legal certainty" for its dismissal on the jurisdictional issue. On appeal, the decision of the District Court on the merits was reversed, but the appellate court did not disapprove of the jurisdictional ruling made by the District Court. That court did not even notice the point in its decision, even though the District Court in its opinion had ruled on the point. In fact, it is not clear from the opinion that the appellants even raised the point. In any event, since this jurisdictional defect, if sound, would have made unnecessary consideration of the other points on appeal and should have been considered by the Court *sua sponte* if of merit, it seems safe to assume that the Court of Appeals agreed with this part of the District Court's ruling. See *In re No. District of Cal. "Dalkon Shield" IUD Products*, 693 F.2d 847 (9th Cir.1982), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983).

In *In re Agent Orange Prod. Liability Litigation*, 818 F.2d 145, 163 (2d Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988), which was a class action suit on behalf of all former servicemen claiming injuries as resulting from the use of Agent Orange by the military forces in Vietnam, the same question arose whether the plaintiffs class satisfied the standard established by *Zahn*. In answering this question, the court noted the rule in *St.*

*Paul Mercury Indemnity* to which we have already referred. It applied that rule and dismissed the point with this statement:

Appellants do not argue that any class members made bad faith damage claims. Nor do they offer us any basis for determining whether such claims clearly are for less than the jurisdictional amount. Instead, they claim the District Court failed to carry out an obligation to police the damage claims. No such affirmative obligation exists, however, absent some apparent reason to make inquiry. Plaintiffs made what must be assumed to have been good faith allegations that each of them was entitled to at least $10,000 in damages. Defendants did not challenge the *bona fides* of these claims, and the District Court thus had no reason to inquire further.

█ The author of the comment, *Federal Mass Tort Class Actions: A Step Towards Equity and Efficiency*, 47 Alb.L.Rev. 1180, 1189–90, n. 36 (1983), suggests as the proper rule to be applied in the mass tort situation that the action will be permitted to proceed against a jurisdictional amount challenge if the class plaintiffs themselves all meet the jurisdictional amount requirement since it "would be consistent with the rule that once federal jurisdiction in a class action has been fixed by the parties of record, subsequent intervenors do not need to meet the jurisdictional amount." *Ibid.*, 1190 n. 36. This rule would not be inconsistent with the literal reading of *Zahn*, since that decision said simply that, if any class member's claim was less than the jurisdictional amount, that class member's claim should be dismissed. However, it is not necessary to go this far in order to dispose of this challenge to the maintenance of the action herein. Applied as it was by the court in *Payton* and the other cases, *St. Paul* clearly sustains jurisdiction here. Thus, there have been countless suits, both in federal and state courts, to recover for injuries caused by the use of the Dalkon Shield. So far as a hasty review of the reported cases has indicated, not one suit has been filed in which the

plaintiff sought less than the then jurisdictional amount. In the face of such a record, it would appear to be indisputable that it cannot be said to a "legal certainty" that the jurisdictional amount herein was not satisfied. We accordingly dismiss appellants' claim of lack of jurisdictional amount herein under *St. Paul Mercury Indemnity*.

### XIII.

We turn now to the challenge of the certification order. This order was issued in what is emerging to be one of the most difficult management problems confronting the courts today, particularly federal courts, *i.e.*, that posed by the mass tort suit. Mass tort suits are generally divided into two classes. Note, *Federal Mass Tort Class Actions: A Step Toward Equity and Efficiency*, 47 Alb.L.Rev. 1180, 1183 (1983); 3 *Newberg on Class Actions*, § 17.21, pp. 394–47 (2d ed. 1985). The first is concerned with what is designated as the mass accident suit, in which a large number of persons are injured as a result of a single accident. A familiar instance of such a tort is an airplane crash or the failure of a building as in *In re Federal Skywalk Cases*, 680 F.2d 1175 (8th Cir. 1982), *cert. denied*, 459 U.S. 988, 103 S.Ct. 342, 74 L.Ed.2d 383 (1983). The other type of mass tort action, of which this case is an outstanding example, is one arising out of the sale, on a national or international market to thousands of persons, of an alleged defective product, from the use of which has caused many persons to have suffered injury. In some of these products liability cases, the number of persons involved may be enormous. The number of potential plaintiffs, in this case, for instance, are in the hundreds of thousands. In most instances, this type of mass tort will generate far more cases than the normal accident type.

Within recent years, the proliferation in the development and distribution of new products and remedies and the complaints of injuries from the use of these products have brought an accelerating avalanche of mass products liability suits primarily in federal courts which represents what is, as we have already observed, probably the most important and difficult management problem facing the federal court system today. Professor Seltzer has well summarized the size of the problem:

> Mass tort litigation in the 1980's has reached unprecedented levels. Thousands of personal injury lawsuits have been filed against manufacturers of such mass-marketed products as asbestos, formaldehyde, diethylstilbestrol (DES), Agent Orange, automobiles, tampons and intrauterine contraceptive devices [IUD's].[21]

The Note, *Class Certification in Mass Accident Cases under Rule 23(b)(1)*, 96 Harv.L.Rev. 1143 (1983), is to the same effect:

> Mass accidents are a recurring phenomenon of modern technological society. It is not unusual for hundreds or thousands of injuries to be caused by a sudden event—an airplane crash or a structural building failure—or by a product defect in a widely used drug. Victims typically seek redress for such injuries by initiating individual suits. As a result, the judicial system becomes crowded with multiple claims concerning one basic course of conduct, with each victim seeking to maximize his own recovery and each defendant attempting to reduce his potential liability. As each party acts to further a narrow perception of his own best interests, the collective interests of the parties, society, and the judicial system may be ignored. *Ibid.* (footnote omitted)

The burden on the courts that these mass torts imposes and the tremendous public and private costs arising from the endless trials of the same issues in repeated court actions covering the same facts in great detail are illustrated by a recent analysis of only one aspect of the cost of such litigation to the parties in the *Agent Orange* mass tort litigation:

---

**21.** Seltzer, *Punitive Damages in Mass Tort Litigation: Addressing The Problems of Fairness, Efficiency and Control*, 52 Fordham L.Rev. 37, 37–38 (1983).

By way of illustration, in the Agent Orange litigation, solely with respect to the government contract defense, the defendants took more than 200 depositions of former or current government employees. Assume that the depositions were performed by outside counsel and that each deposition took two days. Assume that the defendants' counsel each spent one day preparing for each deposition and another day summarizing and reviewing. Assume that the law firms used teams of two attorneys with an hourly billing rate for each attorney of $150. The calculation begins with: 200 depositions × 4 days × 8 hours = 6400 hours. The next step is 6400 hours × 14 attorneys (2 for each defendant) × $150 per hour = a total cost for attorneys of $13,440,000 for deposition costs for this aspect of the suit, leaving out transcript fees, travel costs, and other expenses. This cost would be multiplied several times over in the taking of depositions of the plaintiffs, the defendants, their physicians, and expert witnesses.[22]

Judge Rubin of the Fifth Circuit, in an article titled *Mass Torts and Litigation Disasters*, 20 Ga.L.Rev. 429, 430 (1986) has said:

> These mass tort claims have a number of similarities: they result in the filing of many suits; they produce high litigation costs; they are generally resolved only after great delay; they affect not only the litigants but other users of the court system; and their total human and economic costs affect all of society.

Judge Rubin then reviewed one example of such mass torts, *i.e.*, the asbestos litigation and made this comment based on a Rand Corporation report:

> Asbestos litigation [for instance] has resulted in far more expense than in recovery of damages for injured persons. A Rand Corporation study estimated that injured persons receive less than thirty-

seven percent of the total amount spent on litigation. Almost two-thirds of the total expenditures are for attorneys' fees and other litigation expenses.

When account is also taken of the toll of such cases on the court system itself, it is evident that the proper functioning of the courts and the fair and efficient administration of justice for other litigants whose right to a judicial determination are inevitably delayed inordinately by the clogging of the court system by mass tort actions tried individually and the societal costs of the endless repetition of these suits in separate trials at substantial costs to the judicial system mean that a mechanism for deciding expeditiously, efficiently and relatively inexpensively these actions without the delays of individual suits is demanded. This demand has been well pointed up by one of the recent groups of mass tort suits. In *In re Bendectin Products Liability Litigation*, 102 F.R.D. 239, 240 (S.D.Ohio 1984),[23] Judge Rubin, commenting on the waste of judicial time involved in individual disposition of one mass tort products case in this court estimated that "[f]or the identified ... cases, a full trial on each would probably require at least 30 trial days. Two *Bendectin* cases have already been tried. One required two trials of 44 and 45 days each. The other required 20 trial days. Assuming 200 trial days available per year per Judge, disposition of the present *Bendectin* cases at the trial level alone might require 21,000 trial days or the equivalent of 105 Judge years, *i.e.*, one Judge for 105 years or 105 Judges for one year." *Ibid.*, at 240 n. 3.

There is no clearer statement of the critical situation in the operation of the judicial system created by the mass tort litigation explosion than the language in a recent article co-authored by the lead counsel for the appellants in this very case:

> The public is crying out for better solutions to mass tort litigation than sepa-

---

**22.** Sand, *How Much Is Enough? Observations in Light of the Agent Orange Settlement*, 9 Harv. Envtl.L.Rev. 283, 297–98 (1985).

**23.** This suit was reversed on grounds later discussed herein. 749 F.2d 300 (6th Cir.1984).

The graphic description by Judge Rubin of the tremendous cost to the judicial system of the mass tort suits, tried separately, is not disputed, however.

rate, redundant trials in thousands of related cases. Why should hundreds, or even thousands, of trials take place in which the same issue of a defendant's liability is litigated over and over again? Why should some plaintiffs recover compensatory and punitive damages, while other plaintiffs in other trials recover much less, or nothing at all, even though the issues of liability and causation are the same? Why should a defendant be put to the expense of parading the same witnesses on the stand in hundreds of different trials to demonstrate over and over again the same evidence that its product was correctly designed and engineered? Is it fair that defendants are exposed to multiple punitive damage claims?

Panzer & Patton, *Utilizing the Class Action Device in Mass Tort Litigation*, 21 Tort & Insurance Law Journal, 560, 561 (1986).

The class action, as this article suggests, is the manifest fair and expeditious procedure for disposing of the mass tort litigants. It has been for years the recognized procedure for dealing with cases which have a marked similarity to those flowing from mass torts. The class action was judicially developed first in the equity courts and later accepted and applied by the law courts. Drawing on English and state procedural decisions, the Supreme Court over a century ago stated in *Smith v. Swormstedt*, 57 U.S. (16 How.) 288, 303, 14 L.Ed. 942 (1853) and restated later in *Hartford Life Ins. Co. v. IBS*, 237 U.S. 662, 672, 35 S.Ct. 692, 59 L.Ed. 1165 (1915) and *Hansberry v. Lee*, 311 U.S. 32, 41–42, 61 S.Ct. 115, 118, 85 L.Ed. 22 (1940) the circumstances justifying the use of such procedure in federal court proceedings. In *Hansberry*, that court declared that the class action device was an "invention [or innovation] of equity [designed] to enable ... [the court] to proceed to a decree in suits [or judgment] where the number of those interested in the subject of the litigation is so great that their joinder as parties in conformity to the usual rules of proce-

dure is impracticable." To the same effect, see *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 155, 102 S.Ct. 2364, 2369, 72 L.Ed.2d 740 (1982). In *Falcon*, the Supreme Court said:

The class action device was designed as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–701 [99 S.Ct. 2545, 2557, 61 L.Ed.2d 176]. Class relief is "peculiarly appropriate" when the "issues involved are common to the class as a whole" and when they "turn on questions of law applicable in the same manner to each member of the class." *Id.*, at 701 [99 S.Ct. at 2557].

The procedure to be followed by a federal court in such a case is now embodied in Rule 23 of the Federal Rules of Civil Procedure as adopted in 1938. The formulation of the practice in this Rule was intended to embody the standards and purposes substantially already established in the federal decisions beginning with *Smith*.[24] Rule 23 was revised in 1966 in its present form but without change in its purpose. It would seem reasonable to assume that the Rule was intended to be applied with the same flexibility and in the same spirit of "invention" as earlier prompted the adoption of the procedure. We accordingly turn to a review of the Rule itself as well as of the decisions which have applied it in cases such as mass tort suits or similar suits.

## XIV.

Under the Rule, certification of a class action, whether a mass tort action or not, requires that the action meet the requirements of a two-step test. As a first step, an action must satisfy all *four* of the prerequisites mandated by subsection (a) of the Rule. These requisites are: (1) numerosity of parties; (2) commonality of legal and factual issues; (3) typicality of the claims and defenses of the class representative; and (4) adequacy of representation. Assuming qualifications under (a) have been met, the next step demands that the action fit within at least one of the three

---

24. *Smith v. Swormstedt, supra,* 57 U.S. (16 How.) 288, 14 L.Ed. 942 (1853).

categories of actions identified in subsection (b) of the Rule. An action may qualify under (b)(1), the first of such categories, "if individual adjudication of the controversy would prejudice either the party opposing the class, (b)(1)(A), or the class members themselves, (b)(1)(B)." *Zimmerman v. Bell*, 800 F.2d 386, 389 (4th Cir.1986); *Intern. Woodworkers v. Chesapeake Bay Plywood*, 659 F.2d 1259, 1269 (4th Cir. 1981). Subsection (b)(2) covers suits for injunctive or declaratory relief. The final category, (b)(3), applies where there are common issues of law or fact and the class action device has superiority over any other available procedure for disposing fairly and efficiently of the controversy.

█ Though not specified in the Rule, establishment of a class action implicitly requires both that there be an identifiable class and that the plaintiff or plaintiffs be a member of such class. 7A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure:* Civil 2d § 1760, pp. 115 *et seq.* (2d ed. 1986); *Roman v. ESB, Inc.*, 550 F.2d 1343, 1348 (4th Cir.1976). Moreover, often an action may qualify under both (b)(1) and (b)(3). In such a situation, certification is to be made under (b)(1). 7A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure:* Civil 2d § 1772, 425 (2d ed. 1986); 3B Moore's Federal Practice, § 23.31[3], p. 236 (1987 ed.); *Robertson v. National Basketball Ass'n.*, 556 F.2d 682, 685 (2d Cir.1977); *Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1340 (9th Cir.1976); *Meyer v. Citizens & Southern Nat'l Bank*, 106 F.R.D. 356, 363 (D.Ga.1985). The rationale for such decision is stated by *Moore* thus:

> If an action can be maintained under (b)(1) and/or (b)(2), and also under (b)(3), the court should order that the suit be maintained as a class action under (b)(1) and/or (b)(2), rather than under (b)(3), so that the judgment will have *res judicata* effect as to all the class (since no member has the right to opt out in a (b)(1) or (b)(2) suit), thereby furthering policy underlying (b)(1) and (b)(2) class suits.[25]

█ Too, if the action includes multiple claims, one or more of which might qualify as a certifiable class claim, the court may separate such claims from other claims in the action and certify them under the provisions of subsection (c)(4). *See* 1 *Newberg on Class Actions*, § 4.20, pp. 310–1 (2d ed. 1985). This subsection provides that "an action may be maintained as a class action as to particular issues only.... Two or more issues, for instance, may be represented in a single action." Among such separate issues, for instance, may be a "limited fund" in which all members of the class have a common interest: such a class is recognized in the Comments of the Advisory Committee as qualifying under subdivision (b)(1)(B). *In re Bendectin Products Liability Litigation*, 749 F.2d 300, 306 (6th Cir.1984) ("The District Court was therefore not clearly erroneous as a matter of law to hold that a limited fund is a justification for a class action under a Rule 23(b)(1)(B)"); *Coburn v. 4–R Corp.*, 77 F.R.D. 43, 45 (E.D.Ky.1977); *Hernandez v. Motor Vessel Skyward*, 61 F.R.D. 558, 561, n. 8 (S.D.Fla.1973, *aff'd without opinion*, 507 F.2d 1278 (1975). However, to repeat: each subclass must independently meet all the requirements of (a) and at least one of the categories specified in (b). *Roby v. St. Louis Southwestern Ry. Co.*, 775 F.2d 959, 961 (8th Cir. 1985). Moreover, when an action is certified under (b)(1), whether (A) or (B) or under (b)(2), all party members become mandatory class members without any opt-out rights, *Kyriazi v. Western Elec. Co.*, 647 F.2d 388, 393 (3d Cir.1981); if certified under (b)(3), however, any class member may opt out. The burden of establishing that a case meets the requirements for class certification under the Rule rests on the party seeking certification. *Davis v. Romney*, 490 F.2d 1360, 1366 (3d Cir.1974). The assessment required for a certification, though, is the responsibility of the District Court, which is to make its decision after "a rigorous analysis" of the particular facts of the case. The "District Court has wide discretion in deciding whether or not to certify a proposed class," and its deci-

---

25. 3B Moore's Federal Practice, ¶ 23.31[3], pp. 236–237 (2d ed. 1987).

sion may be reversed "only for abuse of discretion." *Jenkins v. Raymark Industries, Inc.,* 782 F.2d 468, 471–72 (5th Cir. 1986).

### XV.

After the Rule was approved, the early view was that Rule 23 should be given "a liberal rather than a restrictive interpretation." *See Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 563 (2d Cir.1968), *rev'd on other grounds,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Moss v. Lane Co.,* 50 F.R.D. 122, 125 (W.D.Va.1970), *aff'd in pertinent part,* 471 F.2d 853 (1973). The decisions on the proper standard of construction under this view were that "if there is to be an error made, let it be in favor and not against the maintenance of the class action," *Esplin v. Hirschi,* 402 F.2d 94, 99 (10th Cir.1968), *cert. denied,* 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459, (1969); *Wright v. Stone Container Corp.,* 524 F.2d 1058, 1061–62 (8th Cir.1975). But despite the clear mandate in the first Section of the Rules that such Rules "[should] be construed to secure the just, speedy, and inexpensive determination of every action," some courts decided to depart from this liberal construction of Rule 23 and to adopt a standard of construction of the basis of the standard of "strict scrutiny."

*Roby v. St. Louis Southwestern Ry. Co., supra,* 775 F.2d at 961. The reason for this departure from the liberal and flexible construction of Rule 23 and for the adoption of the "strict scrutiny" standard was stated in *La Mar v. H & B Novelty & Loan Company,* 489 F.2d 461, 468 (9th Cir.1973). In that case, the Court based its strict construction of the Rule on its "belief that *restrictions on the flexible language of Rule 23 [was] a necessary contribution to the effort to avoid the intractable problems of massive class actions and to maintain a wholesome degree of difference between the judicial and administrative functions*" (Italics added).[26] It declared that such construction was one "of prudence and caution" in line with what it declared was the "tone of the Advisory Committee's Note" (referring to the Advisory Committee's Note on Rule 23(b)(3)). 489 F.2d 465, 466.[27]

The "belief" that the class action procedure should be sharply reined in prompted the court which decided *La Mar* later to create two rules intended to accomplish this purpose of constraining the use of the class action device. It is important to remember that neither limitation, designed purposefully to hobble the use of the class action device, was said to be justified in the language of the Advisory Committee's

---

**26.** It is manifest in the language of the case that the court recognized that the language of the Rule itself provided a "flexible" standard, which could respond to changing conditions in the litigation area.

**27.** This departure by some courts from the earlier liberal application of Rule 23 has been well described in 7A C. Wright, A. Miller & M. Kane, *supra,* § 1754 at 52–54:

The years since amended Rule 23 took effect have revealed that the notion that the courts should adopt a liberal attitude toward the certification of class actions has undergone some change. As problems in managing class actions began to surface, the courts began to construe the requirements of Rule 23 more strictly in order to reduce the number of class actions (*citing La Mar v. H & B Novelty & Loan Company,* as an example).

. . . .

Much of this restrictive attitude can be traced to mounting criticisms lodged at class actions. Unfortunately, much of that criticism was made without any information sup-

porting it. Thus, various empirical studies were undertaken in order to better evaluate both the successes and failures of current Rule 23. Somewhat interestingly, one study, carried out for the United States Senate Commerce Committee revealed that many of the claimed abuses and problems caused by class actions for damages actually occur in only a small percentage of the cases.

. . . .

Class actions now appear to be moving into a third and more enlightened stage in which the courts, aware of the difficulties inherent in class relief, carefully scrutinize the cases for compliance with the requirements of Rule 23; they are not content merely to certify an action as a proper class suit and then suggest that all the problems raised by the parties may be adjusted or handled at a later stage. At the same time, however, the requirements are construed in light of the objectives of the rule—to provide for the expeditious handling of disputes and to allow a remedy for those for whom it would be unrealistic to expect to resort to individual litigation.

Note; these limitations were judicially imposed to justify a constrained use of the Rule mistakenly adopted in the belief that the manageability of mass tort litigation was beyond the resources of the courts. The first of the limitations found expression in *Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1340 (9th Cir.1976), where it was held that suits for damages were not appropriate for class action certification.[28] It *cited* in support of this principle *La Mar, supra,* which in turn had relied in large part on this statement in the Advisory Committee's Note on (b)(3):

> A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of

the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried.

For its second limitation, it held in *McDonnell Douglas Corp. v. U.S. District Ct., C.D. of California,* 523 F.2d 1083 (9th Cir. 1975), that the fact that one judgment in favor of one plaintiff in a mass tort situation and a judgment against the plaintiff in another suit in the mass tort situation would not be the type of inconsistency referred to in Rule 23(b)(1)(A).[29]

**28.** *Newberg on Class Actions* has properly criticized this limitation:

> Some courts have gone further and have held that Rule 23(b)(1)(A) was not designed to encompass class suits that seek damages relief. Such a limitation not only is unsupported in the language of the subdivision but also is contrary to the prevailing precedents which construe the various class categories of Rule 23(b). This construction of Rule 23(b)(1)(A) has been generally rejected or not followed by prevailing precedents. Moreover, cases in which the plaintiffs are seeking recovery from a limited fund readily qualify under Rule 23(b)(1)(B) and commonly qualify also under Rule 23(b)(1)(A).
>
> 1 *Newberg on Class Actions,* Section 4.04, pp. 276–77.

We have in two earlier cases taken note of this limitation in the use of Rule 23, but we have never based our decision in any case on such limitation. Thus, in *Lukenas v. Bryce's Mountain Resort, Inc.,* 538 F.2d 594 (4th Cir. 1976), we were only concerned with whether a damage suit could qualify under (b)(2), which relates to declaratory or injunctive action. We, however, expressly chose not to decide the case on that point. *See,* 538 F.2d at 596. In *Zimmerman v. Bell,* 800 F.2d at 389, we said that Rule 23 is "not normally posed by a request for money damages." This was merely a dictum without actual relevance to the decision in that case.

**29.** *Newberg on Class Actions* also comments on this limitation:

> The most commonly used and accepted limitation on Rule 23(b)(1)(A) is that this subdivision was not designed to cover class situations where some members recover and others do not. The rationale is that such application of Rule 23(b)(1)(A) would be too broad. Because they speak in terms of recovery for members, presumably these decisions are referring to damages or monetary recovery,

> though injunctive and equitable relief can be part of a class member's recovery in a broad sense. In any event, carried to its logical end, this articulated limitation could conceivably be construed as precluding the application of Rule 23(b)(1)(A) in virtually every situation. More likely, courts invoking this limitation are saying that if Rule 23(b)(1)(A) is properly going to be applicable, there must be present some discrete, usually inarticulated, circumstances, but the court will not invoke this subdivision simply because separate actions may reach different results which will affect the right of individual litigants to recover.
>
> 1 *Newberg on Class Actions,* Section 4.04, pp. 276–77.
>
> *See also* 96 Harv.L.Rev., *supra,* at 1154–55 criticizing the placing of this construction on the use of (b)(1)(A):
>
> > Two goals of tort law should be predictability and uniformity. As a practical matter, until the legality of a particular course of conduct has been adjudicated, potential defendants are guided only by a general standard, such as "reasonable conduct," and by analogous cases decided under that standard. What may appear to be inconsistent adjudications in similar situations can generally be rationalized because of differences in the facts. But if various fact finders reach inconsistent conclusions about the same set of facts, the defendant (and others in similar circumstances) is left without any guidance concerning the legality of its conduct, which may serve important legitimate aims. To be sure, the loss of guidance may be less problematic than being ordered by two courts to perform simultaneous conflicting tasks. But defendants and plaintiffs alike have compelling interests in consistent liability determinations, interests that can and should be addressed. Therefore, certifying (b)(1)(A) classes to promote these interests, even in cases in which there is no danger of conflict-

It is evident that these cases which have sought to circumscribe drastically the courts in the use of the class action device find their rationale in the Advisory Committee Note on (b)(3) of Rule 23 for their result. That Note was written in connection with the 1966 version of the Rule. Since that time, it has become recognized that the reluctance to use class actions in mass tort cases, as stated in cases such as *La Mar* and its progeny, represents an unnecessary limitation on the efficient case management in federal courts of mass torts. As a consequence of this changed attitude, commentators have expressed their dissatisfaction with the constraints which the Advisory Committee's Note and the decisions of the Ninth Circuit would place on the use of Rule 23 in the mass tort context. Thus, *Newberg on Class Actions* states:

Mass torts in modern-day jurisprudence are taking a fresh look at the value of Rule 23 class actions. The economies of time, effort, and expense of the class device cut across categorical tort lines and ought not to be obscured by the narrow application of circumstanes or by undue emphasis on traditional interests in one-to-one litigation.

I was an ex officio member of the Advisory Committee on Civil Rules when Rule 23 was amended, which came out with an Advisory Committee Note saying that mass torts are inappropriate for class certification. I thought then that was true. I am profoundly convinced now that that is untrue. Unless we can use the class action and devices built on the class action, our judicial system is simply not going to be able to cope with the challenge of the mass repetitive wrong that we see in this case and so many others that have been mentioned this morning and afternoon.

ing equitable decrees, is fully compatible with the language and policy of the rule.

*See also* the Court's comments *In Re School Asbestos Litigation,* 789 F.2d 996 (3d Cir.1986), where the Court commented that the inconsistency in verdicts in a mass tort context made litigation look "more like roulette than jurisprudence," *Ibid.* at 1001 n. 3, and "[t]he asbestos litigation [in particular] often resembles the ca-

[Quoting from Statement by] Prof. Charles Alan Wright *In Re: School Asbestos Litigation* Master File 83–0268 (ED Pa) Class Action Argument, July 30, 1984, Tr. 106.[30]

Mr. Newberg in an article published in Trial, February Issue 1986, at page 53, under the title *Mass Tort Class Actions,* expressed in somewhat extended form the same view:[31]

Mass tort class actions are rapidly emerging as a way to handle claims resulting from negligent acts or defective or toxic products affecting groups of similar parties. The historical barriers to class actions in the negligence field are fast giving way. Why? The problems of trying to resolve personal injury claims of often tragic proportions on anything but an individual basis still exist, do they not? Yes, but....

Two benchmarks herald the arrival of mass tort class actions. First, the emerging judicial acceptance of class suits involving mass torts is undoubtedly the result of cumulative effects of mass production, with its attendant imperfections, in the context of a growing population and a court system with finite growth dimensions. The other arises from a single event—the Johns–Manville bankruptcy proceedings.

Society relies on the tort system, as enforced by private damage actions, to prevent or deter mass accidents and torts, and to compensate their victims. As mass production increases, there will inevitably be an increase in personal and economic injuries arising from mass accidents and from the mass distribution of defective or toxic products. Lawsuits seeking redress for these injuries will also inevitably multiply.

sinos 60 miles east of Philadelphia, rather than a courtroom procedure." *Ibid.* at 1001.

**30.** 3 *Newberg on Class Actions,* § 17.06, p. 373 (2d ed. 1980).

**31.** Mr. Newberg is a counsel for the appellees in this proceeding, but it would seem his discussion, as quoted here, preceded his connection with this case.

Many courts are now abandoning their historical reluctance to certify mass tort class actions in light of what is often an overwhelming need to create an orderly, efficient means for adjudicating hundreds or thousands of related claims. It is not surprising that the *Manual for Complex Litigation, Second,* has a section dealing with class actions in mass disasters and other complex tort cases. More and more tribunals now recognize that a central judicial tool for coordinating many related tort claims is the class action.

In the Tentative Draft No. 1 issued by The American Law Institute Complex Litigation Project and prepared for consideration at the 1989 Annual ALI Meeting, the Committee on the Federal Intrasystem Consolidation, of which Professor Arthur Miller was the Reporter, declared (Pages 36–37):

> Rule 23 provides for the adjudication of the claims or defenses of an entire class of similarly situated parties in a single action. The Federal Rule is intended to eliminate or reduce the threat of repetitive litigation, to prevent inconsistent resolution of similar cases, and to provide an effective means of redress for individuals whose claims are too small to make it economically viable to pursue them in independent actions. Despite Rule 23's ambitious goals, multiparty, multiforum cases often are not certified for class treatment because its requirements have been read quite restrictively by some federal courts. Large scale tort actions involving personal injuries rarely are certified. In the past, this may be due primarily to the federal courts' reliance on the statement in the 1966 Advisory Committee Note that

> [a] "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but also of liability and defenses to liability, would be present, affecting the individuals in different ways. In these circumstances, an action conducted nominally as a class action would de-

generate in practice into multiple lawsuits separately tried.

Fed.R.Civ.P. 23(b)(3), Advisory Committee Note (1966). Although this reasoning may be criticized as shortsighted, it nonetheless has been influential. In addition, concerns about how to handle individual issues and large numbers of claimants have served to restrict class certification in nationwide products liability cases, as well as in consumer, securities, and antitrust actions. Recent years, however, have seen some weakening in the resistance to the certification of mass tort class actions. *E.g., Jenkins v. Raymark Indus., Inc.,* 782 F.2d 468, *rehearing en banc denied,* 785 F.2d 1034 (5th Cir.1986); *In re School Asbestos Litigation,* 104 F.R.D. 422 (E.D.Pa.1984), *vacated in part, aff'd in part,* 789 F.2d 996 (3d Cir.1986), *cert. denied,* 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986). Nonetheless, the full procedural advantages of class actions have not been realized.

Among the cases which the courts were said to have "read the requirements of Rule 23 narrowly," the Draft identified *In re Northern District of California Dalkon Shield IUD Prods. Liability Litigation,* 693 F.2d 847, (9th Cir.1982), *cert. denied,* 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983); *La Mar v. H & B Novelty & Loan Co.,* 489 F.2d 461 (9th Cir.1973); *In re Federal Skywalk Cases,* 680 F.2d 1175 (8th Cir.), *cert. denied,* 459 U.S. 988, 103 S.Ct. 342, 74 L.Ed.2d 383 (1982). Page 40 of the Draft. Later, the Draft observes (page 43):

> Several commentators have decried the courts' narrow approach to the Rule, arguing it should be interpreted more broadly to achieve unitary adjudication.

It cites in support Professor Miller's article, *An Overview of Federal Class Actions: Past, Present and Future 45* (Fed. Jud.Center 1977); 96 Harv.L.Rev. 1143 (1983) and 47 Alb.L.Rev. 1180, 1199 (1983), already discussed.

It will be observed that the principal reason assigned by the Advisory Committee for its cautionary comment on mass

torts in the 1966 Notes was that individualized proof of damages in such a case was not practical in a class action format. The authors in 7B C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure*, § 1784, at 78–82 (2d ed. 1986), found this reasoning not persuasive, saying:

> Rule 23 provides more than enough flexibility and room for judicial innovation so that the question of damages can be determined through individual trials on that issue pursuant to "equitable procedures" devised by the court.
>
> . . . .
>
> One possibility is to try the damage issue only once, making a single award for the class, and then develop an expeditious administrative means of dividing the lump sum among the class members. This approach has been employed in judicially approved settlements under Rule 23(e) and the courts could look for guidance to some of the procedures that have been developed in that context.
>
> . . . .
>
> Utilizing procedures to distribute a lump sum recovery is judicially economical since it eliminates the need for separate trials on damage issues. In a case involving an extremely large plaintiff class whose members only have small individual claims, the savings in time and expense for all will be considerable. Occasionally this will be achieved at the expense of some traditional procedural safeguards, most notably jury trial. Nonetheless, simplifying the process of establishing individual claims may be the only way of making it economically feasible for class members to come forward and assert their rights and some of the procedural patterns that are considered fundamental when the litigation involves the single plaintiff and a single defendant will have to be abandoned. (Footnotes omitted).

Moreover, Professor Arthur Miller in a perceptive article published in 1979, *Of Frankenstein Monsters and Shining Knights: Myth, Reality, and the "Class Action Problem",* 92 Harv.L.Rev. 664, warned against the tendency in some of the decisions to disregard the effect of the changing pattern of litigation on the application of the Rule and suggested an innovative application of the Rule dealing with this changing pattern of litigation as represented by the mass torts. He wrote:

> It is important in understanding the class action debate to realize that the "big case" phenomenon transcends the class action. The "big case" is an inevitable byproduct of the mass character of contemporary American society and the complexity of today's substantive regulations. It is a problem that would confront us whether or not rule 23 existed. Indeed, it is becoming increasingly obvious that the traditional notion of civil litigation as merely bilateral private dispute resolution is outmoded. Since our conception of the roles of judges and advocates is based on this traditional view, the ferocious attack on the class action may reflect anxiety over the growing challenge to the model's immutability.
>
> . . . .
>
> Even in its current elaborated form, rule 23 really must be thought of as a procedural skeleton requiring fleshing out by judges and lawyers experimenting with it in an ever-increasing range of circumstances and in a variety of innovative ways . . . .
>
> The procedural complexities that can emerge under rule 23 are extraordinarily variegated in character. Class actions tend therefore to be processed in a highly individualistic fashion, making the extrapolation of general propositions from judicial opinions difficult and overall evaluation risky; procedural techniques employed in one case may be ill suited in another context. Every rule 23 decision, therefore, must be viewed through the prism of its particular facts, some of which may not even appear in the court's opinion. 92 Harv.L.Rev. at 668, 677 (footnote omitted).

Another commentator has chided appellate courts [32] for failing to recognize the seriousness of the mass tort problem and for failing to abandon their narrow approach to the use of the class action device in the handling of mass tort litigation. Mullenix, *Class Resolution of the Mass–Tort Case: A Proposed Federal Procedure Act*, 64 Tex.L.Rev. 1039 (1986). She said:

Confronted with the realities of this growing, nationwide mass-tort litigation crisis, an increasing number of judges and commentators have urged a more flexible application of Rule 23 in the mass-tort context in order to better serve the interests of justice. Yet these judicial and scholarly pleas continue to fall on deaf appellate ears as the circuit courts persist in construing narrowly the Rule 23 class action procedure.[33] 64 Tex. L.Rev. at 1043 (footnotes omitted).

It is obvious that there is a movement towards a more liberal use of Rule 23 in the mass tort context. This new attitude has found expression in a number of recent cases which recognize that the mass tort phenomenon has created a pressing "[n]ecessity ... to change and invent," *Jenkins v. Raymark Indus. Inc.*, 782 F.2d 468, 473 (5th Cir.1986), with the result that, as one court has correctly concluded, "the trend has been for courts to be more receptive to use of the class action in mass tort litigation," *In re School Asbestos Litigation*, 789 F.2d 996, 1009 (3d Cir.), *cert. denied*, 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117, 479 U.S. 915, 107 S.Ct. 318, 93 L.Ed.2d 291 (1986). This approach, with its skepticism on the current validity of the reasons suggested in the earlier 1966 Advisory Com-

mittee Notes on which the Ninth Circuit had rested its limited restrictions as stated in *La Mar*, *Green* and *McDonnell Douglas*, was explained in *Jenkins:*

Courts have usually avoided class actions in the mass accident or tort setting. Because of differences between individual plaintiffs on issues of liability and defenses of liability, as well as damages, it has been feared that separate trials would overshadow the common disposition for the class (citing Advisory Notes). The courts are now being forced to rethink the alternatives and priorities by the current volume of litigation and more frequent mass disasters (citing authority). If Congress leaves us to our own devices, we may be forced to abandon repetitive hearings and arguments for each claimant's attorney to the extent enjoyed by the profession in the past. Be that as time will tell, the decision at hand is driven in one direction by all the circumstances. Judge Parker's plan is clearly superior to the alternative of repeating, hundreds of times over, the litigation of the state of the art issues with, as that experienced judge says, "days of the same witnesses, exhibits and issues from trial to trial." 782 F.2d at 473.

The decision in *Jenkins* involved a mass asbestos case. In all asbestos cases, a primary defense had evolved about the "state of the art" at the time of the happening of the alleged tort. Evidence on that issue, the District Court found, "would vary little as to individual plaintiffs while consuming a major part of the time re-

---

**32.** The reason for singling out appellate courts for criticism in this regard is that District Courts which are more intimately involved in mass tort litigation and the problems caused by such suits for court management and administration have shown a much greater willingness to utilize the class action device in this context than courts of appeals.

**33.** Later, Professor Mullenix offers an olive branch to the courts by absolving them of any "fault" and in assigning the fault to Rule 23 itself. Thus she wrote:

Clearly, the fault lies not in the courts or commentators, but in the requirements of Rule 23. Assuming, as many jurists and com-

mentators agree, that the class action mechanism is superior to any other currently available method for adjudicating mass-tort claims, then either Rule 23 should be retailored to the mass-tort case, or Congress should enact a federal procedure act designed to accommodate the special problems of contemporary mass-tort litigation. 64 Tex.L.Rev. at 1043–44 (footnotes omitted).

This comment is somewhat contradictory of the author's earlier statement in which she concluded the fault lay in the persistence of the circuit courts "in construing narrowly the Rule 23 class action procedure."

quired for their trials." [34] 782 F.2d at 471. The District Court concluded that "[c]onsiderable savings, both for the litigants and for the court, could thus be gained by resolving [this 'state of the art' defense] *and other defense-related questions, including product identification, product defectiveness, gross negligence and punitive damages, in one class trial*" *Ibid.* (Italics added). It accordingly "certified the class as to the common questions, ordering them resolved for the class by a class action jury. The class jury would also decide all the individual issues in the class representatives' underlying suits; individual issues of the unnamed members would be resolved later in 'mini-trials' of seven to ten plaintiffs." *Ibid.* The District Court said further that "[a]lthough the class action jury would evaluate the culpability of defendants' conduct for a possible punitive damage award, any such damages would be awarded only after class members had won or settled their individual cases." *Ibid.* Such were the circumstances under which the class certification was granted by the District Court in that case. The defendants on appeal challenged the certification under (b)(3). The Court of Appeals, after observing that "[t]he purpose of class actions is to conserve 'the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion" *Ibid.* at 471, (quoting from *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 155, 102 S.Ct. 2364, 2369, 72 L.Ed.2d 740 (1982), and recognizing the innovativeness of the District Court's procedure, affirmed that Court's action, saying that "in light of the magnitude of the problem and the need for innovative approaches, we find no abuse of discretion in this court's decision to try these cases by means of a Rule 23(b)(3) class suit." 782 F.2d at 475.

The *School Asbestos* case was a consolidated suit instituted by various school districts in several states to recover the costs of testing and removing asbestos material from their buildings. It is another decision in which the court engaged in "rethinking" the use of class actions in mass tort suits. In that case, the District Court certified a nationwide mandatory class for punitive damages and an opt-out class (*i.e.* (b)(3)) for compensatory damages. On appeal, the certification of a mandatory class for punitive damages on the record then before the Court was vacated with the statement that "we hold open the possibility of a 23(b)(1)(B) punitive damage class in more appropriate circumstances," 789 F.2d at 1008, but the certification for compensatory damages under (b)(3) was affirmed. In approving the (b)(3) certification, the Court recognized, as we have observed, that "the trend has been for courts to be more receptive to use of the class action in mass tort litigation." 789 F.2d at 1009. After taking note of the Advisory Committee Note on the mass tort case, the Court then dismissed the modern applicability of such comment thus:

> Although that statement continues to be repeated in case law, (*i.e.,* Advisory Note to (b)(3) of Rule 23) there is growing acceptance of the notion that some mass accident situations may be good candidates for class action treatment. An airplane crash, for instance, would present the same liability questions for each passenger, although the damages would depend on individual circumstances. Determination of the liability issues in one suit may represent a substantial savings in time and resources. Even if the action thereafter "degenerates" into a series of individual damage suits, the result nevertheless works an improvement over the situation in which the same separate suits require adjudication on liability using the same evidence over and over again. *See Hernandez v. Motor Vessel Skyward,* 61 F.R.D. 558 (S.D. Fla.1973).

> Reassessment of the utility of the class action in the mass tort area has come about, no doubt, because courts have re-

---

**34.** This summary of the District Court's conclusion is taken from the Court of Appeals' opinion on appeal of the District Court's opinion.

alized that such an action need not resolve all issues in the litigation. *See* Fed.R.Civ.P. 23(c)(4)(A). If economies can be achieved by use of the class device, then its application must be given serious and sympathetic consideration. 789 F.2d at 1008–09.

After expressing agreement with the reasoning in *Jenkins,* the court in *School Asbestos* further commented:

> Manageability is a practical problem, one with which a District Court generally has a greater degree of expertise and familiarity than does an appellate court (omitting citation). Hence, a District Court must necessarily enjoy wide discretion, and we are not inclined to reverse a certification before the District Judge has had an opportunity to put the matter to a test. 789 F.2d at 1011.

Finally, in upholding the (b)(3) certification, the Court concluded its opinion with this statement:

> We acknowledge that our reluctance to vacate the (b)(3) certification is influenced by the highly unusual nature of asbestos litigation. The District Court has demonstrated a willingness to attempt to cope with an unprecedented situation in a somewhat novel fashion, and we do not wish to foreclose an approach that might offer some possibility of improvement over the methods employed to date. *Ibid.*

A highly publicized example of this new thinking is also provided by *In re "Agent Orange" Product Liability Litigation,* 100 F.R.D. 718 (E.D.N.Y.1983). That was an action by a class of former military servicemen or their families seeking recovery of both compensatory and punitive damages for injuries suffered by them while serving in Vietnam as a result of the use by the military forces of a certain herbicide. A primary defense asserted by the manufacturers of the herbicide was the government contract defense. After notice and hearing, the District Court certified all issues, other than punitive damages for trial and disposition, under (b)(3); it certified the pu-

nitive damage issue under (b)(1)(B). After certification, the parties submitted a proposed settlement of the action. In granting such certification, the court noted the common issues involved in the government contract defense asserted by the defendants and in the claim of causation, the immense size of the plaintiff class, and the likelihood that certification might "encourage settlement of the litigation." 100 F.R.D. at 720–21. It found that in the previous cases where certification had been denied in this type of case, the courts had relied for their action on the Comment of the Advisory Committee already quoted, and it seems to have dismissed the Comment as applicable to the "mass accident" type of mass torts but not to "a mass products liability based upon a series of discrete events." 100 F.R.D. at 722. In response to the defendants' request that certification be confined to the issue of the government contract defense, the court found such proposal was "not a workable one," that it was impossible to try that issue without litigating the issue of causation, and that the common question in the case predominated over any issues affecting individual members. 100 F.R.D. at 723. In resolving the certification issue, it emphasized the importance of certification as related to settlement of the action:

> ... the court may not ignore the real world of dispute resolution. As already noted, a classwide finding of causation may serve to resolve the claims of individual members, in a way that determinations in individual cases would not, by enhancing the possibility of settlement among the parties and with the federal government.[35]

It accordingly certified the case on all issues other than punitive damages under (b)(3)[36] and on punitive damages under (b)(1)(B).

On appeal, the Court of Appeals affirmed. *In re Diamond Shamrock Chemicals Co.,* 725 F.2d 858 (2d Cir.), *cert. denied,* 465 U.S. 1067, 104 S.Ct. 1417, 79

---

**35.** *Ibid.* There was a settlement had in the case after certification.

**36.** It disapproved a (b)(2) certification.

L.Ed.2d 743 (1984). On the (b)(3) certification, the court found that

> it seems likely that some common issues, which stem from the unique fact that the alleged damage was caused by a product sold by private manufacturers under contract to the government for use in a war, can be disposed of in a single trial. The resolution of some of these issues in defendants' favor may end the litigation entirely. Moreover, since these issues may involve extensive documentary and testimonial evidence, Chief Judge Weinstein found that obviating a retrial in countless individual cases will lead to substantial economies in the use of judicial and private resources. 725 F.2d at 860-61.

It explicated this conclusion with the comment that "there [were] substantial grounds at this stage to support [the District Court's] conclusion that the common issues predominate and that a class action is the most efficient means of adjudicating them." *Ibid.* at 861. It found in particular that "[t]he unique common issues take the case out of the general rule that '[a] "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways.' " *Ibid.*, quoting the Advisory Committee Note. Later, on appeal from final judgment, the grant of certification under (b)(3) was reaffirmed, though with some expressions of skepticism of the difficulties of managing expeditiously mass tort suits, finding that "class certification was justified under Rule 23(b)(3) due to the centrality of the military contractor defense. First, this defense is common to all of the plaintiffs' cases, and thus satisfies the commonality requirement of Rule 23(a)(2)." *In re "Agent Orange" Products Liability Litigation,* 818 F.2d 145, 166-67 (2d Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988). Because of this ruling, it found no need to consider at the time the question of the punitive damage claim.

One of the most instructive cases in this connection was cited by the appellants in support of their objection to class certification, *Federal Skywalk Cases.* The action in that case concerned claims arising out of the Skywalk disaster in the Hyatt Regency Hotel in Kansas City, Missouri on July 17, 1981. There the District Court had certified a Rule 23(b)(1) mandatory class action on the issues of liability for compensatory damages, liability for punitive damages and amount of punitive damages. On appeal, the Court of Appeals found that the mandatory class action was barred by the Anti–Injunction Statute, 28 U.S.C. § 2283, but in so ruling, it recognized the complex issues faced by the District Court and commended the District Court's "creative efforts," but concluded that the certification could not "stand on the facts before it." *Federal Skywalk Cases,* 680 F.2d 1175 (8th Cir. 1982), *cert. denied,* 459 U.S. 988, 103 S.Ct. 342, 74 L.Ed.2d 383 (1982). However, by limiting its opinion to the facts before it, the Court of Appeals left open the possibility that some future mandatory certification in the action might be better received. The subsequent developments in the *Skywalk* case appear in 97 F.R.D. 380 (W.D.Mo. 1983) with a comment on those late developments in an article co-authored by Judge Wright, who had written the earlier District Court opinion, and Joseph Colussi, titled *The Successful Use of the Class Action Device in the Management of the Skywalks Mass Tort Litigation,* 52 UMKC L.Rev. 141, 141–43 (1984), in which they made this interesting comment on the denouement of the *Skywalk* litigation:

> Several commentators have recently suggested that the appellate court decision in the *Skywalk* mass tort case vacating certification of a mandatory class action struck the death knell for the use of the class action procedure in the management of mass tort litigation. The manner in which the *Skywalks* litigation was managed and resolved in the wake of that appellate court decision, however, demonstrated that the opposite is true. What many observers of the *Skywalks* litigation have failed to recognize is that the litigation was ultimately managed

and resolved through the use of the class action procedure. After the mandatory class action was vacated by the appellate court, two nearly identical voluntary class actions were certified and settled in the federal and state trial courts. The certification and settlement of those two voluntary class actions performed the same management function and permitted the claims of all litigants to be resolved in the same equitable and efficient manner that would have resulted if the mandatory class action had not been vacated.

The experience of the *Skywalks* litigation has made clear that the mandatory class action device is the only procedure presently available to state and federal courts which allows for the equitable and efficient management of mass tort litigation. Though the appellate court ruling in the *Skywalks* litigation did not prevent the eventual equitable and efficient management of that mass tort case through the use of the class action device, the ruling unwittingly sanctioned forum shopping and inequitably parceled the burden of mass tort litigation management between state and federal trial courts. The appellate court effectively placed the full responsibility of mass tort management on its state court brethren.

It may be definitely said—respecting the language of *School Asbestos, supra*—that the "trend" of the authorities is clearly in the direction of a more liberal approach to the certification of the mass tort action.

### XVI.

It is to be noted that a number of the decisions we have discussed involved settlements of the proposed class action. This raises the question whether class certification for settlement purposes is permissible under Rule 23. The appellants argue flatly that certification for such purposes is impermissible. However, despite this statement of appellants, certification for such purposes finds strong support in a number of various Law Review comments. Nielson, *Was the 1966 Advisory Committee Right?: Suggested Revisions of Rule 23 to Allow More Frequent Use of Class Actions in Mass Tort Litigation*, 25 Harv.J. on Legislation 461, 480 (1988), for instance, recognized a "trend" in favor of such certification:

> In recent years, several federal judges have explicitly recognized the effect of class certification on the likelihood of prejudgment settlement in mass-tort suits, and have apparently allowed such recognition to influence their decision to certify class actions.

Professor Transgrud, though he took a somewhat skeptical view of mass-tort certifications generally, felt that certification "as a pretrial joinder device to facilitate group settlements [was] both proper and desirable," adding

> Its use is proper because Federal Rule of Civil Procedure 23 provides that the court may certify a common question class action when it will prove "superior to other available methods for the fair and efficient adjudication of the controversy." A judicially supervised and approved class action settlement, like a judicially supervised trial, is a means of hearing and determining judicially, in other words, "adjudicating," the value of claims arising from a mass tort. As a result, if conditional certification of the case as a common question class action for settlement purposes would enhance the prospects for a group settlement, then Rule 23 authorizes certification.

Transgrud, *Joinder Alternatives in Mass Tort Litigation*, 70 Cornell L.Rev. 779, 835 (1985).

Recent court decisions have also spoken approvingly of the class certification of mass-tort actions for purposes of settlement in conformity with these academic comments. These decisions confirm that the promotion of settlement may well be a factor in resolving the issue of certification. Thus, in *Agent Orange*, Chief Judge Weinstein wrote, (100 F.R.D. at 723):

> Finally, the court may not ignore the real world of dispute resolution. As already noted, a classwide finding of causation may serve to resolve the claims of

individual members, in a way that determinations in individual cases would not, by enhancing the possibility of settlement among the parties and with the federal government.

Similarly, in *In re School Asbestos Litigation,* 789 F.2d at 1009, the Court said:

Concentration of individual damage suits in one forum can lead to formidable problems, but the realities of litigation should not be overlooked in theoretical musings. Most tort cases settle, and the preliminary maneuverings in litigation today are designed as much, if not more, for settlement purposes than for trial. Settlements of class actions often result in savings for all concerned.

The only federal court decision which has actually granted class certification for settlement purposes in a mass-tort action is *In re Bendectin,* 102 F.R.D. 239, 240 (S.D. Ohio 1984). In that case, Judge Rubin, in granting certification for settlement purposes, said:

The Bendectin litigation is but one example of massive product liability lawsuits involving large numbers of plaintiffs, protracted trials and substantial litigation costs. The traditional court system is simply unequipped to handle such [mass tort] litigation in a conventional manner without materially depleting the judicial resources available for all other litigation. It is theoretically possible to assign sufficient judicial time to hear these cases promptly but only at the cost of further delay in an already overburdened system. The cost to the parties of litigating these cases under current procedures is such that few plaintiffs could afford the expense or the delay. Justice is not served by erecting tollgates at the courthouse door.

There is a solution. The resolution of disputes does not necessarily require trial. Within the judicial authority of this Court is a means whereby the parties might be assisted in reaching a prompt and equitable disposition of the entire problem. That solution involves limited use of Rule 23 of the Federal Rules of Civil Procedure. A class certification would enable any proposed settlement to be presented to all class members and by them either accepted or rejected.

On appeal, the certification was invalidated, 749 F.2d 300 (6th Cir.1984). The ground for denial was that the action failed to qualify for certification under (b)(1) because of the limitation in the use of the class action decision stated in *McDonnell Douglas,* and under the "limited fund" doctrine. The Court, however, was careful to point out that it was not determining that class certification for settlement purposes of the mass tort in that case was impermissible. To emphasize this fact, the Court declared at p. 305, n. 10:

We do note that there is precedent for the proposition that a class can be certified for settlement purposes only. *See, e.g., In re Beef Industry Antitrust Litigation,* 607 F.2d 167 (5th Cir.1979), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981). *The Beef Industry* case involved the certification of a temporary settlement class prior to certification of a class for trial. In this case, the District Judge certified a class for settlement purposes after having rejected the same class for trial purposes. The District Judge therefore implicitly held that the standards for certifying a class are different depending on whether the class is for settlement or whether it is for trial. Because we decide the case on other grounds, we do not consider whether this holding is correct.[37]

As *Bendectin* had recognized, courts in cases involving numerous parties, though not mass-tort cases, had granted class certification for settlement purposes. Judge Wisdom in *In re Beef Industry Antitrust Litigation,* 607 F.2d 167 (5th Cir.1979), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981), carefully considered all angles of the question of class certification to promote settlement and, in his con-

---

**37.** *See* the recent San Juan mass accident case, which has as its basis a settlement, as set forth later in note 40 at page 743.

vincing opinion, found certification under proper circumstances to be in order. That decision has been followed in other cases, perhaps the most notable one being *Weinberger v. Kendrick*, 698 F.2d 61, 72–73 (2d Cir.1982), in which Judge Friendly, speaking for the court, said:

> The hallmark of Rule 23 is the flexibility it affords to the courts to utilize the class device in a particular case to best serve the ends of justice for the affected parties and to promote judicial efficiencies. Temporary settlement classes have proved to be quite useful in resolving major class action disputes. While their use may still be controversial, most Courts have recognized their utility and have authorized the parties to seek to compromise their differences, including class action issues through this means.

*See also In re Mid–Atlantic Toyota Antitrust Litigation*, 564 F.Supp. 1379, 1388–90 (D.Md.1983); *In re First Commodity Corp. of Boston, etc.*, 119 F.R.D. 301, 306–08 (D.Mass.1987).

Though, as we have said, these cases were not mass-tort suits, there seems to be no real reason why the precedent established by the cases, just cited, should not be equally applicable to the mass-tort. If not a ground for certification *per se*, certainly settlement should be a factor, and an important factor, to be considered when determining certification. That is all the District Court did in this case. Its action in considering this circumstance would appear to have been appropriate.

### XVII.

In summary, we take it as the lessons to be gleaned from the authorities already cited and discussed to be (a) that the "trend" is once again to give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case "best serve the ends of justice for the affected parties and ... promote judicial efficiency"; (b) that the Advisory Committee's Note suggestion that suit for damages is "not appropriate" for class certification has proved unworkable and is now increasingly disregarded; (c) that the theory that the Rule should be constrained by establishing judicially, without support in the Rule itself, limitations on its use such as were stated in *La Mar, Green,* and *McDonnell Douglas* have been outdated by the increasing phenomenon of the mass products tort action and by the growing body of recent class action decisions and comments favoring class actions in the mass tort context; (d) that, in order to promote the use of the class device and to reduce the range of disputed issues, courts should take full advantage of the provision in subsection (c)(4) permitting class treatment of separate issues in the case and, if such separate issues predominate sufficiently (*i.e.*, is the central issue), to certify the entire controversy as in *Agent Orange;* and (e) that it is "proper" in determining certification to consider whether such certification will foster settlement of the case with advantage to the parties and with great saving in judicial time and services; and (f) that the mass tort action for damages may in a proper case be appropriate for class action, either partially on in whole.

We accordingly now turn to an attempt to apply these lessons to the facts of this case.

### XVIII.

The overriding fact to be observed in attempting to apply these rules for class certification here is the uniqueness of this case. It is not simply a case by a numerous group or class suing one or more tortfeasors in one action to recover for a single set of wrongful acts. This is a case in which literally hundreds of thousands of claimants are involved as proposed class parties. It is a suit that breaks down into a number of separate and distinct issues, each of which is susceptible of independent proof, analysis and resolution and several of which arise out of the same factual background, pose a like legal issue and provide a basis for a separate certification. The first of these separate issues is one for the rescission or, as it is described in the complaint herein, a "vitiation" of a 1984

agreement between Robins and Aetna on the coverage afforded Robins under Aetna's policy. The differences between Robins and Aetna which this settlement disposed of, grew out of certain extra sums allegedly due "on account of defense costs and related items" over and above the stated face amount of the contract of insurance by Aetna to Robins. The agreement which settled the difference provided that Aetna would increase coverage to the extent of several hundreds of millions of dollars beyond the face limits of the policy. The *Breland* plaintiffs challenge the correctness of this settlement made by Robins with Aetna. They assert that they, as the representatives of the class of Dalkon Shield claimants, were third-party beneficiaries of the policy between Aetna and Robins and that they should have been involved in the settlement but were not and that their interest and the interest of all members of the class they seek to represent were prejudiced by such settlement. They wish to reopen the settlement and to seek apparently some additional sum in settlement from Aetna, thereby creating a fund in which all Dalkon Shield claimants would have a common interest. This is a classic type of "limited fund" embraced within the authorization of subsection (b)(1)(B) of Rule 23. The District Court properly certified the issue under (b)(1)(B) and (c)(4), and we do not understand the appellants to contest this ruling.[38]

■ The second issue represents the point which is critical and in dispute in this appeal. That issue poses the question whether Aetna may be subjected to liability in the Dalkon Shield litigation as a joint tortfeasor. The theory on which the *Breland* plaintiffs premise this right against Aetna has as its basis the claim that Aetna went beyond its duty as the insurance carrier for Robins and became an "active participant in all stages of the development, testing, promoting, and marketing of the product [Dalkon Shield]...." It alleged that Aetna's conduct in this regard made it a joint tortfeasor equally liable

with Robins in all the Dalkon Shield suits. This contention goes to the very heart of the plaintiffs' case here and overhangs the other issues in the litigation. It occupies the same place in this litigation as the military contractor defense did in *Agent Orange* and as the "state of the art" did in *Jenkins*. If the Dalkon Shield plaintiffs were to be unable to establish that basic issue in their favor, there would be no Dalkon Shield liability for Aetna and no trial herein would be required on the defectiveness of the Dalkon Shield. Further, there would be no dispute for resolution herein over causation or damages in these cases. It was accordingly very much in the interests of both Aetna and Dalkon Shield claimants as well as in the public interest that this issue common to every Dalkon Shield case be resolved through a class certification rather than through an interminable procession of thousands of individual cases. If that issue could be disposed of in a class certified context, the courts might well be saved the trial anew of thousands of Dalkon Shield claims.

Whether Aetna is liable as a joint tortfeasor in Dalkon Shield litigation will depend on an analysis of a common nucleus of facts that will not vary in the individual cases. The bulk of these facts, it seems apparent from those in the record, will be documentary. Most of those facts on which the determination of joint tortfeasor on Aetna's part is to be made are detailed already in the record on appeal. Assuming no certification, that legal determination will be made in each individual case by the court before whom the individual case may be tried. Absent class certification, the risk of conflicting decisions on that issue could be anticipated in practically every individual case against Aetna that would be tried. That threat of conflicting legal standards and results could well create a chaotic situation in this case. There are over 300,000 claims and possibly the same number of suits (assuming there is no certification). It would be intolerable that whether liability could exist might vary from state to state on the legal standard that each

---

**38.** On page 4 of their brief in this court, the appellants, after referring to this "limited fund" claim in the complaint, stated: "We are not concerned here with that matter."

particular court, hearing a Dalkon Shield case against Aetna, would apply to this common nucleus of relevant facts. It would thus be possible that one plaintiff, suing in State A, would be permitted to recover against Aetna as a joint tortfeasor but in sister State B, another plaintiff, equally entitled to relief, would not be permitted to recover. This is the very situation to which the lead attorney for the plaintiffs on this appeal, along with his co-author, referred in his article, already cited, when he said that in the mass tort context the public cry was:

> Why should hundreds, or even thousands, of trials take place in which the same issue of a defendant's liability is litigated over and over again? Why should some plaintiffs recover compensatory and punitive damages, while other plaintiffs in other trials receive much less, or nothing at all, even though the issues of liability and causation are the same? [39]

The writer in 96 Harvard Law Review at 1154, 1155 commented in the same vein:

> Two goals of tort law should be predictability and uniformity.... But if various factfinders reach inconsistent conclusions about the same set of facts, the defendant (and others in similar circumstances) is left without any guidance concerning the legality of its conduct, which may serve important legitimate aims.... But defendants and plaintiffs alike have compelling interests in consistent liability determinations, interests that can and should be addressed. Therefore, certifying (b)(1)(A) classes to promote these interests, even in cases in which there is no danger of conflicting equitable decrees, is fully compatible with the language and policy of the rule [Rule 23].

There is another important circumstance. Under Aetna's stipulation, a certification and resolution of the issue of Aetna's liability as a tortfeasor would, if the decision were adverse to Aetna, result in a resolution of all individual issues of causality and damages through a Claims Resolution Fa-

cility, obviating an endless procession of separate individual suits with varying results (some possibly in the few cases where the claimant elected for a jury trial rather than arbitration under the procedure to be followed under the Claims Resolution procedure) in suits heard in courts all over the country.

When an issue central to all the claims can be resolved by a class certification for all claims in the Dalkon Shield context without requiring a trial of the underlying Dalkon Shield liability claims and can be done with fairness to all Dalkon Shield claimants against Aetna, as it could be under the plan for the resolution of the non-common issues, it would be unfair alike to the litigants and to the societal interest in maintaining an efficient court system to refuse class certification. The likelihood of conflicting decisions and varying decisions of liability based on the standards of law applied to identical facts by different courts provide the very conditions contemplated in Rule 23(b)(1)(A) for class certification herein.

There is still another circumstance that pleads for certification of the issue of Aetna's liability as a joint tortfeasor. If Aetna is forced to go to trial on every individual Dalkon Shield case on the issue whether it is a joint tortfeasor and assuming that some of the individuals prevail both on that issue and that on the issue of recovery in a few of such cases, Aetna would, under the rule prevailing in a majority of the States be entitled to contribution by Robins. Such claim for contribution could be a contingent, unliquidated claim entitled to treatment in the Robins bankruptcy. To dispose of that claim, the court having jurisdiction over the bankruptcy would be required to delay the bankruptcy proceedings until the right to and the amount of the claim of contribution could be exactly ascertained through an "estimation" as mandated under Section 502(c) of the Bankruptcy Code.

Further, it is possible that even if this issue of Aetna's liability as a tortfeasor were resolved in favor of Aetna's liability, the burden of Dalkon Shield cases on the

---

**39.** *See Panzer & Patton, supra,* 21 Tort & Ins. Journal at 561.

courts would still have been rendered more manageable by the courts because of a certification. Aetna has stipulated in the record herein that, if this case is certified as a mandatory class action under (b)(1)(A), and "if the liability issue were resolved against Aetna in *Breland* unfavorable to Aetna," [i]t would "agree not to litigate separately any of the non-common issues of individual medical causation and individual counts of damages. Instead these issues, if reached, would be resolved for class members through the Claims Resolution Facility", which would be coordinated with the Claims Resolution procedure to be provided in the Robins reorganization proceedings. It is interesting that this procedure for disposing of the case is not novel; it follows largely the suggestion made in 7B C. Wright, A. Miller & M. Kane at 80 and 81, already discussed herein, and, as formulated by the courts in *Jenkins* and *Skywalk II.* The process begins under the Wright–Miller–Kane model with a trial "only once" of the damage issue, making a single award for the class, and "with the development of an expeditious administrative means of dividing the lump sum among the class members." [40] Similarly, in the Robins reorganization, the procedure begins as we have seen, with a judicially determined "estimation," made on the basis of a full hearing and after arguments of counsel, of a sum which would fully compensate every qualifying Dalkon Shield claimant for her injury. To accomplish that result, the Plan of Reorganization creates a Trust which in turn was to establish a claims resolution facility. Each Dalkon Shield claimant would file her claim with the Trust or facility, which, in turn, would

---

**40.** It seems that in a number of mass accident cases, the courts have recently followed much the procedure suggested in the district court opinions in *Bendectin* and *Skywalk II* and as recommended earlier by C. Wright, A. Miller & M. Kane, *supra.*

Thus, an AP report published in *New York Times* on May 12, 1989, p. 8, reported the acceptance in the San Juan hotel fire case by the federal judge in charge of the negotiations of a settlement therein involving 2,300 plaintiffs seeking damages in 264 separate suits against 230 defendants with an *ad damnum* clause totaling $1.8 billion in damages. The federal judge sustaining the settlement, Judge Bechtle of the Eastern District of Pennsylvania, had been appointed to handle the cases by Chief Justice Rehnquist, according to the AP article. The article stated that the judge had "accepted a plan to pay up to $100 million to settle hundreds of law suits stemming from the fire at the Dupont Plaza Hotel on New Year's Eve, 1986, that killed 97 people." The court explained that the agreement of settlement "was binding on all parties if certain conditions that were not specified were met" but one of plaintiffs' counsel said that the conditions "generally dealt with deadlines for the defendants to pay their share of the settlement." It will be observed that the plan of settlement arrived at an overall award, which was then to be awarded among the plaintiffs. Similarly, it would seem the amount of the award was determined by the weight—or, more appropriately lack of weight—of the plaintiffs' case against the named defendants. Three members of the International Brotherhood of Teamsters had been "convicted of murder in 1987 for setting the fire," which had caused the accident. The liability of the defendants who had no connection with the claim or the three parties was, as is Aetna's liability as a tortfeasor in this case, tenuous, thus the limited amount of the settlement by those parties. Further, all the claimants were subjected to the class settlement, making the settlement in the nature of a mandatory class certification.

The same article states that Judge Bechtle "had presided in a similar case involving the 1980 fire at the MGM Grand Hotel in Las Vegas that killed 54 people. The settlement in that case was $200 million.

It is manifest from this that the courts have already begun to follow the procedure suggested in 7B C. Wright, A. Miller & M. Kane at § 1784, discussed previously herein, in the mass accident case. There is no logical reason for not using it also in the mass tort product case.

An earlier news article indicated that this procedure has also awakened consideration at the legislative level. Thus in the New York Times for August 7, 1984, Section D, page 2, column 1, it is said:

There has been a lot of talk in Congress and even a little action—about unclogging the courts by setting up some sort of out-of-court claims-handling facility to resolve product liability problems involving substances that have injured hundreds, or thousands, of people.

Much of the Congressional concern was prompted by the more than 20,000 asbestos-related lawsuits now swamping the courts. In both the House and the Senate, legislation has been introduced to take those cases out of the courts and instead handle them through a fund offering fixed payments for different levels of injury. Those proposals are stalled, but there is some movement on separate legislation that would create an out-of-court mechanism to compensate people injured by toxic substances.

following some discussions, make an offer of settlement. If the claimant accepted the settlement offer, that would constitute full and complete settlement of her claim against Robins, Aetna, American Home and all others. Should she not wish to accept, she has the option of deciding her claim by arbitration or by a jury trial at her option. If the claimant opts for a jury trial, the suit shall be against the Trust, the "[v]enue shall be unchanged by the chapter 11 case" and "[a]ll claims and defenses shall be available to both sides at a trial." That was the combined procedure to be followed for resolving all Dalkon Shield claims against both Robins and Aetna, as well as any other parties involved. This procedure accords with what the Supreme Court in *General Telephone Co. v. Falcon*, 457 U.S. at 155, 102 S.Ct. at 2369, declared to be the purpose of class actions, especially in the mass tort context, to ensure "the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion." [citation omitted] As the Court in *Jenkins* said, "in the light of the magnitude of the problem and the need for innovative approaches," 782 F.2d at 475, we find no abuse of discretion on the part of the District Judge in his certification herein under these circumstances.

There is a final reason why certification is warranted in this case. As a result of the conditional certification made by the District Judge, the parties in the *Breland* action were enabled to develop a settlement of this controversy—a settlement which has been approved by approximately 95% of all voting claimants. As Professor Transgrud, in the article already cited and quoted has correctly stated, class certification "is proper because Federal Rules of Civil Procedure 23 provides that the court may certify a common question class action when it will prove 'superior to other available methods for the fair and efficient adjudication of the controversy.'" *See also* Schuster, *Precertification of Class Actions: Will California Follow the Federal Lead*, 40 Hastings L.J. 863, 873 (1989).

The appellants, however, would find the certification invalid because it fails to provide an opt-out right in favor of claimants under the procedure established. They assert that *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), proscribes any class certification, which does not provide the class members with the right to opt out. *Shutts*, however, has been the subject of considerable discussion by commentators. Many of the commentators take the view that *Shutts* held "that a state court can bind absent class plaintiffs to a judgment for money damages (only) if it provides the absent parties the minimal procedural protections of adequate representation, notice of the action, and an opportunity to opt out of the litigation." A view which would put in jeopardy non opt-out certification. Note, *Phillips Petroleum Company v. Shutts: Procedural Due Process and Absent Class Members: Minimum Contacts Is Out—Is Individual Notice In?*, 13 Hastings Const. L.Q., 817, 821 (1986); Note, *Phillips Petroleum Company, v. Shutts: Multistate Plaintiff Class Actions: A Definite Forum, But Is It Proper?*, 19 John Marshall L.Rev. 483, 485 (1986). The most careful and thoughtful comment on the decision, however, is in Miller & Crump, *Jurisdiction and Choice of Law in Multistate Class Actions after Phillips Petroleum Co. v. Shutts*, 96 Yale L.J. 1 (1986). The authors are not entirely certain of the effect of the decision on the mandatory class certification with its no opt-out provision. The authors said that "[t]here is no neat and logical means of resolving the question whether mandatory actions survive *Shutts*. The answer depends upon the view one takes of *Shutts* itself and of the need for mandatory classes. It also depends upon the characteristics of the particular class action." *Ibid.* at 52 (footnote omitted). Professor Mark Weber, in an article titled *Preclusion and Procedural Due Process in Rule 23(b)(2) Class Actions*, 21 Univ. of Mich.J. of Law Reform 347 (1988), indicates a situation in which a mandatory class action which did not include an opt-out provision might qualify under *Shutts*. He wrote:

The problem of the Rule 23(b)(2) class action is that binding absent class members without giving them notice and the right to opt out violates due process. The problem is clear under the apparently applicable standards of *Phillips Petroleum Co. v. Shutts*. Indeed, the only way in which the binding Rule 23(b)(2) class action might be seen not to be a violation of due process is if one follows *Mathews v. Eldridge* and weighs the harm to the interests of absentees with the cost of the alternative safeguard of notice and the right to opt out. 21 Mich. J. of Law Reform at 394 (footnote omitted).

Fortunately, however, *Shutts*—if taken as requiring an opt-out provision in any class certification, and assuming without deciding, that opt-out could not be validated here under the *Mathews v. Eldridge* standard—is satisfied in this case. The requirement of an opt-out provision if proven, is based on principles of due process. Chief Justice Rehnquist made this quite clear in his opinion in *Shutts*. In this case the Trust created by the parties for the resolution of all Class A claims on individual causation and damages does not in express terms include an opt-out provision but in effect it does. The Plan gives every such class member the right to elect to have her claim settled in a trial with all the procedural rights normally attaching to a jury trial. That is everything that an express opt-out provision could give a class member if such right is required under due process.

Due process, the courts have often declared, "is a flexible concept," intended to ensure "fundamental fairness." *Walters v. Nat. Ass'n. of Radiation Survivors*, 473 U.S. 305, 320, 105 S.Ct. 3180, 3189, 87 L.Ed. 2d 220 (1985). *See also Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). It is not a matter of semantics, not a matter of whether the talismanic word "opt-out" is used but whether the right given exists in effect. *Walters*, 473 U.S. at 321, 105 S.Ct. at 3189. Certainly, the procedure provided every class member here fairly meets the standard of "fundamental fairness" which due process demands. It follows that *Shutts*, if applicable, is fully complied with in this case.[41]

The appellants also posit that every class certification by a District Court has been reversed by the Court of Appeals and argue that such uniformity among the authorities should induce us to deny certification in this case. They list four decisions in support of this contention. *In re Bendectin Products Liability Litigation*, 749 F.2d 300 (6th Cir.1984); *In re Northern District of California, Dalkon Shield I.U.D. Products Liability Litigation*, 693 F.2d 847 (9th Cir.1982), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983); *In re Federal Skywalk Cases*, 680 F.2d 1175 (8th Cir.), *reversing* 93 F.R.D. 415 (W.D.Mo.1982), *cert. denied*, 459 U.S. 988, 103 S.Ct. 342, 74 L.Ed.2d 383 (1982); and *In re Temple*, 851 F.2d 1269 (11th Cir. 1988).[42] We do not find that these cases

**41.** It may be suggested that there must be some negotiation between the Trust or its designated Resolution Facility and the claimant before an offer is made by the Trust in settlement of the claim. It is after this that the right accrues to a resolution of the claim by either arbitration or a jury trial at the option of the claimant. Such minimal delay in the right to settle a claim by arbitration or trial does not implicate due process rights. The negotiations have no binding effect and may not be considered in a jury trial if the claimant elects to utilize such method of settling her claim. The delay in this case is much less than that required under the medical malpractice legislation, which has recently been enacted in many states under which medical malpractice claims must be submitted to a medical panel before suit. These have been

found constitutionally valid in *Davison v. Sinai Hospital of Baltimore, Inc.*, 617 F.2d 361 (4th Cir.1980); *see also Woods v. Holy Cross Hospital*, 591 F.2d 1164 (5th Cir.1979).

**42.** On remand, the district court refused to grant Raymark's motion to certify a mandatory plaintiff class pursuant to Rule 23(b)(1)(B). *Waldron v. Raymark Indus., Inc.*, 124 F.R.D. 235, 236 (N.D.Ga.1989). The district court added: "Although this court would like to see a mechanism by which asbestos victims would be fairly and promptly compensated, this court, regretfully, concludes that the law does not allow a class action pursuant to Rule 23(b)(1)(B) to be that mechanism." *Ibid.* at 239.

We would note that in *Waldron*, the court refused to approve certification of a mandatory

support appellants' broad statement. For instance, *Temple* expressly disclaimed any intention to hold that "a products liability or mass accident suit could *never* be the proper subject of a class action." 851 F.2d at 1273 n. 7 (emphasis in original). It then cited *Dalkon Shield*, 693 F.2d at 853 (noting "that mass torts caused by a single transaction, *i.e.*, a plane crash, might be proper subject of a class action"), and *Jenkins v. Raymark Indus. Inc.*, 782 F.2d 468, 475 (5th Cir.1986) (noting that the single issue of "state of art" defense certifiable in non-mandatory context), 851 F.2d at 1273 n. 7, as mass tort cases in which certification had been had. Actually, class action certification was denied in *Temple* because of lack of commonality on the part of the proposed class members; a contention not made in this case. 851 F.2d at 1273. In *Bendectin*, the first case cited by appellants, the Court of Appeals expressly refused to decide whether class certification for settlement purposes was permissible under Rule 23 and decided the case on the ground that the action did not qualify under (b)(1) because of the limitation placed on the use of Rule 23(b)(1)(A) in *McDonnell Douglas*, already discussed, and because it did not produce sufficient proof of a limited fund. 749 F.2d at 305–06. For reasons already given, we believe *McDonnell Douglas* is outdated as a proper limitation on the use of (b)(1)(A). We have already discussed *Dalkon Shield* and pointed out the differences between that decision and this case. Properly construed, *Dalkon Shield* may be said to have gone off on lack of a proper class representative, according to *Agent Orange, supra*. *Skywalk*'s final end as set forth in 97 F.R.D. 380 (W.D.Mo.1983) is not noted by the appellants. The most significant error of the appellants, however, is that, in making the broad statement that no Court of Appeals

had sustained a mass tort certification, they completely disregarded *School Asbestos, Jenkins*, and *Agent Orange*, as well as the later decision in *Skywalk*, all of which sustained a mass tort certification.

■ The appellants also assert that the *Breland* plaintiffs are not proper and adequate class representatives. This contention is based on the claim that there are claimants who object to class certification and the settlement which the *Breland* plaintiffs as class representatives submitted to the District Court for approval. Appellants' argument would deny class certification if any number of members of the class, however small, objected. Class certification cannot be defeated simply because a few claimants—actually, their attorneys—feel that they would fare better by pressing as quickly as they could their individual suits than they would if the suit were to be prosecuted for the benefit of all claimants. Certainly, in the mass tort situation, there is a substantial societal interest. The burden placed on the judicial system resulting from every products liability litigation entails great public and private expense, encumbers the court calendars, and prejudices other litigants by unusual delays in their litigation. As we have already said, judges in such cases are required to try case after case where the same documentary evidence is produced, where the same expert witnesses and their tests are exhaustively developed, where there is extended direct and cross-examination, and required, as by rote, to repeat the same instructions to a jury. To permit a small number of claimants who are seeking actually to promote their own interests largely at the expense of the other claimants to frustrate a class certification in such a case is unthinkable.[43]

---

plaintiff class for purposes of the Rule 23(b)(1)(B) "limited fund" class action certification. Thus, *Waldron* is entirely different from, and has no application to, the certification of the present class under Rule 23(b)(1)(A).

**43.** Judge Spencer Williams in *Mass Tort Class Actions: Going, Going, Gone?*, 98 F.R.D. 323 (1984), has well answered the argument that class certification must yield to the right of the

individual plaintiff to control his or her case. He wrote:

With surprising regularity, the primary opponents of class treatment of mass tort litigation are the plaintiffs' lawyers. These lawyers argue that the class action device was intended for situations when individual litigants would be incapable or unlikely to bring their own suit, due either to difficulties or expense of proof or the insubstantiality of the poten-

And what has been said here is equally applicable to the objection to the action of the class representative in submitting a proposed settlement to the District Court for approval. That proposed settlement was submitted to all the claimants and all claimants were given notice of a hearing on the proposed settlement where any claimant could raise such objection as she might have to the settlement. That procedure was followed by the objecting claimants. At the hearing, there was extensive testimony taken with attorneys for the objecting claimants participating and being heard. After the hearing the settlement was submitted to all the claimants and an overwhelming majority (almost 95%) of the Class A claimants and almost 98% of the Class B claimants voted in favor of the settlement. Should a class certification and a class settlement be dismissed simply because a minimal number of the claimants voting objected? Must the federal courts be forced to try individually thousands of individual cases presenting the same issues of liability and causation year after year, with an intolerable burden on the court system and the judiciary and with great delay in the resolution of the individual claims, when there is a ready remedy for expeditious adjudication and fair recovery available for the full 100% of claimants through a properly constructed class action when the objections are so limited? We think not, and we dismiss this objection to the class certification herein.

 The appellants also find error in the certification in this case because the District Court, in finding compliance with (b)(1), failed to indicate whether it was certifying under (1)(A) or (1)(B). This objection is without merit. As Wright, Miller & Kane points out, it is unimportant whether certification is under (A) or (B) "inasmuch as actions under clause (A) and clause (B) are treated in the same manner for purposes of the other portions of Rule 23 and nothing turns on which provision is held controlling." 7A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1772, at 424–25 (2d ed. 1986).

In conclusion, we affirm the class certification herein. It is clear from the record that the determinative, critical issue in this case was whether Aetna was liable as a joint tortfeasor; it overshadows all other issues. Just as the military defense was central to the case in *Agent Orange*, so the question whether Aetna was a joint tortfeasor here was the critical issue common to all the cases against Aetna, and one which, if not established, would dispose of the entire litigation. *See* 818 F.2d at 166–67. Such an issue satisfies the commonality requirement of Rule 23(a)(2), as well as the other prerequisites of subsection (a). Moreover, the action qualifies under subsection (b)(1)(A) as well as (3). Manifestly the class action as a method of adjudicating that overshadowing issue is superior to any alternative form of adjudication. Further, the resolution of this issue, if required to be made in the thousands of individual suits in different courts, would involve the risk of varying and contradictory legal decisions on what was precisely the same factual record. The result would be chaotic. This is a situation which would unquestionably qualify under (b)(1)(A). It is of no moment that this action qualifies under (b)(3) or that the District Court in this case may have certified this action under (b)(3) instead of (b)(1). In fact, it is "very common for an action to fall under Rule 23(b)(1) and one of the other catego-

---

tial recovery on individual claims. Of course, this argument is totally specious; the critics' stake obvious. *Every* member of a federal class certified under Rule 23 must have a claim for recovery in excess of $10,000,00. Moreover, such an interpretation ignores the primary justification offered by Rule 23's drafters *i.e.,* that the class action device was intended to foster judicial economy and efficiency. In fact, litigants are often deprived of this so-called "right" to control their own case by many of life's, as well as the law's harsher

realities. 98 F.R.D. at 329–30 (footnotes omitted).

He added, by way of a note, this newspaper item:

Almost everyone who has had contact with plaintiffs of tort litigation at the trial court level would admit that, ultimately, everyone and everything *but* the injured plaintiff controls the litigation. *See, e.g.,* Chen, *Product Safety, Liability Suits: Few Guidelines*, L.A. Times, October 6, 1982, pp. 19, 26–27. 98 F.R.D. at 33 n. 23.

ries in Rule 23(b)." 7A C. Wright, A. Miller & M. Kane, *supra*, at 425.[44] Were we not satisfied that there was authority under (b)(1)(A) for certification, we could, it is true, affirm the decision of the District Court as permissible under (b)(3). We realize that it was under (b)(3) that *Jenkins* and *School Asbestos* made their class certification, and the District Judge could have followed those decisions. It is, however, of no moment that the District Judge did not grant certification on this ground; it would be appropriate for us to affirm the certification herein as a (b)(3) since the decision of the court below can be affirmed on any ground supported by the record, whether raised below or by the parties in the proceedings before us, if one concluded that this action could not be certified under (b)(1). *Thigpen v. Roberts*, 468 U.S. 27, 29–30, 104 S.Ct. 2916, 2918, 82 L.Ed.2d 23 (1984); *Schweiker v. Hogan*, 457 U.S. 569, 585, 102 S.Ct. 2597, 2607, 73 L.Ed.2d 227 (1982); *Stern v. Merrill, Lynch, Pierce, Fenner & Smith*, 603 F.2d 1073, 1093 (4th Cir.1979); *Blackwelder v. Millman*, 522 F.2d 766, 771 (4th Cir.1975); *Charley's Taxi Radio Dispatch v. SIDA of Hawaii*, 810 F.2d 869, 874 (9th Cir.1987); *Colorado Flying Academy, Inc. v. United States*, 724 F.2d 871, 880 (10th Cir.1984), *cert. denied*, 476 U.S. 1182, 106 S.Ct. 2915, 91 L.Ed.2d 544 (1986). The basic difference between a mandatory certification under (b)(1)(A) and a certification under (b)(3) is that there is no opt-out requirement on the former but there is in the latter. As we have already pointed out, there is in practice, though not in express language, an opt-out provided by the right of a dissatisfied class claimant to choose a jury trial for resolution of her individual causation and damages claims. Accordingly, while the District Court might have certified this case under (b)(3), it acted in accordance with the general rule applicable in such a situation to certify under (b)(1)(A) (*See* C. Wright, A. Miller, & M. Kane, *supra*,

§ 1772, at 425, and other authorities cited on page 728 herein). For reasons already given, we are of opinion that the District Judge had the right to base his certification on (b)(1). We accordingly affirm the class certification as made herein by the District Court.

We turn now to consider the appeal from the order of the District Court approving the settlement herein.

### XIX.

■ Under *Flinn v. FMC Corporation*, 528 F.2d 1169 (4th Cir.1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976), a case cited by both parties as the guide for our decision on this phase of the appeal, the review of the decision of a District Court approving a proposed settlement of a class action is one for "clear abuse of discretion." 528 F.2d at 1172. *Flinn* declares that the most important fact to be considered in conducting such a review is "whether the trial court gave proper consideration to the strength of the plaintiffs' claim on the merits." *Ibid.* The reviewing court should consider in evaluating whether the trial court had given proper consideration to the strength of the plaintiffs case "the extent of discovery that [had] taken place, the stage of the proceedings, the want of collusion in the settlement, and the expense of counsel who [had] represented the plaintiffs in the negotiation" in the record before the trial court. *Ibid.* at 1173. The trial court should also give proper consideration to the attitude of the class members themselves to the settlement. It is not, however, to be assumed that a settlement is "unfair or unreasonable because a large number of class members oppose it" or that the settlement "may only amount to a fraction of the potential recovery." *Ibid.* It would have been in order for the trial court to grant to any objector to the settlement the right to be

---

**44.** There is another reason for a mandatory certification herein as opposed to one under (b)(3). There is a settlement in this case; that settlement binds all members of the class. It does not mean, though, that any dissatisfied claimant cannot have a jury trial on her claim:

she has a right of election either to arbitrate or to have a jury trial on her claim. Every claimant has all the rights she can expect of the judicial system, even if the certification were under (b)(3) and not under (b)(1)(A).

heard, to cross-examine witnesses or to submit evidence, but the trial court may limit the proceedings to "whatever is necessary to aid in reaching an informed, just and reasoned decision," *Ibid.* and specifically the trial court "should not 'turn the settlement hearing into a trial or a rehearsal of the trial.'" Ultimately, the rule to be applied is that

> [s]o long as the record before it is adequate to reach "an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated," and "form an educated estimate of the complexity, expense and likely duration of such litigation, ... and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise," *Ibid.*

If that procedure is followed, a trial court has acted properly in determining whether to approve the proposed settlement or not. We think that the District Judge in this case followed those principles in reaching his decision. Under such circumstances, he did not abuse his discretion in approving the settlement.

It is important to recognize that this case is closely tied in with the bankruptcy of Robins. Both this case and the Robins bankruptcy were before the same District Judge. Under the proposed settlement, the resolution of individual causation and damages for Dalkon Shield claimants seeking recovery from Robins and Aetna is through the same mechanism. The Robins Plan of Reorganization and the *Breland* settlement are intended to provide full payment of all compensatory damages suffered by all Dalkon Shield claimants who have properly filed claims. The Plan creates a Trust Fund which will be sufficient to achieve this goal. Neither the appellants nor anyone else has asserted that such fund is insufficient.[45] When the parties have funded the trust, Robins, Aetna and any successor corporations are relieved of any further

liability, and this is proper since Dalkon Shield claimants will be paid by the Trust the full value of their claims. Aetna has made a minimal contribution to that fund. But that is not all that Aetna has done to assure the full payment of all Dalkon Shield claimants: It has provided an extra fund of $325 million to protect the Trust against any deficiency that may occur in the Trust Fund. That undertaking of Aetna is the "icing on the cake" for the Dalkon Shield claimants, who, when the Robins Plan of Reorganization and the *Breland* settlement are approved, can begin promptly to collect compensatory damages for their injuries. The Plan of Reorganization and the *Breland* settlement are interdependent. Failure of approval of either the Plan of Reorganization or the *Breland* settlement would derail hopelessly the carefully negotiated and crafted Plan and Settlement and leave the Dalkon Shield claimants to the vagaries, expenses and delay of further extended litigation. It is understandable that, under these circumstances, about 95% of the claimants who voted on the Settlement voted in favor. Such a strong showing of support for the Plan by those most interested should not be lightly disregarded.

Of course, this expression of the feelings of claimants cannot relieve the trial judge of his obligation to review and make his own informed and reasoned judgment on the fairness of the settlement. The most important consideration, as declared by *Flinn*, 528 F.2d at 1173, in reviewing a class action settlement, is whether the District Court gave proper consideration to the strength of the *Breland* claim on the merits. The District Judge, in reaching his decision in this case, had before him a record that had been accumulated over many years. He had the extensive discovery conducted before the Judicial Panel on Multi–District Litigation over a period of years. He had available the records

---

**45.** The failure of the appellants to contest the adequacy of the estimation on the basis of which the Plan of Reorganization was premised is understandable. After all, in 1981 in the *Dalkon Shield* litigation in 521 F.Supp. at 1191 the value of Robins was said to be approximate-

ly $280,394,000; Robins, however, under the Plan is paying $2.475 billion to the Dalkon Shield claimants, quite an increase (almost ten times) from the earlier figure of $280 million arrived at in 1981.

developed as a result of the discovery conducted in the actions pending before Judge Lord in the District of Minnesota, as well as the investigations and reports of the two masters appointed by Judge Lord. Counsel for the *Breland* plaintiffs had thoroughly examined in Hartford Connecticut, the files of Aetna, and in Richmond Virginia, Robins' files. They had made copies of the relevant items in such files and collated them in various volumes. These examinations by the *Breland* plaintiffs covered a period of several months and entailed the services of a team of lawyers numbering at times as many as seven or ten.[46] All this was brought to the attention of the District Court either by the filing of the requisite documents or papers themselves or by the testimony or representations during argument by *Breland* counsel. Some forty-two depositions were included in the record. The trial judge received exhaustive briefs and heard at length counsel on the legal aspects of the *Breland* plaintiffs' claim. He took the testimony of a number of witnesses in open court. The conclusion seems inescapable, in our opinion, that the District Judge conducted a most exacting inquiry into the strength of the *Breland* plaintiffs' case and stated an informed and reasoned conclusion on that issue.

It is the appellants' position, though, that the record will show that counsel for the

class did not adequately investigate this case or conduct appropriate discovery. From the discovery already conducted before this suit was brought and the extensive investigation by counsel after this suit was instituted as already detailed, it appears to us, as it apparently did to the trial judge, the *Breland* Court had covered thoroughly the facts involved herein.[47] The report of the investigations by class representatives' counsel was set forth in a "Memorandum Settlement" submitted by Mr. Friedberg and Mr. Meshbesher as counsel for the *Breland* plaintiffs. Later Mr. Friedberg and other counsel engaged with him in developing the *Breland* case and in formulation on behalf of the *Breland* class the settlement, testified in person and were extensively cross-examined by counsel for the appellants. In addition, depositions of other counsel were submitted in the record. All this supported the statements in the Memorandum submitted in support of the Settlement. Counsel for the *Breland* plaintiffs aggressively and at great expense appear to have investigated every possible avenue for relevant evidence that might support the *Breland* suit.

What we have discussed relates to the relevant factual record which counsel for the *Breland* plaintiffs zealously developed

---

**46.** As an aside, it should be borne in mind that Aetna is obligated to pay the class counsel. Thus, the fund available to the claimants will not be diminished by attorneys' fees for the class representatives' counsel.

**47.** In this regard, it is important to review again the investigation conducted under Judge Lord's direction into the matter of Aetna's liability. That Judge Lord was concerned with the question of Aetna's possible liability is manifested by his order as reported in *Dean v. A.H. Robins Co., Inc.*, 101 F.R.D. 21, 26 (D.Minn.1984). The authorized discovery extended specifically to the relations of Aetna and Robins in regard to the issues in this case. Thus, the court's order required discovery of, among other items, their documents, records, and memoranda:

G. All correspondence, memoranda or other documents received or prepared by A.H. Robins or its representatives concerning the underwriting (purchase, cancellation, termination or analysis of past or future claims or premiums) applicable to the insurance or self-insurance of Dalkon Shield claims;

H. All correspondence, memoranda or other documents received or propounded by A.H. Robins or its representatives concerning either partial or complete denials of coverage (or reservations of rights to deny coverage) by Aetna Casualty and Surety Company concerning Dalkon Shield claims;

I. All correspondence, memoranda or other documents exchanged between Aetna and A.H. Robins concerning the safety or characteristics of the Dalkon Shield, the warning of Dalkon Shield hazards, dangers of defects or the recall of the Dalkon Shield at any level of distribution;

J. All opinions, tests, examinations or studies regarding the safety of the Dalkon Shield and authored by experts or consultants retained in any of the individual lawsuits initiated against the Robins Company for the period June 1, 1974 to the present.

It is thus plain that Judge Lord and the Masters appointed by him did inquire into and investigate the strength of the Dalkon Shield claimants' case.

and analyzed and which was before the District Judge. We now look to the legal basis for the *Breland* suit against Aetna. There was no evidence that Aetna had any connection with the manufacture, labeling or marketing of the Dalkon Shield by Robins as developed either by Judge Lord's masters or by the *Breland* counsel (or, for that matter, the appellants). Nor is there any evidence that Aetna took any part in the decision not to recall the Dalkon Shield in 1974; that decision was made by Robins, apparently on the advice of its counsel. There was no evidence of the making of false misrepresentation of any kind to Dalkon Shield claimants by Aetna that involved any prejudice to such claimants and there was thus no basis for a fraud action against Aetna. This case is accordingly clearly distinguishable from *West v. Western Cas. and Sur. Co.*, 846 F.2d 387 (7th Cir.1988), in which the agent of the insurance carrier was found to have induced the plaintiff West by false representation to delay filing a suit which could have been prejudicial to the interests of the insurer. Aetna had no dealings with any Dalkon Shield claimants, assumed no duty to such claimants and could not be liable to Dalkon Shield claimants under accepted insurance law. This was the very ground for the decision in *Bast* and *Campbell* discussed on pages 715 and 716 herein, and similar cases. The District Court in this case reached the same conclusion.

■ The only actions as charged against Aetna in this regard related to conduct of counsel paid by Aetna, as it was required to do under its contract with Robins, to represent the latter in certain Dalkon Shield litigation. This contention raises the question whether an insurance carrier in such a case can be regarded in law to be the employer of the counsel, for whose actions the carrier may be liable under *respondeat superior*. It is universally declared that such counsel represents the insured and not the insurer. Repeated opinions issued by the American Bar Association [ABA], as illustrated by ABA Comm. on Ethics and Professional Responsibility, Informal Opinion 1476 (1981) declare: "When a liability insurer retains a lawyer to defend an insured, the insured is the lawyer's client." *See also* the following opinions in ABA/BNA Lawyers' Manual on Professional Conduct (1984): Connecticut, Informal Opinion 83–5, at 801:2059; Delaware Opinion 1981–1 at 801:2201; Michigan Opinion CI–866 at 801:4856. *See also Point Pleasant Canoe Rental v. Tinicum TP.*, 110 F.R.D. 166, 170 (E.D.Pa.1986); *Gibson v. Western Fire Ins. Co.*, 210 Mont. 267, 682 P.2d 725, 736 (1984). The acts of counsel retained by Aetna to defend its insured Robins cannot be imputed to Aetna under any rule of *respondeat superior*.

■ It appears at another point in the appellants' catalogue of objections to the settlement to be the position of the appellants that Aetna knew of the deficiencies in the Dalkon Shield and failed to tell claimants of such. They would characterize this failure to be an actionable fraud. Such an argument assumes that an insurance carrier which, in reviewing with its insured a claim against the latter learns that its insured was at fault in some particular, owes a duty to advise the claimant of such dereliction on the part of its insured. Obviously, the carrier has no such duty and no court, so far as we know, has ever so held. *See Nipper v. California Automobile Assigned Risk Plan*, 19 Cal.3d 35, 136 Cal. Rptr. 854, 560 P.2d 743, 749 (1977) ("[w]e are aware of [no authority] which suggests that an insurer ... either stands in a special relationship with the applicant or his potential victims, or alternately owes any affirmative duty of inquiry or disclosure regarding the applicant.")

The appellants, in their brief, refer critically to the alleged fact that certain damaging files of Robins were either destroyed or were planned to be destroyed. There is, however, no evidence, either direct or circumstantial, in the record to indicate that Aetna knew of or participated in such action. When it later did hear that there had been some discussion of the possible destruction of certain Dalkon Shield records by house counsel, it is apparent, from the record on which the appellants base this assertion, that Aetna promptly demanded as a condition of renewing its policy that

the Robins official who had allegedly proposed such plan be removed from any connection with the Dalkon Shield files in litigation. It is thus plain that Aetna neither participated nor did it later do any act to condone such proposed or actual destruction of records. This record is simply devoid of any evidence of any wrongful conduct on Aetna's part or participation in this incident on the part of Robins (assuming, without deciding that there was such an incident).

■ Nor did the appellants offer any evidence or point to any fact in the record which established or indicated collusion between counsel for the *Breland* plaintiffs and Aetna. *Breland* counsel aggressively pursued this case. They did so at great expense. After this exhaustive review of the Robins and Aetna records, it is obvious that they recognized they had found no "smoking gun" but it was not because they had not tried relentlessly to discover one. The negotiations for settlement that later developed appear to have been conducted on the part of *Breland* counsel with complete fidelity to their responsibility.

Finally, appellants discount the settlement as a "nuisance settlement." It was a settlement that involved a potential liability on Aetna's part of $425 million. Considering the expense of defending individually all the Dalkon Shield claims, the settlement figure might be thought of as the "nuisance" value of the *Breland* plaintiffs' claim to Aetna which had to bear the expense of such litigation, but this in no way taints the settlement, when the record indicates clearly that the *Breland* plaintiffs had but a tenuous, if at all, chance of success on this claim. Further, the settlement, coupled with that offered in the Robins Reorganization Plan, assured every *Breland* plaintiff of full payment of her proven claim, with an added contingent provision supplied by Aetna to protect against any possible deficiency in the Trust. Moreover, a settlement involving the acceptance of a possible liability of $425 million is not an insignificant settlement. Moreover, in every settlement, the amount is directly related to the strength of the plaintiffs'

case. This is indicated by the settlement of $1,800 million of claims in the San Juan hotel fire for $100 million. *See* note 41. It is difficult to see what more the *Breland* action, if continued, could have availed the Dalkon Shield claimants. Without further elaboration, we hold the District Court did not err in approving the settlement of the class action.

The judgments of the District Court granting class certification and approving the settlement are accordingly

AFFIRMED.

## ADDENDUM

| APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER |
|---|---|---|
| 88–1755 | Mary Albert | 252684 |
| | Carol Angus | 215751 |
| | Judith Beaule | 62242 |
| | Janis Belcher | 237565 |
| | Daniel Belcher | 237566 |
| | Karen Belcher | 237564 |
| | David Belcher | 243035 |
| | Melanie Bennett | 183837 |
| | Nancy Benson | 191191 |
| | Jean Boeckler | 122207 |
| | John Boeckler | 122208 |
| | Janet Bruce | 296254 |
| | Melody Cannon | 228522 |
| | Barbara L. Carr | 20475 |
| | David W. Carr | 244903 |
| | Helen Carty | 78400 |
| | Sandra Cassier | 7647 |
| | Patrick Cassier | 7646 |
| | Victoria Charnock | 228521 |
| | Ellen Chodes | 42705 |
| | Elizabeth Cote | 26935 |
| | Brenda Davis | 111886 |
| | Marion DuFord | 78493 |
| | Deborah Fallon | 80309 |
| | John Fallon | 80310 |
| | Dawn Gebo | 7306 |
| | Janet Gregory | 79226 |
| | Frank Gregory | 79225 |
| | Sarah E. Haskell | 78399 |
| | Pamela Hockenhull | 78909 |
| | Patricia Johnson | 78581 |
| | Mary E. Jordan | 291790 |
| | April Weeks–Korn | 78397 |
| | Leonard Korn | 78398 |
| | Debora Lamont | 96144 |
| | Beverly McClure | 80313 |
| | Katherine Maher | 19424 |
| | Elaine Nizza | 228523 |
| | Donna Oberg | 77966 |
| | Diane Pinard | 7113 |
| | Jeanne Robey | 237567 |
| | Paul Robey | 237568 |
| | Pamela Saxby | 78580 |
| | Shellie Shapiro | 78583 |
| | Howard Shapiro | 78582 |
| | Sharon Lee Spern | 187651 |
| | Rebecca Steinbach | 281041 |
| | Jeannette Sweet | 85890 |
| | Beverly Tonkin | 184469 |
| | Donna Tshanakas | 222583 |
| | Nicholas Tshanakas | 222584 |

| APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER |
|---|---|---|
| | Daphne Whitmore | 78910 |
| | Linda Bisson | 172492 |
| | Anne Soucy | 286513 |
| | Sally Adams | 225908 |
| | Randy Adams | 225886 |
| | Charlotte Allen | 227324 |
| | Charles Allen | 225896 |
| | Jan Allen | 225897 |
| | Barbara Bill Klinger | 225899 |
| | Linda Brust | 225323 |
| | Virginia Bryan Roberts | 225901 |
| | Gwendolyn E. Buettner | 70274 |
| | Carolyn Campbell | 225900 |
| | Lynn Crosby | 225902 |
| | William Franklin Crosby | 233041 |
| | Mary Kathryn Deemer | 235677 |
| | John Deemer | 225885 |
| | Donna Faremouth | 260787 |
| | Charles Faremouth | 260788 |
| | Cindy Franco | 225884 |
| | Fred Franco | 231644 |
| | Elena Friedman | 225893 |
| | Darleene L. Frink | 226609 |
| | Kenneth Frink | 225964 |
| | Diane Goshorn | 113174 |
| | Christiane J. Guignard | 219368 |
| | Linda Harre | 225883 |
| | William Harre | 225894 |
| | June Ellen Harris | 225895 |
| | Carol Harterink | 225903 |
| | Anton Harterink | 225904 |
| | Rosanne Heard | 225905 |
| | Jimmie Dale Heard | 225906 |
| | Atha Henderson | 225907 |
| | Jill Campion Huff | 233339 |
| | Pamela Johnson | 7353 |
| | Ted Johnson | 7356 |
| | Wanda Lancaster | 6020 |
| | Deborah Jean Lenzi | 225485 |
| | Betty Leobold | 225486 |
| | William D. Leobold | 235694 |
| | Susan Lippner | 225890 |
| | Robert Lippner | 225889 |
| | Victoria L. McCord | 225888 |
| | Cheryl McFarland | 192508 |
| | Dayna McKendree | 225887 |
| | Diane Mance Zywotko | 225892 |
| | Carol Mitchell | 225891 |
| | Susan Nehrig Cole | 46096 |
| | Paul Nehrig | 46097 |
| | Deloris A. Nicolaou | 255933 |
| | Sherry Peavy | 225322 |
| | Kenneth Peavy | 225488 |
| | Flora Poe | 109594 |
| | Brenda Reilly | 225489 |
| | Gerald Reilly | 225490 |
| | Patricia Scolaro | 225491 |
| | Edward Scolaro | 235693 |
| | Wanda Joe Selvanik | 225492 |
| | Michael Selvanik | 225487 |
| | Janice Denise Simmons | 7355 |
| | Merrick Simmons | 7354 |
| | Martha E. Sims | 225483 |
| | Eslyn South | 189220 |
| | Tracy Staneart | 176376 |
| | Debra Renee Thompson | 225321 |
| | Denise B. Wax | 225946 |
| | Dan Wax | 234731 |
| | Rachael O. Thompson | 200369 |
| | Edwin L. Wilbur | 202442 |
| | Sharon Malloy Wilber | 201016 |
| | Harold E. Kerkhoff, Jr. | 200370 |
| | Robert F. Grant, Deceased | 200373 |

| APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER |
|---|---|---|
| | Robert W. Adams | 200368 |
| | Gillian L. Adams | 200367 |
| | Mr. R.S. Shaw | 285422 |
| | Blanche M. Shaw | 202439 |
| | Donna M. Kerkhoff | 200375 |
| | Kathleen A. Denise | 62658 |
| | Jim H. James | 200366 |
| | Beatrice D. Sewell | 200374 |
| | Kenneth R. Livingston | 200883 |
| | Gloria W. Livingston | 200372 |
| | Harvey H. Friedman | 200371 |
| | Arlene Whitaker James | 200365 |
| | Phyllis B. Puckett | 225059 |
| | Rhalda S. Friedman | 202440 |
| | Joyce F. Grant | 202441 |
| | Barbara A. Purvis | 202438 |
| 88–1757 | Carolyn Abernethy | 227352 |
| | Barbara Ackerman | |
| | Agnes S. Adams | 138145 |
| | Deirdre Adams | 304924 |
| | Janet Adams | 239853 |
| | Katherine Adams (Shaw) | 24580 |
| | Mary Adams | 293804 |
| | Olive J. Adams | 205634 |
| | Pauline Adams | 209345 |
| | Morenike Adejumo | 283378 |
| | Georgette M. Adlington | 204639 |
| | Maureen Ahern | 216306 |
| | Annie Aitken | 283379 |
| | Sandra Aldridge | 102304 |
| | Iona M. Alexander | 215468 |
| | Marie A. Ali | 241349 |
| | Christine Allen | 209349 |
| | Emelda Allen | 216276 |
| | Gail Frances Allen | |
| | Josephine Allen | 1437 |
| | June W. Allen | 285351 |
| | Marie Stella Allen | 204671 |
| | Maureen Allen | 88623 |
| | Patricia M. Allen | 283383 |
| | Anita C. Almond | 283385 |
| | Jacqueline A. Almond | 205660 |
| | Lucia Alvarez de Toledo | 226897 |
| | Elizabeth Amies | 210903 |
| | Doreen Amos | 283390 |
| | Joan Anderson | 283392 |
| | Lilieth C. Anderson | 205673 |
| | Norma Anderson | 230534 |
| | Veronica Ann Anderson | 203532 |
| | Trina Andrashi (Guessous) | 283912 |
| | Gillian Monaghan Andrews | 226869 |
| | June Andrews | |
| | Mary Annette | 42298 |
| | Jean M. Anslow | 209353 |
| | Patricia Apsimon | 202246 |
| | Leonie Archer | 204551 |
| | Yvonne A. Archibald | 203552 |
| | Brenda Arkless | 203493 |
| | Patricia A. Armstrong | 205636 |
| | Maureen W. Arnfield | 283396 |
| | Joan Arnold | 283398 |
| | Joyce Arnott | 283400 |
| | Shelia E. Arsenault | 239840 |
| | Mary Asprey | 207057 |
| | Janet Asson | 282918 |
| | Agnes Aston | 203470 |
| | Barbara Atkins | 299237 |
| | Eunice M. Atkins | 239806 |
| | Patricia Atkins | 231499 |
| | Betty Atkinson | 207059 |
| | Sylvia Atkinson | 283404 |
| | Betty Auger | 203586 |
| | Susan Aultman | 70842 |
| | Margaret Averill | 205687 |
| | Judith Avril | 283406 |
| | Trudi Axford | 283408 |

| APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER | APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER |
|---|---|---|---|---|---|
| | Patricia Baber | 282961 | | Norma Bishop | 283468 |
| | Ram Dai Bacchus | 205684 | | Tracey Biss | 283470 |
| | Linda Backerman | | | Dorothy Blackham | 216270 |
| | Gail Bacon | 42036 | | Anna Blaiklock | 283472 |
| | Carole Badrick | 239791 | | Maureen Blair | 15809 |
| | Janet Bailey | 283414 | | Mary Lou Blake | 287359 |
| | Peter J. Bailey | 283415 | | Noreen Blake | |
| | Janet Doreen Bailey | 283410 | | Christine Blakemore | 283474 |
| | Patricia Bailey | | | Jennifer Ann Blanch | 215462 |
| | Irene Bain | 283416 | | Ann Blau | 251536 |
| | Hazel Bainbridge | 283417 | | Bonnie Bleiweiss | 287360 |
| | Betsy Baird | 283419 | | Eunice Blewer | 203675 |
| | Robert Baird | 283420 | | Ethel Bloomer | |
| | Christine Baker | 283421 | | Patricia H. Bloomfield | 283477 |
| | Joy M. Baker | 207061 | | Barbara Bloyce | 195255 |
| | Gillian Bambury | 299222 | | Loretta Jayne Bluck | 283479 |
| | Rosalind Banfield | 283423 | | Sydney Blum | 263517 |
| | Margaret B. Bannister | 283425 | | Lynda Lee Bockler | 80029 |
| | Kathleen Barber | 297495 | | Ruth Boddy | 283481 |
| | Susan M. Barber | 283426 | | Pauline M. Bolle–Mead | 132591 |
| | Alexandra J. Barbosa | 49764 | | Carole G. Bolt (Wilkes) | 203564 |
| | Patricia Barford (Hudson) | 226898 | | Ann Bolton | 283482 |
| | Ann E. Barham | 203639 | | Winifred Helen Bolton | 283483 |
| | Jennifer Barley | 207970 | | Shelia Bones | 283485 |
| | Eileen Barlow | 204560 | | Patricia Bonner | 234413 |
| | Sandra Barnard | 283428 | | Mary B. Bonthron | 283487 |
| | Elaine Barone | 305202 | | Joanne Mary Booth (Stanton) | 208023 |
| | Susan Bashford | 48510 | | Lucey Bourne | 203464 |
| | Megan Bashir | 283432 | | Sylvannie L. Bourne | 282903 |
| | Carole Baskin | 283434 | | Pauline Anne Bowater | 239834 |
| | Pauline Basson (Reid) | 209346 | | Maureen Bowden | 223638 |
| | Pauline Bate | 226854 | | Verlaine Bowden | 283493 |
| | Janet Patricia Bates | 203509 | | Betty Bowers | 209339 |
| | Pauline M. Bates | 205642 | | Joyce Bowler | 29264 |
| | Christine Bates–Brownsword | | | Pamela Bowling | 283497 |
| | Heather C. Bathers | 203513 | | Gloria Bowman | 227354 |
| | Rosezella Battle | | | Winifred Boyce | 205638 |
| | Janet Baughan | 216283 | | Margaret Boyle | 224824 |
| | Ruth Baynton | 209196 | | Carolyn E. Bradburn | 224857 |
| | Karen Beach | 283440 | | Evelyn M. Bradbury | 203682 |
| | Janine Maeve Beadle | 105984 | | Betty Constance Bradley | 205632 |
| | Madeline A. Beattie | 203670 | | Janet Alice Bradley | 203582 |
| | Chantal Beaudry | 185103 | | Christine A. Brady | 205647 |
| | Janet Sue Beckwith | 84367 | | Jennifer A. Brady | 283502 |
| | Jean Bedford | 215449 | | Margaret M. Brady | 203527 |
| | Jamila Begum | 299223 | | Margaret P. Brady | 307353 |
| | Kaniz Begum | 207975 | | V.E. Braga | 285684 |
| | Magsood Kahn Begum | 203625 | | Linda Braid | |
| | Mary E. Behan | 283444 | | Margaret Bramble | 283504 |
| | Danielle Belanger | 237706 | | Pamela Ann Branden | 283506 |
| | Denise Belford | 243649 | | Trudie Branford | 283508 |
| | Jennifer Belsham | 283446 | | Norma Brannan | 207063 |
| | Helen Benham | 15107 | | Ida Brassard | 227355 |
| | Jacqueline D. Bennett | 215444 | | Raymond Brassard | 227356 |
| | Myrtle Bennett | 283448 | | Pamela Braun | 237436 |
| | Sandra A. Bennett | 249668 | | Berenice Brennan | 204586 |
| | Elizabeth A. Benson | 283450 | | Cathryn Brennan | 153187 |
| | Doreen Bentley | 226847 | | Kathleen Brennan | 283512 |
| | Katreane Bernard | 283452 | | Sharon L. Brennan | 283514 |
| | Cathryn Berr | | | Joyce Marylou Brett | 209369 |
| | Valerie Berriman | 299224 | | Denise Brewer | 294001 |
| | Georgia Berring | 207019 | | Mary Bridgeman | 249546 |
| | Patricia Berry | 283454 | | Linda Bridgewood | 205680 |
| | Patricia Bibbo | | | Diane Brimmer | 231066 |
| | Manzoor Bibi | 299240 | | Veronica Brimsted | 234425 |
| | Daphne Bickley | 283458 | | Julia Alica Brindley | 283517 |
| | Janus Bidawid | 287358 | | Sandra Brindley | 283519 |
| | Susan Bills | 215463 | | Denise Brinig | 283521 |
| | Mairi Binns | 283462 | | Elsada Bristol | 231502 |
| | Deborah (Lynn) Bino | 249212 | | Francesca E. Bristow | 203525 |
| | Carol Birch | 283464 | | Patricia Bristow (Sutherland) | 287461 |
| | Margaret Patricia Birch | 204564 | | Shirley Britt | 287361 |
| | Ann Bish | 283466 | | Wendy Elizabeth Brooke | 204644 |
| | | | | Jennifer Brookes | 209186 |
| | | | | Brenda Brooks (Mynard) | 224845 |
| | | | | Richmal Broomfield | 203521 |

| APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER |
|---|---|---|
| | Elizabeth Brophy | 283523 |
| | Reta F. Brothers | |
| | Alma Brown | 283525 |
| | Jennifer Brown | 209335 |
| | Patricia Brown | 216290 |
| | Patricia I. Brown | 203475 |
| | Susan Brown (Hinman) | 84652 |
| | Anne Browne | 209175 |
| | Pearline Browne | 282904 |
| | Ann Broyles (Louise) | 286359 |
| | Jean Brunt | 283527 |
| | Christine Bryan | 217994 |
| | Sophie Buamah | 283529 |
| | Moira Buchan | 283531 |
| | Jo Ellen Buchanan | |
| | Jan Buckley | |
| | Elsie Buhler | 291265 |
| | Christine Bull | 204638 |
| | Marion Burford | 153188 |
| | Marion Burgess | 283538 |
| | Patricia A. Burgess | 283540 |
| | Sheenagh Burgess | 283544 |
| | Joan Burke | 283545 |
| | Margaret Burke | 216274 |
| | Audrey H. Burton | 283549 |
| | Doreen Burton | 203482 |
| | Leslie Burton | 283550 |
| | Mary Burton | 283551 |
| | Mavis Bush | 283553 |
| | Georjeau Busha | 287398 |
| | Anne C. Butcher | 217302 |
| | Valery E. Butler | 231495 |
| | Anne Butterworth | 283557 |
| | Glynis Byatt | 142274 |
| | Bettina H. Byras | 84421 |
| | Ann Marie Byrne | |
| | Rita Josephine Byron | 224849 |
| | Linda Cabena | 249659 |
| | Marjorie Cairney | 84424 |
| | Lorraine Cakebread | 285686 |
| | Susan Calder | 207996 |
| | Dr. Fiona Caldicott | 215451 |
| | Pauline E. Calladine | 299163 |
| | Kathy Callaway | |
| | Sandra K. Caller | 283561 |
| | Valerie Calvert | 224834 |
| | Christine Camp | |
| | Margaret Campayne | 283564 |
| | Evelyn A. Campbell | 283566 |
| | Hilma Campbell | 203500 |
| | Jeanette Campbell | 283570 |
| | Judith L. Campbell | |
| | Nancy Campbell | |
| | Tina Campbell | 207067 |
| | Yvonne Campbell | |
| | Mary Ann Canning | 239795 |
| | Valerie Canning | 204670 |
| | Else–Marie Carlander | 283573 |
| | Barbara Carnaby | 283575 |
| | Georgina C. Carnegie | 283577 |
| | Sandra J. Carpenter | 287365 |
| | Sandra M. Carpenter | 207984 |
| | Bridget Teresa Carroll | 283578 |
| | E. Carroll | 283580 |
| | Elizabeth Ann Carter | |
| | Margaret E. Carter | 204597 |
| | Margaret Cartlidge | 226899 |
| | Margaret Ann Carton | 207048 |
| | Janet D. Cartwright | |
| | Lurline Carty | 283582 |
| | Marianne Carven | |
| | Jacqueline Casey | 283584 |
| | Jane Casey | 203533 |

| APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER |
|---|---|---|
| | Mary Sheila Cashmore | 204598 |
| | Margaret Casserly | 209364 |
| | Kathleen Cassettari | 283586 |
| | Carole A. Cassie | 209264 |
| | Mary Frances Castle | 283590 |
| | Iona Castro | 283592 |
| | Margaret A. Caswell | 204642 |
| | Christine Cave | 203611 |
| | Ann Cawley | 283593 |
| | Ruth Evelyn Cecil | 287366 |
| | Doreen Chalke | 605808 |
| | Catherine B. Challender | 283595 |
| | Edna Challinor | 239784 |
| | Kathleen Chambers | 283597 |
| | Cheryl Chambers | 241355 |
| | Mary Champagne | 287367 |
| | Raymond Champagne | 287368 |
| | Maria L. Chandler (Holt) | 284877 |
| | Shirley Chant | 215397 |
| | Patricia M. Chaplain | 42281 |
| | Jacqueline Chapman | 224821 |
| | Lily Chapman | 204664 |
| | Jose Charles | 283603 |
| | Marion Charles | 282933 |
| | Caroline O. Charlton | 212449 |
| | Valerie Chattoe | 216291 |
| | Zohra S. Chaudry | 204667 |
| | Margaret M. Checkley | 203569 |
| | Mary Cherrington | 283606 |
| | Marcia Chessell | 283608 |
| | Carol Chew | 203612 |
| | Louise Ching | 283610 |
| | Janet Chioffi | |
| | Maureen R. Chittock | 283611 |
| | Gillian D. Chitty | 283613 |
| | Brenda Victoria Choat | 283615 |
| | Marilyn Chong | |
| | Barbara P. Chorley | 207974 |
| | Dallas Christodoulou (Bonell) | 255186 |
| | Madelaine Church (aka Canale–Parola) | 283571 |
| | Alison Clark | 247714 |
| | Ann Clark | 203555 |
| | Doreen M. Clark | 215457 |
| | Gillian Clark | 239808 |
| | Judith Ann Clark | 283617 |
| | Lee Christine Clark | 283619 |
| | Pamela Clark | 239816 |
| | Patsy Clark | |
| | Sylvia Clark | 216315 |
| | Ann D. Clarke | 241360 |
| | Dorothy Clarke | 203551 |
| | Florence J. Clarke | 203540 |
| | Joyce E. Clarke | 216296 |
| | June Clarke | 204652 |
| | L. Clarke | 283619 |
| | Olen Jane Clarke (estate) | 283621 |
| | Patricia Clarke | 247048 |
| | Linda Claxton | 205663 |
| | Sylvia Clay | 283623 |
| | Kerry Claytor | |
| | Nancy Cleary | 207020 |
| | Edwin Cleary | 207021 |
| | Carol Faye Clements | 287370 |
| | Violet R. Clews | 204660 |
| | June Cliffe | 283625 |
| | Mavis Una Clinton | 283626 |
| | Joan W. Clulow | 209206 |
| | Irene Cobb | 120967 |
| | Mary Ann Cockerton | 283628 |
| | Christine Cocksey | 283630 |
| | John Cocksey | 283631 |
| | Linsay Marcia Cohen | 283632 |
| | Diane Cole | 283634 |
| | Janice Cole | 283636 |
| | Nikki Cole | 287372 |

| APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER | APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER |
|---|---|---|---|---|---|
| | Teresa M. Cole | 209344 | | Debbie Dameron | |
| | Betty Coleman | 288372 | | Susan Mary Daniels | 204641 |
| | Mary G. Colley | 204678 | | Lynda Dare | 283691 |
| | Margaret Collins | 203601 | | Valerie J. Darneille | 283692 |
| | Theresa Coltman | 283640 | | Shelia Dart | 155669 |
| | Greta Connelly | 234526 | | Beryl Davey | 283695 |
| | Margaret Conner | | | Christine E. Davidson | 203598 |
| | Pauline Conolly | 63312 | | Tina Davidson | |
| | Elizabeth Conran | 283642 | | Avril Davies | 209191 |
| | Karen Conti | 285688 | | Elaine P. Davies | 204654 |
| | Audrey Conway | 283644 | | Katherine Davies | 239827 |
| | Beatrice S. Cook | 207973 | | Patricia E. Davies | 293756 |
| | Catherine Cook | 307352 | | Joyce Davis | 203635 |
| | Wendy R. Cook | 226903 | | June Davis | 203628 |
| | Margaret K. Coomber | 283646 | | Kaye Davis | 153191 |
| | Catherine Coombes | 153068 | | Valerie J. Dawkins | 203578 |
| | Elaine Coombes | 605809 | | Rosemary E. Dawson | 283697 |
| | Christine Coombs | 204646 | | Ann De Bont | 203511 |
| | Beatrice Cooper | | | Louisa De La Falaise | 207981 |
| | Dorothy P. Cooper | 216294 | | Dorothy P.A. De'Souza | 283715 |
| | Gay Maxine Cooper | 31333 | | Patricia DeAngelo | 204388 |
| | Patricia Cooper | 224837 | | Susan DeGavre | |
| | Theresa Cooper | 283652 | | Carolyn DeRijke | 207024 |
| | A. Corbett | 283653 | | Bernadette Dean | 205631 |
| | Josephine A. Corcoran | 216330 | | Jacqueline Dean | 203562 |
| | Lenore Corfe | | | Theresa Dean | 305204 |
| | Christine Corfield | 283654 | | Jacqueline K. Dean–Lewis | 283699 |
| | Sue Corfield | 170937 | | Pamela Deane | 283701 |
| | Margaret H. Corlett | 203665 | | Mary B. Delaney | 231497 |
| | Margaret Cornwell | 286351 | | Janice Delany | 283703 |
| | Nicolina Cortiglia | 283662 | | Amanda Dellar | 283705 |
| | Mary Cotterill | 216288 | | Angela Dempsey | 283706 |
| | Josephine V. Cottingham | 283663 | | Pamela Denney | 283708 |
| | Maureen Coughlan | 294002 | | Joyce Densham | 226881 |
| | Christine Ann Coulson | 283665 | | Maureen Dent | 283710 |
| | Barbara I. Court | 208014 | | B.H. Deputron | |
| | Alice Couture | 231074 | | Dianne Derrick | 283713 |
| | Caroline Cowell | 283667 | | Elise J. Desabrais | |
| | Ursula Cowley | 299164 | | Michelle Detrice | 204578 |
| | Ira Cox | 283669 | | Shelia Devaney | 138170 |
| | Joyce E. Cox | 188092 | | Christine Devine | 283718 |
| | Margaret Cox | 205670 | | Barbara Dhalai | 203545 |
| | Janet Crabb | 282905 | | Patricia Diaz | 283719 |
| | Jackie Craig | 287373 | | Rosemary Dickson | 283721 |
| | Lynette Crannis | 285690 | | Christopher Dickson | 283722 |
| | Mary B. Craven | 203579 | | Moira Dimech | 153192 |
| | Browyn Crawford | | | Joanne Dinatale | 269143 |
| | Margaret Creber | 153190 | | Linda Dingman | 106964 |
| | Margaret Credaro | 285693 | | Gail I. Dixon | 283727 |
| | Laura J. Cremin | 217837 | | Jennifer E. Dixon | 203517 |
| | Lavinia Croft | 283671 | | Rosemary Ann Doble | 226861 |
| | Patricia V. Croshaw | 85056 | | Mary Docherty | 283731 |
| | Kathleen G. Cross | 239864 | | Alison Gay Doggart | 283733 |
| | Ursula Cross | 265028 | | Margaret J. Doherty | 212603 |
| | Ann Crossan | 283673 | | Mary Donnelly | 205669 |
| | Cynthia Crowley | 303907 | | Annie Donoghue | 209208 |
| | Angela Culbert | 283677 | | Annie J. Donoghue | 224833 |
| | Sandra Evelyn Culhane | 307349 | | Joan Doogood | 209616 |
| | Elaine Cumley | 207022 | | Amanda Dore | 283737 |
| | Mairead Cummins | 12819 | | Patricia Dorkins | 234416 |
| | Marion Cummins | 247715 | | Dorothy Douglas | 283739 |
| | Philomena Cummins | 195260 | | Clara Douglass | 84510 |
| | June Rita Cumper | 283681 | | Susan Dow | 287377 |
| | Catherine Cunnane | 239857 | | Norma Dowd | 142277 |
| | Dawn Iris Cunningham | 283685 | | Susan Dowie | 226857 |
| | Ellen Marie Cunningham | 127234 | | Beryl L. Dowling | 88572 |
| | Mary F. Cunningham | 288491 | | Winifred Downes | 283741 |
| | Anne W. Curtis | 239793 | | Audrey J. Downey | 203623 |
| | Marilyn Curtis | 287374 | | Joyce Doyle | 283743 |
| | Barbara Cuthbert | 84491 | | Sylvia M. Duffy | 203575 |
| | Jean Daff | 283687 | | Joanne K. Dugdale | 203658 |
| | Johanna Dahn | 207995 | | Joyce Dunbar–Brunton | 283745 |
| | Shirley Joy Dallas | 283689 | | Patricia F. Dunderdale | 240973 |
| | | | | Christine Dunleavy | 227357 |
| | | | | Patricia Dunne | 202220 |
| | | | | Mary E. Dunster | 287378 |

| APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER |
|---|---|---|
| | Hillary A. Durochia | 41108 |
| | Josephine E. Durrant | 205689 |
| | Linda Durrant | 226809 |
| | Michelle Dutot | 283747 |
| | Patricia Dyer | 142278 |
| | Margaret Ealand | 295359 |
| | Barbara Eastbury | 239866 |
| | Brenda Easthope | 209197 |
| | Gloria Eaton | 215464 |
| | Patricia Ann Eaton | 224852 |
| | Margaret Eatough | 283750 |
| | Teresa M. Eatough | 283752 |
| | Jillian Ede | 189032 |
| | Betheda Edmonds | 249121 |
| | Elizabeth Edwards | 209202 |
| | Ellen N. Edwards | 239848 |
| | Josephine A. Edwards | 203515 |
| | Sheryl Edwards | 283754 |
| | Catherine M. Egan | 226868 |
| | Janice Egglestone | 283756 |
| | Mary Rose Elgie | 283758 |
| | Vassoulla Elia | 226845 |
| | Barbara L. Elliman | 203473 |
| | Rosalind Elliott | 142279 |
| | Gay (Brown) Ellis | 231082 |
| | Eugenie Ellis | 283760 |
| | Lorraine Ellis | 208765 |
| | Avril Dawn Elms | 283764 |
| | Jennifer Ann Elvy | 283766 |
| | Janet S. Emery | 204595 |
| | Sally P. Emms | 283768 |
| | Cheryl L. English | 285695 |
| | Yvonne Enright | 283769 |
| | Doris Epstein | 84532 |
| | Ingrid Eriksen–Wilson | 207055 |
| | James Eriksen–Wilson | 207056 |
| | Janice Esom | 283773 |
| | Nancy Rose Estry | 283777 |
| | Caroline Evans | 299165 |
| | Mary A. Evans | 283781 |
| | Sheila Evans | 283779 |
| | Susanne Evans | 212389 |
| | Janet C. Everill | 282906 |
| | Pauline B. Everitt | 299244 |
| | Joan M. Eveson | 226840 |
| | Patricia V. Ewart | 283783 |
| | Janice Renee Fairweather | 119690 |
| | Shirley D. Faloon | 249569 |
| | Julie Falzarano | 287380 |
| | Gwyneth Fanning | 84541 |
| | Ian Fanning | 84542 |
| | Anne Faraday | 216304 |
| | Donna Faremouth | |
| | Charles Faremouth | |
| | Jerilyn Farinella | 286358 |
| | Mary Ann Farrell | 283785 |
| | Ruth Farrell | 287381 |
| | Margaret F. Farrington–Wood | 283787 |
| | Sabina Faust | 285696 |
| | Sylvia Jeannette Feaver | 283789 |
| | Janet Fell | 204593 |
| | Dorothy M. Fellows | 205656 |
| | Teresa Maron Felton | |
| | Susan Lee Fenney | 291638 |
| | Paula Fenton | 283793 |
| | Annette Ferlin | 207028 |
| | Margaret J. Ferris | 84556 |
| | Margaret W. Ferris | 224823 |
| | Christine M. Finney | 204661 |
| | Heather Ann Firkin | 283795 |
| | Ann Elizabeth Fish | 209327 |
| | Janice Fishburn | 285698 |
| | Linda Fitzackerley | 283797 |

| APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER |
|---|---|---|
| | Sandey Fitzgerald | 84563 |
| | Valerie Fitzgibbons | 205674 |
| | Thelma Fitzpatrick | 283799 |
| | Elizabeth Fivet | 283801 |
| | Mavis Flastig | 283803 |
| | Susan M. Flegg | 203520 |
| | Helen Fletcher | 285700 |
| | Alice Foran | 249661 |
| | Anne S. Ford | 283805 |
| | Elizabeth Ford | 142281 |
| | Peter Ford | 142282 |
| | Margaret Ann Forrest | 283807 |
| | Geraldine Forristal (Mary) | 148621 |
| | Avril Forsdyke | 205688 |
| | Irene C. Forshaw | 283809 |
| | Jean Foster | 204571 |
| | Joan M. Foulsham | 204581 |
| | Jeanette Fournier | 270165 |
| | Anne Fowler | 295363 |
| | Valerie Ann Fowler | 283811 |
| | Elizabeth Fox | 226885 |
| | Helen Elizabeth Fox | 283813 |
| | Sheila Fox | 283817 |
| | Shirley Foxall | 282965 |
| | Betty Frances | 285692 |
| | Cristine Elizabeth Francis | 207071 |
| | Dorothy Francis | 282966 |
| | Rosemary D. Francis | 283819 |
| | Sheila Francis | 203678 |
| | Doreen Franklin | 224828 |
| | Brenda A. Franklyn–Stokes | 283821 |
| | Joyce Fraser | |
| | Carol Frederick | |
| | Brenda Freeman | 203571 |
| | Pauline Freeman | 70777 |
| | Valerie Freeman | 299225 |
| | Mary D. Freer | 243652 |
| | Sandra G. French | 155772 |
| | Susan French | 283823 |
| | Annaliese Fritz | 101994 |
| | Georgia Furminger | 287383 |
| | Lesley D. Fyfe | 153193 |
| | Catherine Gaffney | 223767 |
| | Loraine Gager | 153195 |
| | Sylvia Gale–Burkitt | 283829 |
| | Andrea Gallagher | 239805 |
| | Gloria Joan Gallant | |
| | Russlaine A. Galliers | 231510 |
| | Judith Gapp | 283831 |
| | Barbara A. Garcia | 203469 |
| | Alison M. Gardiner | 299226 |
| | Linda Ann Gardner | 205651 |
| | Diane Garner | 283833 |
| | Peggy A. Garrett | 287384 |
| | Betty C. Gauntlett | 208003 |
| | Kathleen Gavaghan | 203499 |
| | Jean A. Gaynor | 283835 |
| | Ann Gear | |
| | Christine A. Gebhardt | 283837 |
| | Patricia L. Gee | 283839 |
| | Anna Marie Gent | 293839 |
| | Valerie Gentry | 283841 |
| | Rita Gerry | 205640 |
| | Sandie Gervasio | 287385 |
| | Joan Gethin | 216331 |
| | Patricia Ann Giannasi | 283842 |
| | Carolyn Gibbins | 283843 |
| | Margaret Gibbons | 283845 |
| | Gwyneth Gibson | |
| | Joan Gibson | 283849 |
| | Joy Gibson | 285701 |
| | Polly Gibson | 270179 |
| | Rosemary Gibson | 216284 |
| | G.A. Gilani | 226875 |
| | Brenda M. Gilbert | 204563 |
| | Alexandra Gildea | 283851 |

| APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER | APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER |
|---|---|---|---|---|---|
| | Jean Giles | 209328 | | William Haines | 84615 |
| | Lillian Giles | 203661 | | Annette E. Hairsine | 203681 |
| | Judy Gilgunn | 283853 | | Elizabeth A. Hale | 203478 |
| | Michael Gilgunn | 283854 | | Sandra Haliben | |
| | Raj Gill | 208019 | | Ann J. Hall | 283913 |
| | Heather Gilroy | | | Jean Hall | 283915 |
| | J.P. Ginesi | 283855 | | Marjorie Hall | 293758 |
| | Judy Girard | 153196 | | Mary P. Hall | 283916 |
| | Suzanne Girard | 287387 | | Phyllis Hall | 283918 |
| | Theresa M. Gladwin | 204655 | | Sheila Hall | 209185 |
| | Marcia Glenwright | 207029 | | Shirley E. Hall | 283920 |
| | Ann C. Glover | 204566 | | Mary I. Hallahan | 239807 |
| | Marie Glucksman | 283856 | | Gillian Halter | 203679 |
| | Jacqueline Glynn | 203668 | | Razia A. Hameed | 203617 |
| | Josephine Glynn | 224822 | | Alison Hamilton | 283921 |
| | Rita Goddard | 216307 | | Kathleen Hamilton | 283923 |
| | Jane Godfrey | 257757 | | Maryann Hammond | 207031 |
| | Teresa Lorraine Godfrey | 283858 | | Clifton Hammond | 207032 |
| | Karen Goff (Smeaton) | 285461 | | Jill M. Hampson | |
| | Mercedez Gomez | 283860 | | Patricia R. Hancock | 283924 |
| | J.A. Goodeve | 283862 | | Susan Handy | 203581 |
| | Marie Goodrich | 245142 | | Margaret Handyside | 153197 |
| | Joy M. Goodwin | 283864 | | Janet Hanks | |
| | Margaret P. Goodwin | 205649 | | Bridget H. Hanley | 209180 |
| | Sandra Goodyear | 283865 | | Wendy Ann Hannabuss | 283926 |
| | Ester McBride Gordon | 288867 | | Margaret Hannan | 283928 |
| | Barbara Gorringe | 295353 | | Shirley Hannon | 305246 |
| | Margaret Gossmann | 270183 | | Lorna Hanrahan | 227359 |
| | Lena Gott | 143619 | | Evelyn Hanson | 209326 |
| | Dorothy A. Gough | 216312 | | Rosemarie Hanson | 11494 |
| | Judith Goulden | 283869 | | Patricia Ann Hara | 181073 |
| | Elizabeth Goulding | 283871 | | Mary Harding | 215453 |
| | Susan Goulding | 283873 | | Pauline Harding | 204549 |
| | Ann Govern | 218087 | | Joyce Hardy (Fox) | 283815 |
| | Philippa Gow | 227358 | | K. Hardy | 188150 |
| | Susan Gower | 202214 | | Margaret E. Hardy | 283931 |
| | Rita Goyette | | | Ann Harman | 205644 |
| | Donna Graham | 225129 | | Catherine Harouche | 239835 |
| | Priscilla Graham | 283877 | | Dianne Harper | 284817 |
| | Valerie Graham | 204672 | | Audrey Harris | 283412 |
| | Veronica Grant | 282968 | | Hilary Harris | 226860 |
| | Deborah Graves | 84601 | | Janet M. Harris | 203602 |
| | Beverly Gray | 287388 | | June H. Harris | 216209 |
| | Doreen Gray | 283879 | | Norma J. Harris | 284821 |
| | Elaine Gray | 249654 | | Pauline T. Harris | 284823 |
| | Mary Catherine Gray | | | Anne Harrison | 282970 |
| | Mary Charlotte Gray | 234379 | | Astrea Harrison | 284825 |
| | Pamela Gray | 283883 | | Barbara Harrison | 284826 |
| | Anna Green | 283885 | | Keith Harrison | 284827 |
| | Robert Green | 283886 | | Maureen Harrison | 203604 |
| | Euvine Green | 239783 | | Pauline Harrison | 203556 |
| | Gillian Green | 203669 | | Elizabeth Harvey | 284831 |
| | Hazel Janice Green | 283889 | | Jan Harvey | 231097 |
| | Judith M. Green (Letts) | 141351 | | Patricia G. Harvey | 299040 |
| | Lynette Green | 205650 | | Rosemary Harvie | 112718 |
| | M. Green | 283891 | | Suzan Harwood | 234423 |
| | Margaret Green | 283893 | | Aileen Haskell | 284832 |
| | Ruth Gregory | 283896 | | Margaret Hassan | 203657 |
| | Melcilyn Grey | 209356 | | Mary Edwina Hassett | 284834 |
| | Betty Griffin | 204592 | | Pamela Hasson | 284836 |
| | Joyce Griffiths | 204662 | | Irene Haunton | 249666 |
| | Christine Grigg | 203539 | | Patricia A. Haverty | 203580 |
| | Jean Grinter | 283900 | | Barbara Hawkins | 284838 |
| | Janet Pamela Grinyer | 283902 | | Robin Hayden | 287392 |
| | Linda Mary Grinyer | 283904 | | Jennifer G. Haye | 299228 |
| | Vilma Grizzle | 204584 | | Jeannette A. Hayes | 204673 |
| | Marie Ann Grogan | 204679 | | Valerie Hayes | 203653 |
| | Pauline Groombridge | 283906 | | Mary Josephine Haynes | 203486 |
| | Brenda Ground | 283908 | | Rose O. Hayter | 216286 |
| | Luella Gulley | 287389 | | Margaret R. Hayward | 205657 |
| | Maureen Anita Haddon | 203514 | | Marjorie Hayward | 284840 |
| | Gloria E. Hadley | 239854 | | Florence Betty Haywood | 284842 |
| | Leslie Haines | 84614 | | Adair He | 288414 |
| | | | | Margaret Head | 205646 |
| | | | | Kathleen Margaret Heal | 284843 |
| | | | | Anne Healey | 284847 |

| APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER | APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER |
|---|---|---|---|---|---|
| | Susan Healey | 284845 | | Kim Jean Hughes | 153199 |
| | Anne M. Hedges | 245654 | | Lesley Hughes | 207994 |
| | Linda Hemphill | | | Mary Hughes | 247718 |
| | Jeanette Hasel Hencher | 284849 | | Philomena Ann Hughes | 284887 |
| | Dorothy A. Henderson | 5294 | | Shirley Hughes | 207972 |
| | Cellastine Hendley | 204582 | | Janet Humphreys | 209198 |
| | Jean E. Henry | 239775 | | Frances Hunt (Howells) | 284896 |
| | Stephanie Hensher | 284851 | | Lydia M. Hunt | 203531 |
| | Christine Herbert | 207977 | | Margaret R. Hunter | 284899 |
| | Vera D. Herbert | 226856 | | Mary Elizabeth Rita Hurt | 284901 |
| | Theresa Hewat | 284855 | | Dorothy Hutchings | 153201 |
| | Sandra Hewes | 216311 | | Margaret Hutchison | 231108 |
| | Joan A. Hewett (estate) | 284857 | | Dennis Hutchison | 231109 |
| | Cynthia Hewitt | 227361 | | Sandra Hynes | 284903 |
| | Olive Hewitt | 249669 | | Ann V. Ikin | 284905 |
| | Sheila Hewson | 282909 | | Christine Iles | 216305 |
| | Barbara Ann Hewston | 203594 | | Edna M. Ind | 231504 |
| | Charlotte Hickcox | 287393 | | Pauline Insull | 203620 |
| | Bridget M.C. Hickey | 284859 | | Margaret Anne Isdale | 203508 |
| | Marion Hickman | 205683 | | Margaret O. Ison | 205699 |
| | Hazel M. Highfield | 284861 | | Janet Ives | 284907 |
| | Margaret Hiley | 204621 | | Janice E. Iveson | 284909 |
| | Elizabeth Hill | 299230 | | Megan Jacka | 231511 |
| | Gillian Hill | | | Cherri Jackson | 287396 |
| | Kathleen Paula Hill | 284863 | | June Anne Jackson | 203528 |
| | Sheila Hill | 203607 | | Suzanne Jackson | 285705 |
| | Susan Hill | 284864 | | Davina Jacobs | 84681 |
| | Lynn Hind | 282972 | | Phillipa D. Jacobs | 282973 |
| | Carole Ann Hine | 203465 | | Susan Maxine Jacobs | 217238 |
| | Susan Hinman–Brown | 14418 | | Irene Jacques | 284912 |
| | Magdalena P. Hinton | 284866 | | Suvinder Kaur Jagdev | 282925 |
| | Margaret H. Hinton | 216282 | | Angela James | 153203 |
| | Mavis Hinton | 282897 | | Anne T. James | 205652 |
| | Joan E. Hitchco | 208025 | | Audrey James | |
| | Sheila A. Hitchinson | 239823 | | Barbara Anne James | 284914 |
| | Pauline Hobby | 207077 | | Catherine M. James | 284916 |
| | Dorothy M. Hobley | 208013 | | Christine James | 284918 |
| | Elizabeth Hodges | 285703 | | Molly James | |
| | Valerie Hodges | 284870 | | Wendy M.A. James | 284920 |
| | Michael Hodges | 284871 | | Begum Jan | 216313 |
| | Helen K. Hodgetts | 239773 | | Karen Jan | 17184 |
| | Joan M. Hodgson | 284872 | | Meewa Jan | 239799 |
| | Patricia Hodgson | 207991 | | Jennifer Mary Jeans | 284922 |
| | S. Hodgson | 203655 | | Anita Jefferies | 203491 |
| | Diane Hogan | 227363 | | Caroline Jeffries | 205698 |
| | Linda Holby | 287394 | | Nusrat Jehan | 282924 |
| | Ginette Holdcroft | 209329 | | Anne G. Jelbert | 209351 |
| | Patricia Holding | 203541 | | Linda Jelfs | 209199 |
| | Patricia Ann Holland | 216281 | | Enid Jenkins | 227365 |
| | Roseanne Hollingbery | 142283 | | May Jenkins | 284924 |
| | Anthony Hollingbery | 142284 | | Patricia N. Jenkins | 239825 |
| | Beverley Marie Holloway | 284874 | | Sandra Jenkins | 209177 |
| | Susan M. Holloway | 223710 | | Shirley Jenkins | 203503 |
| | Judith Holt | 207033 | | Tessa Jenkinson | 284926 |
| | David Holt | 207034 | | Evelyn Jenks | 284928 |
| | Deree Holton | 286354 | | Anne Jennings | 284930 |
| | Patricia M. Hope | 284879 | | Jane Jennings | 284932 |
| | Ruth J. Hopkins–Green | 282473 | | Maureen Jennings | 284934 |
| | Muriel Hopwood | 224847 | | Marie Jerrold | 284936 |
| | Ann Horne | 284881 | | Mary Phoebe Jessop | 284937 |
| | Sandra Horth | 70824 | | Angela Johns | 284938 |
| | Marlene McKeown Hoskins | 209340 | | Avril M. Johnson | 204657 |
| | Marilyn Houlberg | 287395 | | Beverly Johnson | |
| | Jacqueline House | 203468 | | Elaine Johnson | 284940 |
| | Mary L. Houston | 203663 | | Josephine Johnson | 224836 |
| | Jean Howarth | 284883 | | Patricia Johnson | 239782 |
| | Rose Miriam Howat | 284884 | | Patsy Johnson | 204648 |
| | Janet Howells | 284885 | | Vera A. Joiner | 226886 |
| | Linda S. Hubbard | 203568 | | Anne Q. Jones | 249662 |
| | Christine A. Hudson | 215446 | | Barbara A. Jones | 209345 |
| | Anne Hughes (Odling) | | | Carol A. Jones | 284942 |
| | Diana Hughes | 142285 | | Carolyn J.P. Jones | 284944 |
| | Florence Hughes | 291650 | | Christine H. Jones | 205629 |
| | | | | Claire A. Jones | 226859 |
| | | | | Gail Georgina Jones | 188155 |
| | | | | Hilda Jones | 204674 |

| APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER |
|---|---|---|
| | Jacqueline Jones | 203557 |
| | Jane Jones | 284946 |
| | Lesley K. Jones | |
| | Linda Jones | 284948 |
| | Linda A. Jones | 203561 |
| | Queenie Jones | 284950 |
| | Valerie E. Jones | 204677 |
| | Jeanne Margaret Jordan | 284952 |
| | Suzanne Jordan | 284953 |
| | Phyllis Joyce | |
| | Barbara Jury | 284954 |
| | Joyce Justice | 287397 |
| | Deborah Kako | 207035 |
| | Marjo Kalo | 131607 |
| | Barbara Kane | 284946 |
| | Daljit Kaur | 203498 |
| | Gurdial Kaur | 243654 |
| | Jagir Kaur | 299041 |
| | Joginder Kaur | 205690 |
| | Surinder Kaur | 239838 |
| | Linda Kayne | 284958 |
| | Mumtaz Begum Kazi | 204565 |
| | Brenda Teresa Keane | 288421 |
| | Lynne Kear | 284959 |
| | Betty Keeffe | 203603 |
| | Angela Keeling | 284963 |
| | Maureen A. Keen | 23731 |
| | Johanna Kelleher | 284967 |
| | Alice Kelly | 204969 |
| | Doris Kelly | 299249 |
| | Elizabeth Kelly | 205703 |
| | Isla Kelly | |
| | Jennifer Kelly | 282974 |
| | Kristine Kelly (estate) | 17628 |
| | Margaret A. Kelly | 284971 |
| | Margaret M. Kelly | 212429 |
| | Carol Kelsey | 153204 |
| | Karen Kelsey | 231114 |
| | Elizabeth Ann Kempson | 226897 |
| | Jacqueline Kennedy | 204645 |
| | Mary I. Kennedy | 203471 |
| | Sandra Kennedy | 287400 |
| | Susan Kennedy | 203593 |
| | Sarah Kenny | 239787 |
| | Karen Luwanna Kerkhoff | 207036 |
| | Patricia Mary Kershaw | 284975 |
| | Angela Kerwin | 284977 |
| | Lal Zara Khan | 203609 |
| | Chandra Khiani | 212359 |
| | Sue Kibbe | 192611 |
| | Kathleen Anne Kidley | |
| | Anne Marie Killingback | 295361 |
| | Valerie Killingbeck | 284981 |
| | Valerie G. Kilpatrick | 203627 |
| | Frances King | 205681 |
| | June M. King | 204640 |
| | Marianne King | 153205 |
| | Sylvia Frances King | 204663 |
| | Gwendoline Rose Kingston | 203616 |
| | Mary P. Kinnavane | 284983 |
| | G.M. Kirkpatrick | 284985 |
| | Bernadette Knight | 284987 |
| | Christine Knight | 284989 |
| | Jean Knight | 284991 |
| | Joan Knight | 204590 |
| | Carol Knott | |
| | Carole Knowles–Baker | 255198 |
| | Estelle S. Kohn | 287405 |
| | Rosemary Komraus | 287406 |
| | Elisabeth Ellen Kondal | 284995 |
| | Kathleen G. Korpa | |
| | Georgina A. Kosniowska | 284997 |
| | Darshna Kour | 204567 |

| APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER |
|---|---|---|
| | Ronee Krakowiak | 24230 |
| | David Krasner | |
| | Irene Krause | 287407 |
| | Eleanor LaFave | 227367 |
| | Ingrid LaTrobe | 285017 |
| | Barbara Labrow | 284999 |
| | Debra M. Ladwig (Morchower) | 231141 |
| | Sylvia Laing | 285001 |
| | Angela Lamb | 285003 |
| | Evelyn A. Lambert | 285005 |
| | Cecily Lamberti | 62248 |
| | Annette Lambourne | 285007 |
| | F.A. Lancaster | 285009 |
| | L.V. Lane | 285010 |
| | Shelley M. Lane | 204694 |
| | Shirley Lane | |
| | Susan Joyce Lane (O'Dwyer) | 19002 |
| | June Lang | 285011 |
| | Sheila Lang | 257758 |
| | M. Langley | 285014 |
| | Sandra G. Langston | 203501 |
| | Beverly Lapacek | 285708 |
| | Teresa Larkin | 285015 |
| | Roseanne Lasorsa | 199867 |
| | Eileen J. Lathan | 204651 |
| | Ruth Lathan | 203588 |
| | Maureen Launchbury | 216317 |
| | Lesley Lavelle | 203467 |
| | Yvonne Lawes | 207083 |
| | Michael Lawes | 207084 |
| | Maureen A. Lawless | 204659 |
| | Elizabeth W. Lawlor | 209174 |
| | Barbara Lawrence | 285020 |
| | Betty A. Lawrence | 237084 |
| | Christina Lawrence | 282926 |
| | Gillian Lawrence | 285022 |
| | Norma Lawrence | 285023 |
| | Audrey O. Layton | 226839 |
| | Dorothy Ann Lazenby | 285025 |
| | Norma A. Lea | 231505 |
| | Christine Ann Lee | 205654 |
| | Elizabeth Lee | 285027 |
| | Pauline Lee | 285029 |
| | Valerie S. Leeney | 204594 |
| | Rita Leese | 299031 |
| | Rose May Leese | 285033 |
| | Barbara Leigh | 285035 |
| | Stella C. Leigh | 226877 |
| | Suzanne Levay | 120889 |
| | Sandra E. Levitz (Lunner) | 17084 |
| | Alexandra R.M. Lewis | 285038 |
| | Ann Lewis | 24878 |
| | Dorothy V. Lewis | 203606 |
| | Elaine M. Lewis | 285040 |
| | Gabrielle Lewis | 285046 |
| | Gwendoline Lewis | 299250 |
| | Jacqueline Lewis | 285044 |
| | Janet Lewis | 243655 |
| | Kathleen M. Lewis | 224855 |
| | Lynda Lewis | 285048 |
| | Mary Lewis | |
| | Pamela Mary Lewis (estate) | 285042 |
| | Yvonne Lewis | 203664 |
| | Eunice Leyland | 285050 |
| | Christine Liggins | 605810 |
| | Patricia A. Limoge | 287410 |
| | Raymond W. Limoge | 287411 |
| | June P. Lincoln | 285052 |
| | Elizabeth W. Lindsay | 224830 |
| | Carley D. Lines | 285712 |
| | Jacqueline Littleford | 224841 |
| | Lael Livak | 287414 |
| | Frances Livingston–Ra | 285056 |
| | Anita J. Llewellyn | 215460 |
| | Janet Lloyd | 204649 |

| APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER |
|---|---|---|
| | Yvonne Lloyd | 216285 |
| | Bernadette Lodge | 120792 |
| | Glennis Swift Loe | 285710 |
| | Maureen Loeffler | 84777 |
| | Sandra Longmire | 249483 |
| | Vivienne Longstaff | 285058 |
| | Carol S. Love (Palombi, C.) | 285061 |
| | Carol Love | 285059 |
| | Audrey Lowe (estate) | 94949 |
| | Christine Lucas | 285063 |
| | Doreen Lucas | 285065 |
| | Jennifer Lucas | |
| | Elizabeth Luck | 285067 |
| | Jennifer Lumley | 283657 |
| | Gillian Lumsdon | 239781 |
| | Christine Lutterman | 285069 |
| | Gloria J. Lyford | 58299 |
| | Sheila Lynch | 285071 |
| | Teresa Carmel Lynch | 285072 |
| | Deirdre Lynn (aka Kerrigan) | 98009 |
| | Mary Lyons | 299032 |
| | Elizabeth MacDonald | 132000 |
| | Wendy MacKenzie | 285073 |
| | Dimity Mackie | 285714 |
| | Elaine Macnamara | 23847 |
| | Jean Madden | 285075 |
| | Jean R. Maddocks | 285077 |
| | Mary Ann Maguire | 282482 |
| | Sarah Maguire | 243656 |
| | Joyce E. Maber | 209212 |
| | M. Malik | 285079 |
| | Shelagh Mallalieu | |
| | Pamela Mallinson | 241350 |
| | Ann Malone | 285081 |
| | Patti Maloney | 270256 |
| | Sheila Malsbury | 226884 |
| | Christine Mann | |
| | Pat Mann | 285083 |
| | Valerie M. Mann | 285085 |
| | Yvonne Marchant | 285087 |
| | Elizabeth Marcotte | 249225 |
| | Amy Marcus | 207042 |
| | Joan Mardner | 205675 |
| | Ester Margolis | |
| | Gwyneth M. Marison | 285089 |
| | Irina Markova | 84797 |
| | Dorothy Marsden | 285091 |
| | Elizabeth Ann Marshall | 285093 |
| | Nola Marshall | 285095 |
| | Sheila Marshall | 208237 |
| | Gloria Martell | 288343 |
| | Barbara Martin | 285097 |
| | Celia Martin | 285099 |
| | Eileen Martin | 216278 |
| | Elaine Martin | 285101 |
| | Elizabeth Martin | 195931 |
| | Glennis Maxine Martin | 60021 |
| | Jillian M. Martin | 247719 |
| | Julie Martin (estate) | 285105 |
| | Pamela Martin | 216308 |
| | Gloria Martins | 209355 |
| | Lynne Maselan | 227369 |
| | Lachmi Masih | 203642 |
| | Furruck Masood | 209183 |
| | Patricia Margaret Massocchi | 285107 |
| | Brenda Masters | 285109 |
| | Vera Mather | 219508 |
| | Carol Matthewman | 285110 |
| | Janet Maughan | |
| | Teresa Maughan | |
| | Martha J. Maund | 285184 |
| | Valerie Maw | 285112 |
| | Mary May | 285114 |

| APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER |
|---|---|---|
| | Renee Y. May | |
| | Carole McAllister | 153206 |
| | Julia McAllister | 287416 |
| | Denni McCann | 249235 |
| | Janet Martha McCann | 285116 |
| | Marie T. McCann | 209209 |
| | Shirley McCann | 209348 |
| | Christine McCarthy | 285117 |
| | Donna McCarthy | 287417 |
| | Lloyd McCarthy | 287418 |
| | Susan McChesney | 257759 |
| | Pauline McClenaghan | 216300 |
| | Janice McCrae | |
| | Irma McCray | |
| | Heather McCrory | 28050 |
| | J.M. McCullough (Brookes) | 216323 |
| | Christine McDermott | 285118 |
| | Esmerelda McDonald | 204668 |
| | Rose Joan McEnery | 282898 |
| | Isabella Fiske McFarlin | |
| | Amelia C. McGann | 205677 |
| | Annie McGann | 285120 |
| | Linda McGeever | 247720 |
| | Sarah McGettigan | 203574 |
| | Jean McGill | 285121 |
| | Hilary E. McGrath | 215454 |
| | Patricia Marie McGrath | 216318 |
| | Pauline McGrath | 285122 |
| | Ann P. McGuigan | 224851 |
| | Rita McHale | 285124 |
| | Marilyn McKay | 203629 |
| | Yevonne McKay | 285126 |
| | Patricia McKenna | 285128 |
| | Delsada McKenzie | 299251 |
| | Edna T. McKnight | 203548 |
| | Sarah McKnight | 285130 |
| | Elizabeth McLennan | 287419 |
| | Mary T. McLennan | 287420 |
| | Keith McLennan | 287421 |
| | Susan McLeod | |
| | Annie McManus | 282910 |
| | Eileen M. McNally | 241354 |
| | Maureen McNally | 207964 |
| | Eileen McNeill | 285132 |
| | Sharon McNicol | 287422 |
| | Jeanette McQuaker | 203518 |
| | Sarah McSweeney | 285134 |
| | Anne Meddings | |
| | Emma Meekins | 287423 |
| | Ted B. Meekins | 287424 |
| | Mubarka Mehta | 239796 |
| | Stella L. Mellor | 282976 |
| | Sandra L. Melnyk | |
| | C. Mendonea | 285136 |
| | Susan Mero (Birtles) | 10780 |
| | Helen Merrigan | 285138 |
| | Ellen J. Merrins | 239840 |
| | Bobbi Mersereau | 84826 |
| | Janet Messenbird | 207085 |
| | Maira Miczek | 12311 |
| | Elizabeth Maud Middlemist | 285140 |
| | Margaret T. Middleton | 285142 |
| | Susan H. Middleton | 207976 |
| | Amanda Midlam | 29745 |
| | Yvette Milazzo–Brombacher | 285143 |
| | Leo Milazzo–Brombacher | 285144 |
| | Sheila B. Miles | 226746 |
| | Sheila L. Miles | 203497 |
| | Margaret M. Millage | 204554 |
| | Icilda V. Miller | 299252 |
| | Marion E.L. Miller | 285145 |
| | Susan Miller | 84835 |
| | Louis Miller | 84836 |
| | Hazel B. Millington | 205694 |
| | Janet Millman | 243658 |
| | Sylvia Millns | 285149 |

| APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER | APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER |
|---|---|---|---|---|---|
| | Pauline Mills | 285151 | | Deborah J. Nason | 84858 |
| | Rosemary J. Mills | 204653 | | Rawza Nasser | 231489 |
| | Dawn Milner | 226858 | | Delia Nassim | 285208 |
| | Sonia Milsom | 285153 | | National Women's Health Network | 6584 |
| | Clarice Mitchell | 203680 | | Winifred Neal | 203554 |
| | Frances Mitchell | 285155 | | Doreen O. Neale | 285210 |
| | Linda J. Mitchell | 247721 | | Doreen Neary | 203537 |
| | Veronica Mitchell | 285157 | | M.T. Neate | 285212 |
| | Wendy Moger | 299044 | | Thelma Needham | 285214 |
| | Mary Theresa Molloy | 239810 | | Nola Nelson | 285723 |
| | Stella Monday (Nathan) | 302221 | | C.A. Denise Neve | 285216 |
| | Marie Monk | 285159 | | Margaret Newboult | 295355 |
| | Elizabeth Ann Moody | 295344 | | Kathryn Newbound | 285218 |
| | Margaret Moody | 285161 | | Ann Newby | 208001 |
| | Virginia Moody | 261342 | | Carol Ann Newell | 226905 |
| | Margaret Moon | 285163 | | Jeanette Newman | 285220 |
| | Jean Mooney | 285165 | | Mildred Newton | 285222 |
| | Jacqueline Moorcroft | 203526 | | Rita Newton | 285224 |
| | Ann Moore | 203638 | | Susan T. Nichols | 285225 |
| | Claudia Moore | 293210 | | Mary Nieporte | |
| | Doreen D. Moore | 285167 | | Patricia Nightswander | |
| | Henrietta J. Moore | 285170 | | Pamela Nightingale | 285227 |
| | Jean Moore | 285169 | | Mary Nisbett | 203504 |
| | Jennifer Mary Moore | | | Rita Nobbs | 285229 |
| | Leigh Moore | 237518 | | Beatrice E. Nock | 282912 |
| | Vera L. Moore | 204669 | | Gillian Nock | 204602 |
| | Elizabeth Ann Moran | 285173 | | Joan Nolan | |
| | Kathleen Moran | 207043 | | Josephine A. Norman | 203570 |
| | Christine P. Moreton | 203596 | | June Norman | 203674 |
| | Vera K. Moreton | 209204 | | Pauline Marie Norman | 42317 |
| | Doreen M. Morgan | 203479 | | Barbara Normand | 287426 |
| | Elizabeth L. Morgan | 204562 | | Kathleen Norton | 203605 |
| | Susan M. Mornington | 207978 | | Irene Notley | 209343 |
| | Edith Nkhala Morothoane | 285175 | | Patricia Novikoff | 183368 |
| | Jean Morris | 207985 | | Mark Novikoff | 183369 |
| | Joan A. Morris | 209362 | | Marilyn Nuske | 153210 |
| | Mary A. Morris | 299253 | | Sarah V. Nutley | 285232 |
| | Maureen Morris | 285176 | | Susan Margaret Nuttall | 285230 |
| | Shawn Morse | 137391 | | Susan Nutter | 270855 |
| | Luisa Mosa | 84847 | | Glenda J. Nye | 38262 |
| | Jack Mosa | 84848 | | Eileen Bridget O'Brien | |
| | Valerie A. Moscow | 285178 | | Florence M. O'Brien | 209195 |
| | Susan E. Moseley | 239829 | | Kathleen S. O'Brien | 203649 |
| | Betty A. Moss | 204650 | | Margaret O'Callaghan | 243659 |
| | Margaret Mott | 287425 | | Kathryn Marie O'Connor | 287429 |
| | June Mottershead | 285180 | | Connie O'Dell (O'Driscoll) | 285236 |
| | Marcia Moulton | 84849 | | Marie O'Donoghue | 224827 |
| | Mary Moulton | 285182 | | Margaret O'Flaherty | 203560 |
| | Susan Mowll | 285186 | | Esther Elizabeth O'Gorman | 285238 |
| | Catherine Moyes | 285188 | | Margaret A. O'Hagan | 204604 |
| | Heather Muco | 285719 | | Yvonne O'Hara | 285240 |
| | Lynn Mudd | 282978 | | Veronica S. O'Neil | 282928 |
| | Morag G. Muego | 285190 | | Carmel O'Neill | 153212 |
| | Susan Mulhall | 241239 | | Linda C. O'Neill | 203463 |
| | Sandra Mullany | 204637 | | Norma O'Neill | 204603 |
| | Theresa Mullen | 216329 | | Kathleen O'Reilly | 7119 |
| | Carol Mullet | 285192 | | Theresa O'Reilly | |
| | Sylvia A. Mulligan | 285194 | | Timothy O'Reilly | |
| | Norma Mumby | 285198 | | Susan O'Shaughnessy | 227371 |
| | Pamela Mumford | 203492 | | Suzanne Okrent | 285242 |
| | June Y. Munro | 285196 | | C. Oladipo | 285244 |
| | Gail Murfin | 203472 | | Joan Oleskevich | |
| | Joan Mary Murfin | 285200 | | Christine Oliver | 205705 |
| | Brenda Murphy | | | Mary Ollerenshaw | 204605 |
| | Deidre Veronia Murphy | 285202 | | Barbara Oreton | 203618 |
| | Diana E. Murphy | 205639 | | Patricia A.F. Osborne | 285247 |
| | Jane Murphy | 285204 | | Patricia A.L. Osborne | 203587 |
| | Linda Murphy | 121051 | | Eunice Owen | 28593 |
| | Wendy Murphy | 285721 | | Gaynor Owen (estate) | 285248 |
| | Joanne T. Myers | | | Jennifer Owen | 285250 |
| | Cynthia Nadeau | 197219 | | Ruth Owens | |
| | Janet Naim | 285206 | | Lisa Padilla | |
| | Marian Nankivell | 285722 | | Elise Padmore | 203603 |
| | | | | Sarah Page | 325462 |
| | | | | Eileen E. Palmer | 204607 |

| APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER | APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER |
|---|---|---|---|---|---|
| | Laurann Pandelakis | 84888 | | Pauline Porter | 285301 |
| | George Pandelakis | 84889 | | Eileen Potter | 209319 |
| | Janette A. Panek | 239839 | | S. Pottinger | 285303 |
| | Sheena Panton | 285256 | | Alice J. Potts | 282949 |
| | Ellen Pareis | 287431 | | Margaret Pover | 285307 |
| | Madhu Ben Parekh | 226888 | | Everett Pover | 285308 |
| | Barbara Parker | 287433 | | Christine Powell | 216275 |
| | Maureen Parker | 285259 | | Margaret Powell | 285309 |
| | Sandra Parker | 210461 | | Pamela Powell | 299233 |
| | Christine Parkes | 204609 | | Margaret Power | 205648 |
| | Maureen Elizabeth Parkes | 227107 | | Farida Pradhan | 287441 |
| | Susan Ann Parkin (Disney) | 283723 | | Anne Pratt | 285310 |
| | Rachel M. Parkins | 203549 | | Jean Preedy | 149520 |
| | Rosemary P. Parkinson | 205679 | | Andrea Prentice | 227373 |
| | Marlene K. Parry | 209357 | | Audrey E. Price | 249667 |
| | Mary Parry | 285260 | | Mary Price | 207090 |
| | Kathleen M. Partridge | 203507 | | Maureen Price | 234415 |
| | Patricia Partridge | 285262 | | Martine A. Prichard | 203613 |
| | Monica Patel | 203572 | | Agnus Primus | 203615 |
| | Jacqueline A. Patterson | 285264 | | Alvarene Prince | 203543 |
| | Janet Pattison | 285266 | | Linda S. Prince | 203577 |
| | Jennifer Patullo | 153213 | | Jennifer Pritchard | 285313 |
| | Bianca Pauza | 153214 | | Hazel M. Prosser | 241357 |
| | Barbara Payne | 205665 | | Jean Lesley Prosser | 204610 |
| | Susan Payne | 240985 | | Jennifer Pugh | 207966 |
| | Gillian Peach | 224829 | | Elizabeth M. Purnell | 102096 |
| | Judy Peacocke | 30956 | | Andrea Quail | 7042 |
| | Diane S. Pearce | | | Norma B. Rabaiotti | 285315 |
| | Mary Pediani | 285268 | | Stella J. Rabbits | 204596 |
| | Elizabeth Pellett | 216336 | | Diana Rabone | 226907 |
| | Jennie Pelotte | 287435 | | Lucy Raby | 285317 |
| | Sheila Pender | 285270 | | Sheila Race | |
| | Kathy Penfield | | | Naomi L. Radovan | 207999 |
| | John Penfield | | | Gladys Ragland | 291649 |
| | Janice Penny | 285272 | | Sharon R. Rainbird | 203495 |
| | Jean Pennycook | 106702 | | Jean Rainville | 287443 |
| | Catherine J. Pepper | 209182 | | E.M. Ramsay | 282982 |
| | Jennifer Pepper | 287437 | | Elaine Randall | 224848 |
| | Julie Jean Mary Percy | 285274 | | Margaret W. Rankin | 207967 |
| | Annette June Perkin | 285275 | | Gayle Raphanel | 84926 |
| | Sally Perkins | 285277 | | Lynda J. Ratcliff | 28152 |
| | Antoinette Perks | 285278 | | Ivy Ravenhill | 215445 |
| | Lesley Perks | 208017 | | Janet Rawe | 207046 |
| | C. Perry | 285280 | | Pauline Reading | 285320 |
| | Gilde Perry | 285282 | | Sheryl Reardon | 285322 |
| | Susan Peterken | 207088 | | Janine Records | 287446 |
| | Johanna Petersen | 84904 | | Katherine Reece | 285326 |
| | Kathryn Peterson | 84905 | | Patricia A. Reece | 209363 |
| | Sharon Pfeifer | 287438 | | Diane Reed | 203590 |
| | Diane I. Phillips | 208008 | | Gillian P.M. Rees | 285328 |
| | Pearlyn Phillips | 299034 | | Mary Ellen Regen | 216292 |
| | Erica G. Philpotts | 226904 | | Deirdre Reid | 241351 |
| | Judith Phipps | 285284 | | Heather Reid | 285330 |
| | Tina L. Piddington | 216302 | | Julia Reidy | 606331 |
| | Susan Myra Pilton | 295357 | | Margaret Ann Reidy | 265562 |
| | Linda Pinchera | 285286 | | Helen Remphrey | 153217 |
| | Sylvia Pinfield | 209352 | | Coral Rendall | 285332 |
| | Sheila Pinner | 216303 | | Mary Reohorn | 285334 |
| | Marilyn A. Piri | 209368 | | Mary Ann Restall | 216299 |
| | S.K. Pitman | 285288 | | Jennifer Revis | 285336 |
| | Linda C. Pitt | 209341 | | M.O. Reynolds | 285338 |
| | Lynne Plant | 285290 | | Brenda Rheeston | 203524 |
| | Rhonda Plant | 153216 | | Catherine Rhodes | 239802 |
| | Lyndon Plante | 84914 | | Christine Rice | 257760 |
| | Christine M. Pointon | 285292 | | Carol Richards | 285340 |
| | Maria Pollakis | 120891 | | Elaine Richards | 239859 |
| | Penelope Pollock | 285293 | | Angela Patricia Richardson | 285342 |
| | Joanne Pomeranz | 287440 | | Jean Richardson | 285344 |
| | Murial Poole | 204606 | | Pearl Richardson | 203538 |
| | Wendy A. Pope | 285295 | | Angela Ride | 224839 |
| | Heather Popham | 285297 | | Joyce Rigby | 231500 |
| | Diana M. Porter | 239779 | | Emma Rikert | 106182 |
| | Helen Porter | 285299 | | Sandra Robbins | 285349 |
| | | | | Susan Robbins | 216289 |
| | | | | Valerie Roberston | 285353 |
| | | | | Margaret Roberts | 207048 |

| APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER |
|---|---|---|
| | Margaret R. Roberts | 285347 |
| | Linda Robertson | 287448 |
| | Peter Robertson | 287449 |
| | June Rose Robinson | 209200 |
| | Pamela A. Robinson | 285359 |
| | Sheila Robinson | 285361 |
| | Susan Robinson | 209324 |
| | Rosemary Robjohn | 282985 |
| | Anne Roddick | 285363 |
| | Christy Ann Rodgers | 227374 |
| | Norma Roe | 203502 |
| | Caroline Roeves | 285364 |
| | Annie Rogers | 299259 |
| | Kathleen Rogers | 285366 |
| | Peter Rogers | 285367 |
| | Linda Rogers | 208247 |
| | Margaret Rogers | 204611 |
| | Mary Linda Rogers | 208247 |
| | Roberta Rogers | |
| | Maureen Rood | 285368 |
| | Janet Rooney | 285370 |
| | Joyce Rose | 181805 |
| | Edna Ross | 285374 |
| | Jacqueline Ross | 188921 |
| | Jean Ross | 257761 |
| | Kathleen M. Ross | 285376 |
| | Ruth M. Ross | 285379 |
| | Pauline Ross-White | 285380 |
| | Hilary Caryl Rothwell | 285382 |
| | Valerie Round | 239817 |
| | Isobell H. Rouse | 205680 |
| | Janice Rouse | 295341 |
| | Kerry A. Rowe | 285726 |
| | Barbara A. Rowley | 205655 |
| | Christine Rowley | 285386 |
| | Rita Roxburgh | 285388 |
| | Angela Roy | 84954 |
| | Dahn Roy | 84955 |
| | Nora P. Roy | 215441 |
| | Roseanne Ruiz | |
| | Aldolphe Ruiz | |
| | Patricia K. Rumens | 285390 |
| | June K. Russell | |
| | Miriam Russell | |
| | Diane Rust | 285392 |
| | Celia Ryan | 299235 |
| | Maura Ryan | 248356 |
| | Anna Ryder | 84964 |
| | Irene Sabbar | 231507 |
| | Paula Sacchinelli | |
| | Nicholas Sacchinelli | |
| | Kathleen Sackett | 282953 |
| | Mari Said | 248238 |
| | Diane Sait | 285394 |
| | Marcia Salmond | |
| | Sheila Salt | 231508 |
| | Janet Salzman | 204521 |
| | Linda Sameja | 239845 |
| | Fiona M. Sandercock | 285728 |
| | Rhoda H. Sanders | 51169 |
| | Helen Sanderson | |
| | Alwyn Sandiford | 285396 |
| | Dr. Patricia M. Santer | 285398 |
| | Jane Sasonow-White | 291643 |
| | Jane Savoie | |
| | Ann E. Sawyer | 241356 |
| | Helga Scaiffe | |
| | Dawn M. Scarrott | 204634 |
| | Yvonne Schaloske | 227375 |
| | Jacqueline Schaverein | |
| | Janet Schebella | 84973 |
| | Betty H. Schilling | 209358 |
| | Mary Schobert | 249318 |

| APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER |
|---|---|---|
| | Cheralyn A. Schofield | |
| | Peggy L. Schrader | |
| | Maria J.H. Schreuder | 285400 |
| | Elizabeth H. Schwartz | 203483 |
| | Amanda Scott | 285403 |
| | Philip Scott | 285404 |
| | Joan Scott | 285405 |
| | Lydia Scott | 207049 |
| | Martha Scott | 285407 |
| | Rowena Scott | 285409 |
| | V.A. Scott | 282987 |
| | Vera Ellen Scott | 205691 |
| | Doreen M. Seager | 205664 |
| | Elizabeth Seagrim | 285730 |
| | Ann Seamarks | 285412 |
| | Monica Ann Sedgwick | 227377 |
| | Sandra A. Sedgwick | 226835 |
| | Christina Ann Seery | 204636 |
| | Margaret M. Seery | 209187 |
| | Sheila Selling | 285416 |
| | Gabriele R. Semrau | 285418 |
| | Betty I. Seviour | 203564 |
| | Eileen Shanahan | 204557 |
| | Cynthia Sharp | |
| | Dawn Sharp | 84986 |
| | Janet Sharp | 249326 |
| | Sandra Marie Eileen Sharp | 170983 |
| | Alison M. Sharpe | 226872 |
| | Patricia Sharpe | 307552 |
| | Ann P. Sharples | 282915 |
| | Carol Ann Sharples | 216321 |
| | Barbara Shaughnessy | 203542 |
| | Blanche Shaw | |
| | Helen Shaw | 204552 |
| | Rosalind Shaw | 239833 |
| | Susan J. Shaw | 285425 |
| | Linda Sheedy | 204635 |
| | Jane Sheehan | 282988 |
| | Mary Sheehy | 285427 |
| | Patricia Sheekley | 285428 |
| | Sheila Sheldon | 285430 |
| | Andrea Shelling | 285434 |
| | Elaine Shepard | 83479 |
| | Jennifer Shepherd | 203519 |
| | Shirley Shepherd | 203474 |
| | Mary Jacqueline Sheppard | 209322 |
| | Dorothy E.A. Sheridan | 285436 |
| | Janet Shields | 207050 |
| | Esther Shifra | 207960 |
| | Marquerite Alwyn Shorland | 285437 |
| | E.N. Shorrock | 285438 |
| | Anita Shurey | 285439 |
| | Rita Sidaway | 299260 |
| | Mary Elsie Sidebotham | 282955 |
| | Nirmal Sikand | 216334 |
| | Beverly Anne Silk | 248266 |
| | June Sillitoe | |
| | Mina Silvester | 209178 |
| | Barbara Simkiss | 226895 |
| | Anne M. Simmonds | 285443 |
| | Susan Simmonds | 208027 |
| | Lynn Simms | 215447 |
| | Norma Simms | 215443 |
| | Valerie Simms | 282916 |
| | Angela Simpson | 208026 |
| | Ann W. Simpson | 285444 |
| | Lynn Simpson | 285446 |
| | Moira Simpson | 285448 |
| | Mary Ann Sinfield | 285450 |
| | Anastasia Sinnott | 203648 |
| | Penelope Skelbeck | 285452 |
| | Christine Skelton | |
| | Patricia Skidmore | 285453 |
| | Beverly Skwira | |
| | Anita D. Slater | 204633 |
| | Diana Slater | 285455 |

| APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER | APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER |
|---|---|---|---|---|---|
| | John Slater | 285456 | | Bernadette Mary Stephens | 285501 |
| | Gail S. Slater | 295348 | | Cristine M. Stevens | 17476 |
| | Gillian Slater | 285457 | | Jacqueline Stevens | 194934 |
| | Susan Slater | 224831 | | Pamela M. Stevens | 204550 |
| | Valerie K. Slayter | 203659 | | Maureen Stevenson | 234419 |
| | Margaret Sleator | 285459 | | Jean Stirling | 285506 |
| | June Small | 216337 | | Shireen Stoddart | 285507 |
| | Marjorie Small | 205702 | | Charity Norton S. Stokes | 223635 |
| | Janice Smart | 231509 | | Barbara Margaretta Stone | 285508 |
| | Jean Smethurst | 285462 | | Laurie Stone | |
| | Catherine Smid | 287455 | | Sheila Stone | 285510 |
| | Charles J. Smid | 287454 | | Debbie Stone | |
| | Ann J. Smith | 203476 | | Sheila Stoneman | 285512 |
| | Barbara Smith | 287456 | | Mary Stovell | 285514 |
| | Carole Ann Smith | 285464 | | Betty Clare Streator | |
| | Christine Smith | 203480 | | Sheila Strong | 203633 |
| | Christine A. Smith | 204570 | | Linda Stuchbury | 285517 |
| | Cynthia Diane Smith | 285465 | | Karen Sturtivant | 285516 |
| | Elizabeth Smith | 285467 | | Doreen Sullivan | 285519 |
| | Frances M. Smith | 207092 | | Justine Sullivan | |
| | Glenis M. Smith | 209211 | | Regina Sullivan | |
| | Holly L. Smith | 285469 | | Valerie Sullivan | 285521 |
| | Hyacinth Smith | 203597 | | Elizabeth Summerfield | 203466 |
| | Jean Smith | 210948 | | Diana M. Summers | 239786 |
| | Josephine Martina Smith | 285471 | | Joan Sumner | 203530 |
| | Joyce Smith | 215465 | | Ellen Surlak | 207052 |
| | June Smith | 285473 | | Hansaben Surti | 249664 |
| | Lucille Smith | 208005 | | Christine I. Sutcliffe | 203535 |
| | Mabel Iris Smith | | | Helene Louise Sutcliffe | 285523 |
| | Margaret Smith | 216319 | | Maria Ann Sutherland | |
| | Marilynn Smith | 285474 | | Anne Sutton | 226841 |
| | Mary R. Smith | 226864 | | Georgia Sutton | 85028 |
| | Maureen Smith | 216320 | | Mary Rose Swain | 204573 |
| | Norma Smith | 203608 | | Elaine Sweeney | 224853 |
| | Patricia K. Smith | 204632 | | Greta Sweeney | 226874 |
| | Shirley A. Smith | 285476 | | Susan Sweeney | 285525 |
| | Thelma Smith | 231493 | | Carole Swingell | 203660 |
| | Theresa Smith | 207982 | | Deborah Syme | 287462 |
| | Wendy Smith | 203490 | | Lorraine Syme | 285527 |
| | Terrina Snelson | 239842 | | Evi Szakolcai | 287464 |
| | Galina Solodchin | 285477 | | Judith Taber | 8595 |
| | Margaret J. Songhurst | 285481 | | Maureen Tabrett | 285529 |
| | Mairi Sosna | 285482 | | Alexandrina Taggart | 239768 |
| | Marjorie P. Southan | 207965 | | Jean Alice Tart | 203558 |
| | Leslie Southwell | | | Christine R. Taylor | 203650 |
| | Ronald Southwell | | | Elizabeth Taylor | 285530 |
| | Mildred Ann Spain | | | Jean Taylor | 285532 |
| | Andrea Spalding | 204568 | | Linda Taylor | 187656 |
| | Elsa A. Spaull | 204630 | | James Taylor | 188998 |
| | Alice Speid | 285484 | | Marilyn Taylor | 285533 |
| | Eileen Spence | 285486 | | Ruth Maureen Taylor | 285535 |
| | Christine Torode Spencer | 226876 | | Susan Taylor | |
| | Jeannette Spencer | 205682 | | Debbie Teague | 102641 |
| | Susan E. Spencer | 209360 | | Susan Teece | 285537 |
| | Sylvia Spencer | 285488 | | June C. Tetley | 239788 |
| | Clarinda M. Spinelli | 287458 | | Mary A. Thatcher | 153218 |
| | Patricia Squire | 224832 | | Joan Yvonne Theriault | 105067 |
| | Margaret R. Squirrell | 285490 | | Audrey Thomas | 204601 |
| | Catherine Stahan | | | Clara D. Thomas | 22684 |
| | Joy Staley | 285492 | | Dorothy Thomas | 204627 |
| | Caroline A. Stanbury | 285494 | | Pamela M. Thomas | 208029 |
| | Stephanie Standberg | 287459 | | Shirley Thomas | |
| | S.C. Stanford | 208018 | | Veronica Eileen Thomas | 285539 |
| | Frances Stanley | 203676 | | Maureen S. Thomason | 204624 |
| | Margaret R. Stanley | 239861 | | Anne S. Thompson | 249538 |
| | Suzanne Stanley | 209201 | | Beryl Thompson | 285541 |
| | Laila Stansfield | 142287 | | Claire M. Thompson | |
| | Daphne Startup | 207094 | | Gaye Thompson | 293998 |
| | Janette P. Stebbens | 209207 | | Janis Thompson | 285543 |
| | Anneliese Stedeford | 226887 | | Jayne E. Thompson | 209184 |
| | Jacqueline Pamela Steele | 226708 | | Linda Thompson | |
| | Mary Steele | 285498 | | Nora Thompson | 153220 |
| | Marta Stefan | 285500 | | Molly Thorkildsen | 270937 |
| | | | | Pauline Thorne | 204623 |
| | | | | Janet Thornley | 209332 |
| | | | | Freda Thurgood | 204587 |

| APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER |
|---|---|---|
| | Vivien Tierney | 54010 |
| | Kay Tilbrook | 216268 |
| | Mary Frances Till | 285545 |
| | Susan Till | 209333 |
| | Charlotte Timms | 207053 |
| | Carole Tod | 287468 |
| | Christine Tombs | 239794 |
| | Susan Elizabeth Tomlin | 285547 |
| | Susan Tongue | |
| | Elizabeth M. Toomey | 285549 |
| | Georgina Toon | 239850 |
| | Margaret M. Torres | 285551 |
| | Sarah Trainor | 239815 |
| | S.C. Trendall | 285555 |
| | Shirley P. Trimble | 239819 |
| | Christine Trueman | 239865 |
| | Glenda J. Truman | 605813 |
| | Erica Tubb | 285733 |
| | Esther Tuckley | |
| | June A. Tudor | 241353 |
| | Janet M. Tuffin | 257763 |
| | B.M. Tunnicliff | 285557 |
| | Mavis Turburfield | 153284 |
| | Dorothy Ann Turner | |
| | Irene S. Turner | 231501 |
| | Jackie Turner | 285503 |
| | Maureen Turner | 285559 |
| | Doreen Twedell | 207096 |
| | Susan B. Tye | 149551 |
| | Mary B. Tyler | 204620 |
| | Maureen A. Tyler | 299236 |
| | Janet Underwood | 205672 |
| | Jill M. Urwin | 285561 |
| | Ann Vallantine | 285563 |
| | Audrey Valunes | |
| | Myra Jane Van Heck | 142289 |
| | Beryl M. Vann | 285565 |
| | Maria Vassiliou | 285567 |
| | Annette Vaughan | 209370 |
| | Gwendolyn Vaughan | 285569 |
| | Julie Vaughan | 285571 |
| | Dorothy E. Venn | 285573 |
| | Suzanne Venus | 285735 |
| | Jane Veress | 285575 |
| | Joyce Vickers | 285577 |
| | Patricia M. Viggers | 208016 |
| | Rossana Villella | 207098 |
| | Ann Vincent | 209336 |
| | Janet June Vincent | 203600 |
| | Nerelyn Virgo | 215456 |
| | Jillian E. Vodden | 299262 |
| | Christine Ann Voisey | 285579 |
| | Dilys C. Vokes | 204619 |
| | Susan Volman | 249370 |
| | Rosemary Vukmanich | 287470 |
| | Sheila Wadham | 295874 |
| | Janice Wagoner | |
| | Catherine A. Wain | |
| | Maureen Wainman | 204577 |
| | Joan M. Waite | 209354 |
| | Elizabeth Waite | 285581 |
| | Elizabeth Wake | 285583 |
| | Patricia Waldie (Knowles) | 184784 |
| | Barbara M. Waldron | 205474 |
| | Janet Waldron | 209350 |
| | Denise Mary Wales | 285585 |
| | Angela Ann Walker | 234007 |
| | Caroline J. Walker | 205645 |
| | Linda S. Walker | 216314 |
| | Marjorie Walker | 234417 |
| | Mary Walker | 207100 |
| | Pauline Walker | 285587 |
| | Valerie Walker | |
| | Patricia Wall | 205662 |
| | Dawn Wallace | |
| | Dorothy Wallace | 285591 |
| | Sue Walliser | 208930 |
| | Dorothy Lofthouse Walmsley | 285593 |
| | Marlene Walmsley | 208020 |
| | Mary Walmsley | 285596 |
| | Harriot Walsh | 282917 |
| | Kathleen B. Walsh | 205635 |
| | Pauline Walsh | 203672 |
| | Carole Ann Walton | 203534 |
| | Veronica Warburton | 285600 |
| | Ellen M. Ward | 203671 |
| | Joylon Ward | 209342 |
| | Julia Ward | 18381 |
| | Margaret Ward | 204618 |
| | Dawn Warfield | 204561 |
| | J. Wark | |
| | Barbara M. Warrilow | 204615 |
| | Barbara Waterhouse | 305472 |
| | Beryl Waterhouse | 285602 |
| | Carol Ann Watkins | 204616 |
| | Donna Watkins | 285404 |
| | Margaret P. Watkins | 203632 |
| | Angela Watson | 285608 |
| | Gillian Dorothy Watson | 67177 |
| | Kim Watson | 299269 |
| | Linda M. Watson | 285610 |
| | Maureen Watson | 285611 |
| | Annette Williams | 226871 |
| | Christine Williams | 209192 |
| | Colleen Ann Williams | |
| | Gaye Williams | 153224 |
| | Jeannette Williams | 181793 |
| | Judith Williams | 248182 |
| | Mary Williams | 207054 |
| | Rosalie Williams | 3450 |
| | Susan I. Williams | 204613 |
| | Sheila Willis | 215440 |
| | Denise A. Willmore | 204617 |
| | Jennifer Wills | 285737 |
| | Alison J. Wilson | 285637 |
| | Barbara Wilson | 285639 |
| | Dr. Janet Wilson | 295351 |
| | Janis Bell Wilson | 285641 |
| | Kara Jane Wilson | 285643 |
| | Louise Lorella Wilson | 285644 |
| | Margaret Wilson | 203510 |
| | Maria Wilson | 285646 |
| | Marlene C. Wilson | 153226 |
| | Mary Rose Wilson | 285648 |
| | Phyllis Wilson | 285649 |
| | Susan L. Wilson | 285651 |
| | Sylvia Wilson | 285653 |
| | Eileen Winant | 285655 |
| | Joan Winder | 285657 |
| | Janet Windibank | 265607 |
| | Beatrice Gail Windsor | |
| | Dale Francis Windsor | |
| | Marlene Winfield | 285661 |
| | Hazel M. Winter | 285662 |
| | Hazel D. Winter | 208009 |
| | Claire A. Winteringham | 285664 |
| | Florence Wisener | 287476 |
| | Ann Withington | |
| | Linda Wolstencroft | 285667 |
| | Linda M. Wontor | 7989 |
| | Carol Roma Wood | 285671 |
| | Joan M. Wood | 243661 |
| | Mary M. Wood | |
| | Sandra Wood | 226851 |
| | Barbara Woods | 285673 |
| | Helen Woodward | 285674 |
| | Hilary D. Woodward | 240984 |
| | Jean M. Woollaston | 239824 |
| | Joy Ann Workman | 239797 |
| | Joy Lee Worle (Lee) | 285028 |
| | Ellen Worlledge | 285677 |
| | Carol A. Worrall | 209321 |
| | Barbara Wright | 205671 |
| | Patricia Wright | 142290 |

| APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER | APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER |
|---|---|---|---|---|---|
| | Rosemary Wright | 208012 | | Ronald Orient Donatelli | 270676 |
| | Jackie Wyartt | 203643 | | Virginia Donatelli | 270677 |
| | Audrey Wyatt | 21068 | | Marquita Dotson | 270696 |
| | Jennifer Wyatt | 239826 | | Doris Dove–Lucas | 270726 |
| | Barbara Yates | 209347 | | Gail Maury Draper | 270668 |
| | Vicki Barbara Yerby | 276081 | | Dean Duffey | 270809 |
| | Sheona York | 208004 | | Susan Duffey | 270808 |
| | Bernadette Young | 605814 | | Barbara Eccles | 24447 |
| | Diane K. Young | 270978 | | Louise Echt | 35557 |
| | Ingrid Young | 216298 | | Letha Naomi Elkins | 37459 |
| | Jolene Young | | | Ernest S. Ertel | 270719 |
| | Leslie Young | 285682 | | Linda Ertel | 270718 |
| | Jill B. Zagurskas | 216279 | | Marilyn Feinberg | 270725 |
| | Josephine Durkan | 606285 | | Elva Ferguson | 174987 |
| | Nancy Ewing | 325934 | | Beverly Fisher | 270712 |
| | Sarah Fleming | 245549 | | James Fisher | 270713 |
| | Ellen Goldberg | 292906 | | Sandra Foland | 270669 |
| | Margaret Elizabeth Haines | 265591 | | Ruth Frame–Adams | 270665 |
| | Yvonne Hall | 36894 | | L.C. Frame–Adams | 270688 |
| | Rosa Halperin | | | Karen Frazier | 85808 |
| | Virginia Henry | | | Claudio Gallo–Godoy | 270806 |
| | Serene Jenkinson | 9392 | | Sheila Gallo–Godoy | 270807 |
| | Dorothy Lanier | | | Barbara Galloway | 270731 |
| | Shelley Irene Lane | | | Melvin Galloway | 270732 |
| | Joan Leithead | | | John P. Getker | 189543 |
| | Winifred Lewis | 209155 | | Susan Getker | 189842 |
| | Hilary Margaret MacDonald | 226700 | | Barry Gibberman | 270804 |
| | Sara MacLurg | | | Nancy Gibberman | 270805 |
| | Barbara Malson | 264744 | | Judy Goldstein | 168393 |
| | Margo Mancusi | | | Zenovy Golembiowsky | 270803 |
| | Amy McLaughlin | | | Audria Golembiowsky | 270802 |
| | Khaleelah AbdulBadee | 270695 | | Cynthia S. Goodwin | 270690 |
| | David Adams | 270819 | | Arthur Griffin | 270801 |
| | Mary Ellen Adams | 270820 | | Valeria K. Griffin | 270800 |
| | Khadijah Ali–Bey | 171411 | | Deborah Hanna | 9012 |
| | June F. Allen (Rusnak) | 270734 | | Donna Harper | 237965 |
| | Linda Diane Allen | 19674 | | Laura Healey | 189603 |
| | Theadora Averiett | 152808 | | Michael Healey | 189602 |
| | Laura J. Baldwin | 270672 | | Billie Lynn Hill | 270692 |
| | Sandra Ann Barcus | 270818 | | Claudia Hill | 27751 |
| | Deborah Lynch Barton | 189756 | | Charles Hitner | 189604 |
| | Pennicia Beasley | 235592 | | Valdee D. Hitner | 189605 |
| | Paula Kaye Bender | 190653 | | Trina Holloway | 270703 |
| | Patricia Bevan | 17578 | | Felton Holloway | 270704 |
| | Rebecca Ann Bishop | 168927 | | Adeline Holt | 270798 |
| | Sherri Ann Blackford | 18081 | | Ralph Davis Holt | 270799 |
| | Alan C. Blake | 270816 | | Judith Ann Hopkins | 270797 |
| | Beverly Jane Blake | 270817 | | Johnnie Howell | 308685 |
| | Celia Borack | 270815 | | Ruby Howell | 270711 |
| | Robert Borack | 270814 | | LaVerne Hunter | 270796 |
| | Linda Sue Branden | 270714 | | Nelson Carver Hunter | 270795 |
| | Wilhemina Brinson | 45805 | | Joyce Hurst | 270793 |
| | Renee Brownlee | 170570 | | Thomas Hurst | 270794 |
| | Regina Butin | 137344 | | Carol Jacobs | 301415 |
| | Jeanette Cave | 137805 | | Edward Jakubs | 270736 |
| | Ronald Cerny | 270811 | | Linda Jean Jakubs | 270735 |
| | Sandra Cerny | 270812 | | Mamie Delores James | 270671 |
| | Joyce Christopher | 270699 | | Judy Jarzembak | 181641 |
| | Anthony J. Cirino | 270717 | | Ginny E. Johnson | 189606 |
| | Virginia Cirino | 270716 | | Daniel S. Jones | 270708 |
| | Vicki Clifford | 8660 | | Debra Jones | 270670 |
| | Nancy Cobedesh | 10437 | | Katrina Jones | 270707 |
| | Charlotte Coffee | 270810 | | Donna Elaine Jordan | 189609 |
| | Mary J. Colaric | 225183 | | Linda Kamandulis | 270720 |
| | Fannie Coleman | 123393 | | Michael A. Kamandulis | 270721 |
| | Cynthia Ann Collier | 270681 | | Jo Ann L. Kellam | 270740 |
| | Melvin D. Collier | 270680 | | Susan Kennedy | 270792 |
| | Anita Cummings | 151453 | | Linda Kimbleton | 270742 |
| | Ellen J. Curran | 270723 | | Henry Kimbleton | 270743 |
| | Margaret F. Czarnitzki | 270709 | | Betty Ann Moore | 270705 |
| | Alma Davis | 270674 | | James Moore | 270706 |
| | Bertha Davis | 270683 | | Marianne Moore | 270739 |
| | Brent Davis | 270673 | | Phyllis A. Morrison | 289230 |
| | Linda Sue Davis | 6150 | | Shirley Mullins | 194004 |
| | Shirlean Dean | 129854 | | Pauline A. Newton | 264811 |
| | Kathryn M. DeChant | 270694 | | Eva Nell Nicely | 17297 |
| | Patricia Devereaux | 319244 | | Marilyn Nickerson | 270684 |

| APPEAL NUMBER | APPELLANT | DALKON SHIELD NUMBER |
|---|---|---|
| | Grace Noble | 86994 |
| | Avonell Mays Norman | 84217 |
| | Judith Oskowski | 270679 |
| | Leonard Oskowski | 270678 |
| | Renee Owens | 270722 |
| | Sheryn Janette Perry | 270702 |
| | Sandra Pertee | 270663 |
| | Virgil Pertee | 270662 |
| | Gail M. Peterson | 270729 |
| | Gary G. Peterson | 270730 |
| | Fannie L. Phillips | 4175 |
| | Jefferica Poindexter | 270667 |
| | Patricia Pollard | 14719 |
| | Robert Powell | 270775 |
| | Sharon Powell | 270774 |
| | Gary W. Reece | 270772 |
| | Judith Ann Reece | 270773 |
| | Margaret G. Reid | 129847 |
| | Marian Reid | 270689 |
| | Jenny Reliford | 270771 |
| | Sharon L. Richard | 270697 |
| | Darlene J. Roach | 69044 |
| | Judith L. Rosen | 270727 |
| | Morton Rosen | 270728 |
| | Novimbrino Angela Rumbeau | 270733 |
| | Islene Runningdeer | 189615 |
| | Robert Salsgiver | 270770 |
| | Kathleen Salsgiver | 270769 |
| | Jane Satchel | 270698 |
| | Virginia Schulman | 80722 |
| | Dennis Scott | 189617 |
| | Jo Ann Scott | 189983 |
| | Judith Anne Scott | 189616 |
| | Norman D. Scott | 189982 |
| | Linda Mae Searcy | 192360 |
| | Jacqueline Shelton | 218897 |
| | Dale Shockling | 270767 |
| | Carolyn Shockling | 270768 |
| | Yvonne Simpson | 106628 |
| | Dora Ann Sipe | 189993 |
| | Barbara Sizemore | 173198 |
| | Catherine Teresa Smith | 270826 |
| | Donald C. Smith | 190106 |
| | Elizabeth A. Smith | 270766 |
| | Helen A. Smith | 190107 |
| | Wayne Smith | 270825 |
| | Wanda Denise Stanton | 190099 |
| | Barbara Strowder | 270765 |
| | David Sturgeon | 270764 |
| | Joann Lee Sturgeon | 270763 |
| | Rayneen Tisovic | 170896 |
| | Pamela Townley | 198575 |
| | Cheryl Urszeni | 270762 |
| | Steven Alexander Urszeni | 270760 |
| | Steven Urszeni | 270761 |
| | Harry Van Arsdale | 270758 |
| | Patricia Lee Van Arsdale | 270759 |
| | Kenneth Van Streader | 270827 |
| | Patricia Ann Van Streader | 270828 |
| | Johnny Waller | 270790 |
| | Marcolina Waller | 270821 |
| | Dona G. Ward | 199342 |
| | Jo Anne Warren | 270822 |
| | Jo Ann Whyte | 270823 |
| | Doreen E. Williams | 24157 |
| | Jeraldine Williams | 297365 |
| | Staria Wims | 270824 |
| | Bonnie Yappel | 270831 |
| | Debbie L. Yates | 25679 |
| | Nora Yisreal | 270701 |
| | Janelle Yonley | 270666 |
| 88–1766 | Diane Pinard | 7113 |
| | Dawn Gebo | 7306 |
| | Sandra Cassier | 7646 |
| | Patrick Cassier | 7647 |
| 88–3604 | Alexia Anderson | 225182 |
| | Barbara Anderson | 231938 |

